No. 24-1091

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

EDWARD A. WILLIAMS,

Plaintiff-Appellee,

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

**BRIEF FOR APPELLANTS**

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

JACQUELINE C. ROMERO
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
KEVIN B. SOTER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7222*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUE ..................................................................... 1

STATEMENT OF RELATED CASES ............................................................ 1

STATEMENT OF THE CASE ...................................................................... 2

    A.    Statutory Background ................................................................. 2

        1.    Section 922(g)(1) ............................................................ 2

        2.    Pennsylvania Penalties for Drunk Driving with Particularly Elevated Blood Alcohol Levels ........................ 4

    B.    Factual Background and Prior Proceedings ................................. 5

SUMMARY OF ARGUMENT ..................................................................... 10

STANDARD OF REVIEW ......................................................................... 12

ARGUMENT ............................................................................................ 12

Williams's challenge to Section 922(g)(1) lacks merit. .................................. 12

    A.    Governing precedent recognizes that Congress may disarm felons, at least as a general matter ............................................... 13

    B.    Section 922(g)(1) is constitutional as applied to Williams. ........... 19

        1.    Text, history, and tradition reflect that legislatures may disarm persons who have committed serious crimes and persons whose possession of firearms would endanger themselves or others. ............................... 19

        2.    The Second Amendment allows Congress to conclude that felony-equivalent offenses for recidivist drunk

driving are serious, dangerous crimes warranting disarmament. ................................................................ 29

3.    The district court's holding reflects an unwarranted extension of this Court's decision in *Range*. ...................... 34

4.    The government preserves arguments foreclosed by *Range*. ............................................................................. 40

CONCLUSION ......................................................................... 42

COMBINED CERTIFICATIONS

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                          **Page(s)**

*Avery v. Everett*,
    18 N.E. 148 (N.Y. 1888)................................................................. 20

*Barrett v. United States*,
    423 U.S. 212 (1976).................................................................... 28

*Begay v. United States*,
    553 U.S. 137 (2008), *overruled on other grounds by*
    *Johnson v. United States*, 576 U.S. 591 (2015) ........................... 29

*Binderup v. Attorney General*,
    836 F.3d 336 (3d Cir. 2016), *cert. denied*,
    582 U.S. 943 (2017)................................................... 7, 17, 27, 36

*Birchfield v. North Dakota*,
    579 U.S. 438 (2016)................................................................11, 30

*Bucklew v. Precythe*,
    587 U.S. 119 (2019)................................................................... 19

*Burgess v. United States*,
    553 U.S. 124 (2008).................................................................. 12

*Deming, In re*,
    10 Johns. 232 (N.Y. Sup. Ct. 1813)............................................ 20

*Dickerson v. New Banner Inst., Inc.*,
    460 U.S. 103 (1983)................................................................... 28

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)................................................................13, 14

*Folajtar v. Attorney General*,
    980 F.3d 897 (3d Cir. 2020) ...................................................... 20

*Hamilton v. Pallozzi,*
   848 F.3d 614 (4th Cir. 2017) ..................................................................... 20

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011)..................................... 14, 16, 22, 23, 36, 38

*Holloway v. Attorney General,*
   948 F.3d 164 (3d Cir. 2020), *abrogated on other grounds by*
   *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ................... 4, 8, 11, 13,
                                                                              31, 33, 40

*Kanter v. Barr,*
   919 F.3d 437 (7th Cir. 2019) ..................................................................... 36

*Lewis v. United States,*
   445 U.S. 55 (1980)..................................................................................... 28

*Logan v. United States,*
   552 U.S. 23 (2007)....................................................................................... 4

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010)...............................................................................14, 15

*Medina v. Whitaker,*
   913 F.3d 152 (D.C. Cir. 2019) ................................................................... 20

*Mitchell v. Wisconsin,*
   139 S. Ct. 2525 (2019) .............................................................................. 29

*New York State Rifle & Pistol Ass'n v. Bruen,*
   597 U.S. 1 (2022) ...............................................1-2, 8, 15, 16, 17, 18, 19, 22,
                                                                  28, 35, 35-36, 36, 37, 38, 39

*New York State Rifle & Pistol Ass'n v. City of New York,*
   140 S. Ct. 1525 (2020) .............................................................................. 14

*Range v. Attorney General,*
   69 F.4th 96 (3d Cir. 2023), *petition for cert. filed,*
   No. 23-374 (U.S. Oct. 5, 2023) ............................... 4, 8-9, 10, 12, 17, 18, 27,
                                                                  28, 32, 33, 34, 35, 36, 41

*Stradford v. Secretary Pa. Dep't of Corr.*,
  53 F.4th 67 (3d Cir. 2022)............................................................ 12

*United States v. Barton*,
  633 F.3d 168 (3d Cir. 2011), *overruled in part by*
  *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016)............................ 27

*United States v. Dubois*,
  No. 22-10829, 2024 WL 927030 (11th Cir. Mar. 5, 2024) .......................... 40

*United States v. Harper*,
  No. 1:21-cr-236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023) ................... 37

*United States v. Jackson*,
  69 F.4th 495 (8th Cir.), *petition for cert. filed*,
  No. 23-6170 (U.S. Nov. 28, 2023)............................................................ 40

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) ......................................................................... 17

*United States v. Perez-Garcia*,
  Nos. 22-50314, 22-50316, 2024 WL 1151665 (9th Cir. Mar. 18, 2024)....... 23

*United States v. Quailes*,
  No. 1:21-cr-176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) ................. 37

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010), *cert denied*,
  562 U.S. 1303 (2011) ................................................................................ 24

*Vincent v. Garland*,
  80 F.4th 1197 (10th Cir.), *petition for cert. filed*,
  No. 23-683 (U.S. Dec. 1, 2023)................................................................. 40

*Virginia v. Harris*,
  558 U.S. 978 (2009) .................................................................................. 29

*Williams v. Attorney General*:
  No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022)....................2, 8, 33
  No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022) ........................ 2, 8

**U.S. Constitution:**

Amend. II ................................................................................................. 13

**Statutes:**

Act of Oct. 3, 1961,
  Pub. L. No. 87-342, § 2, 75 Stat. 757, 757 ................................................. 12

Gun Control Act of 1968,
  Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-14 ............................. 3

Omnibus Crime Control and Safe Streets Act of 1968,
  Pub. L. No. 90-351, tit. IV, § 901(b), 82 Stat. 197, 226................................. 3

18 U.S.C. § 921(a)(20) .......................................................................... 3, 13

18 U.S.C. § 921(a)(20)(A) ........................................................................... 3

18 U.S.C. § 921(a)(20)(B) ........................................................................... 3

18 U.S.C. § 922(g)(1) ....................................................1, 2, 10, 12, 26

18 U.S.C. § 925(c) ................................................................................... 3-4

18 U.S.C. § 3559(a) .................................................................................. 13

23 U.S.C. § 163(a)-(b) .............................................................................. 30

23 U.S.C. § 164(a)(5) ............................................................................... 30

23 U.S.C. § 164(b) ................................................................................... 30

23 U.S.C. § 402(a)(2)(A)(iv).................................................................... 30

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 1331 .................................................................................... 1

Ala. Code § 13A-11-72(b) .................................................................... 32

Ark. Code Ann. § 5-73-309(8)(A) ....................................................... 32

Colo. Rev. Stat. Ann. § 18-12-203(1)(e) .............................................. 32

Del. Code Ann. tit 11, § 4205(b) ......................................................... 13

Del. Code Ann. tit 11, § 4206(a)-(b) ................................................... 13

Fla. Stat. Ann. § 790.06(2)(f) .............................................................. 32

Ga. Code Ann. § 16-11-129(b)(2)(J) .................................................... 32

10 Guam Code Ann. § 60109.1(b)(6) ................................................... 32

Haw. Rev. Stat. § 134-7(c)(1) .............................................................. 32

Ind. Code § 35-47-1-7(5) ..................................................................... 32

Kan. Stat. Ann. § 21-6301(a)(13) ........................................................ 32

Ky. Rev. Stat. Ann. § 237.110(4)(e) .................................................... 32

Mass. Gen. Laws ch. 140, § 131(d)(iii)(A) .......................................... 32

Md. Code Ann., Public Safety § 5-133(b)(4) ....................................... 32

Mo. Rev. Stat. § 571.070.1(2) .............................................................. 32

N.C. Gen. Stat. § 14-415.12(b)(5) ........................................................ 32

N.J. Stat. Ann. § 2C:58-3.c.(3) ............................................................ 32

Ohio Rev. Code § 2923.13(A)(4) .......................................................... 32

18 Pa. Cons. Stat. § 106(b)(6) ............................................... 1, 5, 6, 13

18 Pa. Cons. Stat. § 1104(1) .................................................. 1, 5, 6, 13

75 Pa. Cons. Stat. § 3802(a) ....................................................... 4

75 Pa. Cons. Stat. § 3802(b)-(c) ................................................. 4

75 Pa. Cons. Stat. § 3802(c) .................................... 1, 5, 6, 30, 31

75 Pa. Cons. Stat. § 3803(b)(4) ............................... 1, 5, 6, 30, 31

75 Pa. Cons. Stat. § 3804(c)(2) ..................................... 5, 31

75 Pa. Cons. Stat. § 3806(a)(1) ........................................... 6

62 Pa. Stat. Ann. § 481(a) ............................................... 42

P.R. Laws Tit. 25, § 462a(a)(3) ...................................... 32

S.C. Code Ann. § 16-23-30(A)(1) ..................................... 32

S.D. Codified Laws § 23-7.7.1(3) ................................... 32

W. Va. Code § 61-7-7(a)(2) ............................................. 32

**Regulation:**

27 C.F.R. § 478.144 ......................................................... 4

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ............................................ 1

**Legislative Materials:**

S. Rep. No 90-1097 (1968) ............................................ 3

Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585 ........... 26

Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237 ................. 26

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 ...................................... 25

Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94.................... 26

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 ................................... 25

Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1 .......................... 26

Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607, 608 ..................... 26

Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10 ..................................... 26

Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197 ....................... 26

Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586 .................... 26

Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477 ................................................ 26

Act of Mar. 28, 1872, ch. 996, §§ 10- 11, 1872 Ky. Acts, Vol. 2.................... 26

Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61, 62 ...................... 26

Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256........................ 26

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59..................................... 25

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 ................................. 25

Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (D.C.) ..................................... 26

Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188.................... 26

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ................................. 25

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170 ................................... 25

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30.................... 25

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274 ......................... 25

ix

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355........................ 25

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394 ......................... 25

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225.................................... 25

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ................................................. 25

Act of June 12, 1879, § 2, 1879 Ohio Laws 192 ............................................. 25

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80.......................................... 25

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 .................. 25

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 ............................... 25

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2 ............................ 25

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87....................... 25

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 ...................................... 25

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73.................................................. 25

Act of June 10, 1881, § 1, 1881 Pa. Laws 111, 112 ........................................ 25

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14.............................. 25

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 ............................ 25

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656 ................................... 25

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159......................... 25

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1 .................... 25

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157................. 25

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556 ................................ 25

x

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144 ........................ 25

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67 .............. 25

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 .................................... 25

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51 ..................................... 25

Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790 .......................... 26

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140 ....... 25

Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67 ..................................... 26

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69 ..................................... 25

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 ........................................ 25

Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116 .................................... 26

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.) .................................. 25

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 ........................ 25

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ................. 25

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 .................................... 25

Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851) ........................................ 26

Miss. Rev. Code ch. 77, § 2964 (1880) ......................................................... 25

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274 (1879) ............................................. 25

3 Jac. 1, c.5, § 16 (1605) (Eng.) .................................................................... 21

**Other Authorities:**

Act of Dec. 1775, *in The Public Records of the Colony of Connecticut
    From May, 1775 to June, 1776, inclusive* (Charles J. Hoadly ed., 1890) .......... 24

Act of 1776, *in 7 Records of the Colony of Rhode Island and Providence Plantations in New England* (John Russell Bartlett ed., 1862); ..................... 24

Act of May 1, 1776, ch. 21, § 2, *in 5 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* (1886) .................................................... 24

Act of 1777, ch. 6, § 9, *in 24 The State Records of North Carolina* (Walter Clark ed., 1905) .............................................................................. 24

Act of May 1777, ch. 3, *in 9 The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed., 1821) ............................................. 24

Act of Sept. 20, 1777, ch. 40, § 20, *in Acts of the General Assembly of the State of New-Jersey* (1777) ........................................................................ 24

Act of Apr. 30, 1855, §§ 1-2, *in 2 The General Laws of the State of California, from 1850 to 1864, inclusive* (Theodore H. Hitchell ed., 1865). .............................................................. 26

Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* (John M. Price et al. eds., 1868) .......................................... 26

Act of Jan. 5, 1871, § 1, *in 68 Ohio General and Local Laws and Joint Resolutions* (1871) ................................................................................. 26

Ark. Rev. Stat., ch. 78, § 1 (William McK. Ball & Sam C. Roane eds., 1838) ...................................... 26

4 William Blackstone, *Commentaries on the Laws of England* (1769) ....................................................................................... 19, 20, 21

Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 (2014) ...................................................................... 20

Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803 (R. H. Clark et al. eds., 1861) ................................................................. 26

4 *Journals of the Continental Congress* 1774-1789
(Worthington Chauncey Ford ed., 1906)................................................... 24

Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving*
*Under the Influence with Risk of Subsequent Arrest for Violent Crimes*
*Among Handgun Purchasers*, 180 JAMA: Internal Med. 35 (2019)............... 33

Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of*
*Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354 (1982) ..................... 21

Ky. Gen. Stat. ch. 29, Art. 29, § 1
(Edward I. Bullock & William Johnson eds., 1873) .................................. 25

Nat'l Highway Traffic Safety Admin., Dep't of Transp.,
DOT HS 809 911, *Traffic Safety Facts: 2004 Data*,
https://perma.cc/CM2L-WVT8 ............................................................ 31

Resolves of Apr. 6, 1776, *in 8 The Statutes at Large of Pennsylvania*
*from 1682-1801* (1902)...................................................................... 24

2 Bernard Schwartz, *The Bill of Rights: A Documentary History* (1971).............. 22

2 *The Documentary History of the Ratification of the*
*Constitution* (Merrill Jensen ed., 1976) ................................................22, 23

15 *The Public Records of the Colony of Connecticut, from May, 1775 to*
*June, 1776* (Charles J. Hoadly ed., 1890)..................................................... 21

## STATEMENT OF JURISDICTION

The district court had jurisdiction over plaintiff's challenge under 28 U.S.C. § 1331.  The district court entered final judgment on November 14, 2023, Appx3, and the government timely appealed on January 12, 2024, *see* Appx1; Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Federal law generally prohibits the possession of firearms by a person who has been convicted of "a crime punishable by imprisonment for a term exceeding one year."  18 U.S.C. § 922(g)(1).  The issue presented is whether the district court erred in holding Section 922(g)(1) unconstitutional as applied to Edward Williams, who was convicted in 2005 for recidivist driving under the influence at the highest rate of alcohol, a state-law offense punishable by up to five years' imprisonment.  *See* Appx5, 13, 17; Dkt. No. 73; 75 Pa. Cons. Stat. §§ 3802(c), 3803(b)(4); 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1).

## STATEMENT OF RELATED CASES

This case was previously before this Court.  After initially affirming the district court's decision granting summary judgment to the government, the Court granted panel rehearing and remanded the case to the district court for reconsideration in light of the Supreme Court's intervening decision in *New*

*York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *See Williams v. Attorney General*, No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022); *Williams v. Attorney General*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022).

Counsel for appellants are not aware of any pending related cases. We note, however, that distinct Second Amendment challenges to 18 U.S.C. § 922(g)(1) are presented in other cases pending before this Court. The legal issues presented here may also be affected by the Supreme Court's decision in *United States v. Rahimi*, No. 22-915 (U.S. argued Nov. 7, 2023), and its disposition of the government's petition for a writ of certiorari in *Garland v. Range*, No. 23-374 (U.S. filed Oct. 5, 2023).

## STATEMENT OF THE CASE

### A.    Statutory Background

### 1.    Section 922(g)(1)

In 18 U.S.C. § 922(g)(1), Congress prohibited a person from possessing a firearm in or affecting commerce if he has been convicted of a "crime punishable by imprisonment for a term exceeding one year." Section 922(g)(1) reflects Congress's longstanding recognition that the "ease with which" firearms could otherwise be acquired by "criminals[] . . . and others whose possession of firearms is similarly contrary to the public interest" is "a matter

2

of serious national concern." S. Rep. No. 90-1097, at 28 (1968). Congress has

explained that "it is not the purpose" of this or similar provisions of federal law

"to place any undue or unnecessary Federal restrictions or burdens on law-

abiding citizens." Omnibus Crime Control and Safe Streets Act of 1968, Pub.

L. No. 90-351, tit. IV, § 901(b), 82 Stat. 197, 226; Gun Control Act of 1968,

Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-14.

Section 922(g)(1) is subject to several exceptions. The provision does not

cover certain offenses "relating to the regulation of business practices." 18

U.S.C. § 921(a)(20)(A). It also does not cover state offenses that are "classified

by the laws of the State as a misdemeanor and punishable by a term of

imprisonment of two years or less." *Id.* § 921(a)(20)(B). And it does not cover

convictions that have "been expunged, or set aside or for which a person has

been pardoned or has had civil rights restored." *Id.* § 921(a)(20).

Until 1992, Congress also allowed an individual to obtain relief from

Section 922(g)(1)'s bar to possessing a firearm by demonstrating to the Bureau

of Alcohol, Tobacco, Firearms and Explosives (ATF) that "the circumstances

regarding the disability, and [his] record and reputation, are such that [he] will

not be likely to act in a manner dangerous to public safety and that the

granting of the relief would not be contrary to the public interest." 18 U.S.C.

3

§ 925(c); *see also* 27 C.F.R. § 478.144 (delegating authority to the Director of ATF).  But since 1992, Congress has effectively suspended that provision by prohibiting the use of federal funds to process applications for relief.  *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

### 2. Pennsylvania Penalties for Drunk Driving with Particularly Elevated Blood Alcohol Levels

Responding to growing concerns about the dangers posed by the most egregious drunk drivers, the Pennsylvania legislature in 2003 enacted new penalties for persons convicted of driving with particularly elevated blood alcohol levels.  *See Holloway v. Attorney General*, 948 F.3d 164, 176 (3d Cir. 2020) (detailing legislative history of Pennsylvania's 2003 amendments), *abrogated on other grounds by Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc).  In addition to the offense of driving under "[g]eneral impairment" with a blood alcohol level of 0.08-0.10, *see* 75 Pa. Cons. Stat. § 3802(a), the 2003 amendments created two other offenses.  Those categories are driving under the influence (DUI) at a "[h]igh rate of alcohol," with a blood alcohol level of 0.10-0.16, and at the "[h]ighest rate of alcohol," with a blood alcohol level of 0.16 or higher.  *See id.* § 3802(b)-(c).

The Pennsylvania legislature enacted mandatory minimum penalties for these offenses that increase with each subsequent DUI offense.  As relevant

4

here, when an individual has one prior DUI offense and commits a second DUI at the highest rate of alcohol, the crime is punishable by a minimum term of imprisonment of three months and a maximum term of five years. *See* 75 Pa. Cons. Stat. §§ 3802(c), 3803(b)(4), 3804(c)(2); *see also* 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1). Penalties also include a minimum $1,500 fine, completion of mandatory alcohol safety driving education, and any required drug and alcohol treatment. 75 Pa. Cons. Stat. § 3804(c)(2). Under Pennsylvania's unique sentencing scheme, the label for crimes punishable by five years' imprisonment is "misdemeanor of the first degree." 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1).

## B.    Factual Background and Prior Proceedings

**1.** In 2000, Williams was pulled over in State College, Pennsylvania, arrested, and charged with driving under the influence with a blood alcohol level over 0.10. Appx4, 16.[1] He entered into Pennsylvania's Accelerated Rehabilitative Disposition program and was sentenced to 12 months of probation, required alcohol safety driving classes, surrender of his driver's

---

[1] In district court, certain factual material underlying the parties' cross-motions for summary judgment was filed under seal. This brief, however, relies solely on facts that are already matters of public record because they have been included in prior judicial decisions rendered in this case, none of which have been sealed.

license, and payment of court costs.  Appx5, 16.  Williams's 2000 DUI charge

was dismissed after he completed the Accelerated Rehabilitative Disposition

program, but under state law, the charge continued to constitute a "prior

offense" for sentencing purposes for subsequent DUI offenses.  Appx5, 16 &

n.3; *see* 75 Pa. Cons. Stat. § 3806(a)(1).

In 2001, Williams was arrested in Philadelphia for DUI.  Appx5, 17.

The charges were dismissed for unknown reasons.  *Id.*

In 2004, Williams was again arrested in Philadelphia for DUI.  Appx5,

17.  He was arrested at approximately 2:00 am, and a test conducted at

3:20 am indicated that his blood alcohol level was 0.223.  *Id.*  He was charged

and subsequently convicted in 2005 of driving under the influence at the

highest rate of intoxication, in violation of 75 Pa. Cons. Stat. § 3802(c).  *Id.*

Because Williams had a prior DUI offense, his conviction was a first-degree

misdemeanor punishable by up to five years' imprisonment.  *Id.*; *see* 75 Pa.

Cons. Stat. § 3803(b)(4); *see also* 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1).  He

was sentenced to 90 days to two years in prison, mandatory attendance at

alcohol safety driving school, fines and court costs, license suspension for 18

months, and imposition of an ignition interlock.  Appx5, 17.  Due to a medical

condition, the judge allowed Williams to serve his sentence under house arrest. *Id.*

**2.** Williams's 2005 conviction barred him from possessing a firearm under Section 922(g)(1), and that conviction also caused his license to carry a firearm to be revoked. Appx5, 17. Williams nevertheless continued to own approximately 20 firearms until 2014, and until 2010, he worked as a sales manager, firearms instructor, and range safety officer at a gun store and range, where he handled firearms and ammunition daily. Appx17-18. His duties included verifying that customers could purchase firearms consistent with state and federal law as well as understanding the applications needed to complete those purchases. Appx18. With respect to his own firearms license and purchase applications, Williams repeatedly made false statements about his disqualifying conviction. Appx18.

**3.** In 2017, Williams filed this lawsuit in the United States District Court for the Eastern District of Pennsylvania, claiming that Section 922(g)(1) is unconstitutional as applied to him under the framework adopted by this Court in *Binderup v. Attorney General*, 836 F.3d 336, 351-52 (3d Cir. 2016) (en banc), *cert. denied*, 582 U.S. 943 (2017). Initially, the district court rejected Williams's challenge, and this Court affirmed in a nonprecedential opinion.

7

*Williams v. Attorney General*, No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022).  As this Court recognized, Williams's claim was at the time foreclosed by *Holloway*, which rejected under *Binderup* an as-applied challenge asserted by an individual with the same disqualifying offense.  As *Holloway* had explained, "[d]runk driving is a dangerous and often deadly crime," and Pennsylvania's felony-equivalent recidivist drunk driving offense is both "serious" and involves conduct that "presents a potential for danger and risk of harm to self and others."  948 F.3d at 167, 173-77.

The Supreme Court then decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and Williams petitioned for rehearing en banc, arguing that this Court's nonprecedential decision was undermined by *Bruen*. This Court granted panel rehearing and remanded the case to the district court for reconsideration in light of *Bruen*.  *Williams v. Attorney General*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022).

**4.**  While the case was on remand, this Court decided *Range*, which held Section 922(g)(1) unconstitutional as applied to an individual whose disqualifying conviction was a Pennsylvania first-degree misdemeanor for making a false statement to fraudulently obtain food stamps.  69 F.4th at 98,

106. The parties renewed their cross-motions for summary judgment, and the district court granted Williams's motion.

The district court explained that it was "quite concerned about the prospect of granting access to firearms to persons who have demonstrably abused alcohol." Appx11. The court similarly acknowledged "the dangerousness of drunk driving" and "of combining firearm use and alcohol consumption," as well as noting "that Plaintiff's offenses were serious and his conduct . . . dangerous." Appx11. In the district court's view, however, this Court's "narrow analysis in *Range* also applies to the Plaintiff here" because the historical record does not reveal a sufficient "analogue to the present-day prohibition on firearm possession by those convicted of DUIs." Appx10, 12. The court distinguished historical regulations keeping firearms away from persons whose possession poses a danger to themselves or others, for example, because "the regulated conduct itself" did not strike the court as "analogous to Plaintiff's" conduct. Appx12. And historical regulations on the possession of firearms by intoxicated persons were different from Section 922(g)(1), the court reasoned, because "[n]one of these regulations allude to disarmament lasting beyond the individual's state of intoxication." Appx12. The court thus concluded that the Second Amendment protected Williams's right to retain

firearms although it recognized that Williams had been convicted of a felony-equivalent offense that is both serious and dangerous.

## SUMMARY OF ARGUMENT

Congress has generally restricted the possession of firearms by persons "convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Plaintiff Edward Williams is subject to that prohibition because he was a recidivist drunk driver convicted for operating a motor vehicle at more than twice the legal blood-alcohol content limit, an offense that the Pennsylvania legislature made punishable by imprisonment of up to five years with a minimum imprisonment term of 90 days. Application of Section 922(g)(1) to Williams comports with the Second Amendment.

The Court's task in interpreting the Second Amendment is to discern constitutional principles based on text, history, and tradition and apply those principles to the challenged regulations. This Court's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), *petition for cert. filed*, No. 23-374 (U.S. Oct. 5, 2023), held Section 922(g)(1) unconstitutional in one of its applications but did not announce which constitutional principles are most relevant to consideration of felon-possession prohibitions. At least two

10

principles supporting felon disarmament are well established in the Nation's historical tradition: (1) legislatures may disarm individuals who have committed serious crimes and (2) legislatures may disarm individuals whose possession of firearms would endanger themselves or others.

Each of these principles provides an ample, independent basis for disarming Williams, as his drunk driving offense is both serious and dangerous.  Recidivists driving with a particularly elevated blood-alcohol content are "the most dangerous offenders" of DUI prohibitions. *Birchfield v. North Dakota*, 579 U.S. 438, 465 (2016).  Legislatures uniformly agree that this is a serious crime, and the Pennsylvania legislature in particular established enhanced penalties for the most egregious forms of drunk driving.  And there is ample reason for legislatures to conclude that persons who repeatedly take reckless risks with motor vehicles would also endanger themselves and others if permitted to handle firearms.

This Court recognized in the context of a prior as-applied challenge to Section 922(g)(1) that the same offense for which Williams was convicted is both serious and dangerous.  *Holloway v. Attorney General*, 948 F.3d 164, 176 (3d Cir. 2020), *abrogated on other grounds by Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc).  While the multifactor test applied in *Holloway* has

11

been overtaken by intervening precedent, its bottom-line conclusion remains sound. The district court's contrary conclusion thus rested on a misunderstanding of this Court's decision in *Range*. This Court should correct that error, which would comport with the Court's assurance that the decision in *Range* is "a narrow one," 69 F.4th at 106, not one that extends to a recidivist DUI offender who is nothing "like Range," *id.* at 104 n.9, 106.

## STANDARD OF REVIEW

This Court reviews the district court's order granting summary judgment de novo. *Stradford v. Secretary Pa. Dep't of Corr.*, 53 F.4th 67 (3d Cir. 2022).

## ARGUMENT

### WILLIAMS'S CHALLENGE TO SECTION 922(G)(1) LACKS MERIT.

For more than six decades, Congress has restricted the possession, receipt, and transportation of firearms by felons—*i.e.*, persons who have been convicted of crimes "punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1); *see* Act of Oct. 3, 1961, Pub. L. No. 87-342, § 2, 75 Stat. 757, 757.[2] Application of that longstanding law to Williams based on

---

[2] Except where referring specifically to a state-law label, this brief uses the term "'felony'" as it is "commonly defined"—"to mean a crime punishable by imprisonment for more than one year," *Burgess v. United States*, 553 U.S. 124, 130 (2008). Some States use different terminology. Under Pennsylvania's unique sentencing scheme, for example, the label for crimes punishable by five

*Continued on next page.*

his recidivist drunk driving conviction does not violate "the right of the people to keep and bear Arms."  U.S. Const. amend. II.

### A.  Governing precedent recognizes that Congress may disarm felons, at least as a general matter.

**1.**  In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects the "right of law-abiding, responsible citizens" to possess handguns in the home for self-defense.  *Id.* at 635.  Consistent with that interpretation, the Court cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," and it described those restrictions as "presumptively lawful regulatory measures."  *Id.* at 626, 627 n.26.  The Court incorporated that understanding into its holding, ruling that

years' imprisonment is "misdemeanor of the first degree."  18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1).  Congress adopted a uniform federal definition of "crime punishable by imprisonment for a term exceeding one year," 18 U.S.C. § 921(a)(20), to ensure that Section 922(g)(1) turns on the substance of the State legislature's judgment regarding punishment, not the label.  Section 922(g)(1) thus treats similarly situated individuals similarly—whether they were convicted in Pennsylvania (where a variety of incontestably serious and dangerous offenses are called first-degree misdemeanors, *see Holloway v. Attorney General*, 948 F.3d 164, 175 (3d Cir. 2020) (collecting examples), *abrogated on other grounds by Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc)), in New Jersey (where crimes are divided by class without the labels "misdemeanor" and "felony," *id.* at 174-75), or under the laws of the many other jurisdictions that use the common definition of felony, *see, e.g.*, Del. Code Ann. tit 11, §§ 4205(b), 4206(a)-(b); 18 U.S.C. § 3559(a).

the plaintiff was entitled to possess a handgun only if he was "not disqualified from the exercise of Second Amendment rights"—meaning, among other things, that he was "not a felon" and was "not insane." *Id.* at 631, 635.  The Court stated that those "exceptions" to the Second Amendment had "historical justifications," which the Court would have "time enough to expound upon" "if and when those exceptions come before" it. *Id.* at 635.

In approving felon-disarmament laws, *Heller* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons." *New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., joined by Thomas and Gorsuch, JJ., dissenting).  As then-Judge Kavanaugh observed, "the Court in *Heller* affirmatively *approved* . . . felon-in-possession laws . . . based on a history- and tradition-based test." *Heller v. District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

*McDonald v. City of Chicago*, 561 U.S. 742 (2010), reaffirmed that understanding of the Second Amendment.  The plurality observed that the Court had "made it clear in *Heller* that [its] holding did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of fire-

14

arms by felons and the mentally ill." *Id.* at 786 (quotation marks omitted). The *McDonald* plurality "repeat[ed] those assurances." *Id.*

Similarly, in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Court repeatedly used the term "law-abiding citizen" to describe the class of persons protected by the Second Amendment. *See id.* at 9 ("ordinary, law-abiding citizens"); *id.* at 15 ("law-abiding, adult citizens"); *id.* at 26 ("law-abiding, responsible citizens" (quotation marks omitted)); *id.* at 29 ("a law-abiding citizen's right to armed self-defense"); *id.* at 30 ("law-abiding citizens"); *id.* at 31 ("ordinary, law-abiding, adult citizens"); *id.* at 33 n.8 ("law-abiding citizens"); *id.* at 38 ("law-abiding citizens"); *id.* at 38 n.9 ("law-abiding, responsible citizens" (quotation marks omitted)); *id.* at 60 ("law-abiding citizens"); *id.* at 70 ("law-abiding, responsible citizens"); *id.* at 71 ("law-abiding citizens"). And Justice Kavanaugh's concurrence, joined by the Chief Justice, repeated *Heller*'s statement that "prohibitions on the possession of firearms by felons" are "presumptively lawful regulatory measures." *Id.* at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quotation marks omitted); *see also id.* at 72 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about

15

restrictions that may be imposed on the possession or carrying of guns"
(citation omitted)).[3]

Many aspects of Second Amendment doctrine rest on the premise that
the Amendment protects only law-abiding citizens, not felons.  In judging
whether modern firearms regulations are consistent with their historical
precursors, courts must ask "how and why the regulations burden a law-
abiding citizen's right to armed self-defense."  *Bruen*, 597 U.S. at 29.  In
determining whether the Second Amendment protects particular types of
weapons, courts must consider whether those weapons are "typically possessed
by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625.  And the
government may require gun owners to pass background checks—which
include a check for felony convictions—because such checks ensure that those
who carry guns "are, in fact, 'law-abiding, responsible citizens.'"  *Bruen*, 597
U.S. at 38 n.9.

---

[3] In total, eight members of the *Bruen* Court have joined at least one
opinion expressly approving of *Heller*'s and *McDonald*'s reassurances regarding
felon-dispossession statutes.  In addition to separate opinions authored or
joined by five of the six members of the *Bruen* majority, the three dissenters in
*Bruen* recognized that "the Court's opinion" should be understood as "cast[ing]
no doubt on [the] aspect of *Heller*'s holding" permitting felons to be prohibited
from possessing firearms.  *Bruen*, 597 U.S. at 129 (Breyer, J., joined by
Sotomayor and Kagan, JJ., dissenting).

**2.** After *Heller* and *McDonald*, this Court adopted a two-step approach to analyzing Second Amendment challenges. *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). The Court held that although Section 922(g)(1) generally "comport[s] with the Second Amendment," some applications of the statute could be challenged under that two-step framework. *Binderup v. Attorney General*, 836 F.3d 336, 343, 346-47 (3d Cir. 2016) (en banc) (Ambro, J.), *cert. denied*, 582 U.S. 943 (2017).

*Bruen* abrogated the two-step approach and held that the constitutional analysis of firearm regulations must be "rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. This Court then applied the *Bruen* framework to Section 922(g)(1) in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), *petition for cert. filed*, No. 23-374 (U.S. Oct. 5, 2023). *Range* held that Section 922(g)(1) could not constitutionally be applied to a civil plaintiff who was disqualified from firearm possession due to a 1995 state-law misdemeanor conviction for making a false statement on an application for food stamps. *Id.* at 98-99, 106. The Court concluded that the conduct at issue was covered by the Second Amendment's plain text, *id.* at 101-03, and that the Government "ha[d] not carried its burden" to show that "applying § 922(g)(1)

to Range" would be "'consistent with the Nation's historical tradition of firearm regulation,'" *id.* at 103 (quoting *Bruen*, 597 U.S. at 24).

This Court's reasoning depended on "Range and his individual circumstances," and the Court emphasized that its new precedent should be understood as a "narrow" holding specific to those circumstances. *Range*, 69 F.4th at 105-06. The Court did not announce a governing test for determining what other felony-equivalent offender's individual circumstances, if any, might likewise fall too far afield of the relevant historical analogies. *See, e.g.*, *id.* at 104 n.9 (declining to decide whether "dangerousness" is the "touchstone" in light of the Court's conclusion that the historical analogues offered by the government did not demonstrate a sufficient basis to "disarm someone like Range").

Notwithstanding this Court's conclusion with respect to the facts at issue in *Range*, nothing in that decision forecloses the Court from recognizing that "a sound basis exists for § 922(g)(1)'s constitutional application in a substantial amount of cases." *Range*, 69 F.4th at 111 (Ambro, J., concurring). "Any historical inquiry that reaches a contrary result must be wrong in view of the answer the Supreme Court has already supplied." *Id.*

18

**B.      Section 922(g)(1) is constitutional as applied to Williams.**

>  **1.  Text, history, and tradition reflect that legislatures may disarm persons who have committed serious crimes and persons whose possession of firearms would endanger themselves or others.**

Under *Bruen* and *Range*, courts discern and apply "constitutional *principles*" from historical materials.  *Bruen*, 597 U.S. at 31 (emphasis added) (quotation marks omitted).  As noted, this Court has not yet decided which constitutional principles are most relevant to consideration of felon-possession prohibitions.  As relevant to this case, historical tradition establishes at least two principles that support felon disarmament: (1) legislatures may disarm individuals who have committed serious crimes and (2) legislatures may disarm individuals whose possession of firearms would endanger themselves or others.  Each principle provides an independent ground for disarming Williams.

*Serious crimes.*  Early legislatures had little occasion to enact laws explicitly disarming persons convicted of felonies.  In England and early America, the standard penalty for a felony—including a non-violent one—was death.  *See* 4 William Blackstone, *Commentaries on the Laws of England* 4, 98, 155, 156, 162, 163 (1769); *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019).  Many States also subjected certain felons to the complete forfeiture of their estates or

19

their goods and chattels. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn. 275-76 (2014) (collecting statutes). And some States enacted statutes carrying forward the common-law doctrine of "civil death," *In re Deming*, 10 Johns. 232, 233 (N.Y. Sup. Ct. 1813) (per curiam)— which involved "an extinction of civil rights," *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888), including the rights "to vote, to sit as a juror, *to bear arms*, [or] to marry," *id.* at 156 (Earl, J., dissenting) (emphasis added). These punishments were justified by the belief that a person can lose his legal rights by violating "his part of the [social] contract." 4 Blackstone, *supra*, at 375. This "widespread, continued condemnation of felons, including those who committed non-violent offenses, to death demonstrates that in 1791 Americans understood felons, as a group, to commit serious crimes." *Folajtar v. Attorney General*, 980 F.3d 897, 905 (3d Cir. 2020); *cf. Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[F]elonies were—and remain—the most serious category of crime deemed by the legislature to reflect 'grave misjudgment and maladjustment.'" (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017))).

Conviction for some non-capital offenses was, moreover, a potential basis for disarmament. For example, an English statute provided that a person

could not "keep arms" if he had been "convicted in a court of law of not

attending the service of the church of England."  4 Blackstone, *supra*, at 55; *see*

3 Jac. 1, c.5, § 16 (1605) (Eng.).  In 1624, Virginia punished a person for

"base" and "opprobrious" speech by ordering him "disarmed" and declaring

him ineligible to exercise "any priviledge or freedom" in the colony.  David

Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal*

*Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982) (quotation marks

omitted).  And in 1775, Connecticut enacted a statute providing that a person

who was convicted of "libel[ing] or defam[ing]" certain colonial resolutions

"shall be disarmed and not allowed to have or keep any arms."  15 *The Public*

*Records of the Colony of Connecticut, from May, 1775 to June, 1776,* at 193 (Charles

J. Hoadly ed., 1890).  Today these statutes would raise serious First

Amendment concerns, but they nonetheless shed light on the original

understanding of the Second Amendment—which incorporates the enduring

principle that legislatures may specify that disarmament may be imposed as a

consequence of conviction for serious crimes.

Key Founding Era sources expressly recognized that the right to bear

arms did not extend to persons who had committed serious crimes.  For

example, Antifederalists at the Pennsylvania ratifying convention proposed a

bill of rights that, among other things, forbade "disarming the people or any of them, *unless for crimes committed*, or real danger of public injury from individuals." 2 *The Documentary History of the Ratification of the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added). The Supreme Court has described this specific proposal as a "highly influential" Second Amendment "precursor[]" whose text accurately reflected founding-era "conceptions of the right to keep and bear arms." *Heller*, 554 U.S. at 604-05. And for good reason: The absence of a Bill of Rights did not persuade the Pennsylvania convention to reject ratification, 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627-28 (1971), but the Antifederalists' proposed amendments then "circulated throughout the country in newspaper, broadside, and pamphlet form," 2 *The Documentary History of the Ratification of the Constitution*, *supra*, at 617. And when the Bill of Rights was adopted, eight of its Amendments tracked provisions "first suggested as amendments in the proposals of the Pennsylvania minority," including the Second Amendment's right to bear arms. 2 Schwartz, *supra*, at 628. Some of the Second Amendment's most "influential" proponents, *Heller*, 554 U.S. at 604, thus understood the "'*pre-existing* right'" that the Amendment "'codified,'" *Bruen*, 597 U.S. at 20 (quoting

*Heller*, 554 U.S. at 592), as permitting legislatures to disarm convicted criminals.

***Danger to self or others.*** A second principle supporting felon disarmament flows from the Nation's historical tradition: Congress can disarm categories of individuals whose possession of firearms would endanger themselves or others. English law before the Founding allowed the disarmament of dangerous individuals; the influential Second Amendment precursor discussed above contemplated the disarmament of individuals who posed a "real danger of public injury," 2 *The Documentary History of the Ratification of the Constitution*, *supra*, at 598; nineteenth-century sources recognized legislatures' power to disarm individuals whose possession of arms would endanger the public; and American legislatures have been disarming such individuals since the seventeenth century, without any indication that these regulations were believed to be incompatible with the right to keep and bear arms. *See* Brief for the United States at 13-27, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023), 2023 WL 5322645 (collecting sources); *see also United States v. Perez-Garcia*, Nos. 22-50314, 22-50316, 2024 WL 1151665, at *14-16 (9th Cir. Mar. 18, 2024) (canvassing historical sources and explaining that "the historical record reflects that legislatures have long disarmed groups

23

or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others").[4]

In exercising that power, Congress need not require case-by-case findings of dangerousness. Congress may make categorical judgments about responsibility; "[t]hat *some* categorical limits are proper is part of the original meaning" of the Second Amendment. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), *cert. denied*, 562 U.S. 1303 (2011). For example, past legislatures enacted laws categorically disarming loyalists,[5] underage

---

[4] The historical tradition of disarming persons whose possession of firearms would endanger themselves or others is also relevant to the Second Amendment issue currently pending before the Supreme Court in *Rahimi*.

[5] *See* 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *in The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *in Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, *in* 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, *in* 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, *in* 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-61 (1902); Act of 1776, *in* 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of May 1777, ch. 3, *in* 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 282 (William Waller Hening ed., 1821).

individuals,[6] and vagrants[7]—each time without requiring case-by-case findings

of dangerousness or irresponsibility.  And many States likewise enacted

---

[6] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716; Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112; Act of Apr. 16, 1881, § 2, 1881 Ill. Laws 73; Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92; Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws 140.

[7] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225; Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964 (1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12, 1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

statutes allowing "habitual drunkards" to be committed to asylums or placed under guardians in the same manner as "lunatics."[8]

*Application of historical principles to Section 922(g)(1).* Felon disarmament falls within these traditions. This case involves a Second Amendment challenge to 18 U.S.C. § 922(g)(1), which applies only to certain individuals who have been convicted of crimes punishable by more than one year of imprisonment. Legislatures generally authorize punishment of more than one

---

[8] *See, e.g.*, Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10 (D.C.); Ark. Rev. Stat., ch. 78, § 1, at 456 (William McK. Ball & Sam C. Roane eds., 1838); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Ga. Code Pt. 2, Tit. 2, Ch. 3, Art. 2, § 1803, at 358 (R. H. Clark et al. eds., 1861); Act of Feb. 21, 1872, § 1, 1872 Ill. Laws 477; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of Mar. 2, 1868, ch. 60, § 5, *in The General Statutes of the State of Kansas* 553 (John M. Price et al. eds., 1868); Act of Mar. 28, 1872, ch. 996, §§ 10- 11, 1872 Ky. Acts, Vol. 2, at 523-524; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116; Act of Mar. 5, 1860, ch. 386, §§ 6-7, 1860 Md. Laws 607-608; Act of June 18, 1885, ch. 339, §§ 1-3, 1885 Mass. Acts 790; Act of Apr. 12, 1827, § 1, 1827 Mich. Terr. Laws 584-585; Minn. Terr. Rev. Stat. ch. 67, § 12, at 278 (1851); Act of Mar. 31, 1873, ch. 57, §§ 1, 3, 1873 Miss. Laws 61-62; Act of Mar. 3, 1853, ch. 89, § 1, 1853 N.J. Acts 237; Act of Feb. 7, 1856, ch. 26, § 1, 1855-1856 N.M. Terr. Laws 94 (1856); Act of Mar. 27, 1857, ch. 184, § 9, 1857 N.Y. Laws, Vol. 1, at 431; Act of Jan. 5, 1871, § 1, *in* 68 *Ohio General and Local Laws and Joint Resolutions* 6 (1871); Act of Feb. 1, 1866, No. 11, § 10, 1866 Pa. Laws 10; Act of Aug. 18, 1876, ch. 112, § 147, 1876 Tex. Gen. Laws 188; Act of Mar. 17, 1870, ch. 131, § 1, 1870 Wis. Gen. Laws 197.

At least one State in the mid-19th century also specifically disarmed "common drunkards." Act of Apr. 30, 1855, §§ 1-2, *in* 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

year of imprisonment only after concluding that persons who commit the

offense at issue have seriously disregarded the rule of law.  This Court in *Range*

concluded that Congress could not rely categorically on the common definition

of felony to identify serious crimes warranting disarmament.  But while the

Court concluded that "the Government did not carry its burden to provide a

historical analogue" for disarming a person convicted of a felony-equivalent

food-stamp fraud offense, *Range*, 69 F.4th at 104 n.9, it should nevertheless be

clear that "[m]ost felons have broken laws deemed to underpin society's

orderly functioning." *id.* at 112 (Ambro, J., concurring).

Section 922(g)(1) is also consistent with the tradition of imposing

categorical limits on the right to keep and bear arms when a legislature

concludes that members of the category pose a danger to themselves or others

with firearms.  Common sense suggests that "felons are more likely to commit

violent crimes" than are law-abiding individuals. *United States v. Barton*, 633

F.3d 168, 175 (3d Cir. 2011), *overruled in part by Binderup*, 836 F.3d at 349-50.

"[N]umerous studies" show a "link between past criminal conduct and future

crime, including gun violence." *Binderup*, 836 F.3d at 400 (Fuentes, J.,

concurring in part, dissenting in part, and dissenting from the judgments); *see*

*id.* at 400 n.160 (collecting studies).  And the Supreme Court has repeatedly

recognized that persons who have been "convicted of serious crimes," as a class, can "be expected to misuse" firearms. *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 119 (1983); *see, e.g.*, *Lewis v. United States*, 445 U.S. 55, 67 (1980) ("The federal gun laws . . . [focus on the] fact of conviction . . . in order to keep firearms away from potentially dangerous persons."); *Barrett v. United States*, 423 U.S. 212, 220 (1976) ("The history of [Section 922(g)] reflects a similar concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons.").

While this Court in *Range* declined to conclude that felons as a category can be disarmed, the individual challenger in that case stood "apart from most other individuals subject to § 922(g)(1) whom we fear much like early Americans feared loyalists or Reconstruction-era citizens feared armed tramps." *Range*, 69 F.4th at 112 (Ambro, J., concurring). As applied to individuals who commit many other felonies, however, Section 922(g)(1) plainly "impose[s] a comparable burden on the right of armed self-defense" that "is comparably justified" when analogized to historical precursors rooted in dangerousness. *Bruen*, 597 U.S. at 29.

28

**2. The Second Amendment allows Congress to conclude that felony-equivalent offenses for recidivist drunk driving are serious, dangerous crimes warranting disarmament.**

Williams's felony-equivalent recidivist drunk driving offense is serious and indicates that his firearm possession would pose a danger to himself or others. Thus, under both of the historically grounded principles discussed above, Section 922(g)(1) passes constitutional muster as applied to Williams.

There can be no question that a recidivist offense for operating a vehicle at twice the legal blood-alcohol content limit is a serious crime that demonstrates reckless disregard for the lives of fellow citizens. "Drunk driving is an extremely dangerous crime." *Begay v. United States*, 553 U.S. 137, 141 (2008), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2015); *see also, e.g.*, *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2541 (2019) (Sotomayor, J., dissenting) ("[D]runk driving poses significant dangers that . . . States must be able to curb."); *Virginia v. Harris*, 558 U.S. 978, 979-80 (2009) (mem.) (Roberts, C.J., dissenting from denial of writ of certiorari) ("There is no question that drunk driving is a serious and potentially deadly crime . . . . . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases." (citation omitted)). And, as the Supreme Court has recognized, "the most dangerous offenders" are those "who drive with a [blood-alcohol content]

29

significantly above the current limit of 0.08% and recidivists." *Birchfield v. North Dakota*, 579 U.S. 438, 465 (2016).

Williams's disqualifying offense places him squarely within that most dangerous group: he was exposed to five years' imprisonment because he was a recidivist who drove with a blood-alcohol content more than double the legal limit of 0.08. *See* 75 Pa. Cons. Stat. §§ 3802(c), 3803(b)(4); *see also* Appx17 (noting that a test conducted approximately an hour and 20 minutes after Williams was arrested for this offense indicated his blood-alcohol content was 0.223).

Legislatures uniformly agree that offenses such as the one for which Williams was convicted are serious, dangerous crimes. Congress has required highway safety programs to put in place measures "to reduce injuries and deaths resulting from persons driving motor vehicles while impaired by alcohol or a controlled substance." 23 U.S.C. § 402(a)(2)(A)(iv). And Congress has provided monetary incentives for States to not only "enact[]" and "enforc[e]" baseline laws that prohibit driving with a blood-alcohol content above 0.08, *id.* § 163(a)-(b), but also to include specific penalties for "an individual convicted of a second or subsequent offense," *id.* § 164(a)(5), (b). State legislatures, meanwhile, "unanimously agree that DUIs are crimes subject to punishment,"

30

with numerous states further providing for heightened penalties for recidivist drunk driving at a high rate of intoxication. *Holloway v. Attorney General*, 948 F.3d 164, 176-77 (3d Cir. 2020), *abrogated on other grounds by Range*, 69 F.4th 96.

With respect to the specific offense for which Williams was convicted, the Pennsylvania legislature determined in 2003 that driving with particularly elevated blood alcohol levels warranted the creation of the new offense of driving under the influence at the "[h]ighest rate of alcohol." 75 Pa. Cons. Stat. § 3802(c). The legislature enacted special sentencing provisions to deter repeat offenders, including mandatory incarceration. *Id.* § 3804(c)(2). Moreover, recidivist offenders who drive at that highest rate of alcohol are exposed to a five-year term of imprisonment. *Id.* § 3803(b)(4).

These serious penalties are backed by the real-world consequences of drunk driving. In 2004, for example, when Williams committed the DUI offense that resulted in his disarmament, 16,694 people died in alcohol-related motor vehicle crashes in the United States. Nat'l Highway Traffic Safety Admin., Dep't of Transp., DOT HS 809 911, *Traffic Safety Facts: 2004 Data* 4, https://perma.cc/CM2L-WVT8. That amounts to an average of one death every 31 minutes. *Id.* Moreover, Williams did not stop driving drunk after his first DUI offense. He was convicted of a second DUI several years after that

31

offense, and that second offense was for driving at the highest rate of
intoxication—demonstrating continued disregard for both public safety and the
law even after his first criminal conviction.

There is good reason to fear the prospect of firearm possession by
persons convicted of the most serious forms of drunk driving "much like early
Americans feared loyalists or Reconstruction-era citizens feared armed
tramps," *Range*, 69 F.4th at 112 (Ambro, J., concurring)—or, for that matter,
much like Reconstruction-era citizens feared armed "habitual drunkards," *see*
*supra* note 8, or like the many States and territories that today restrict firearm
possession by alcoholics.[9]  Empirical evidence confirms the common-sense
recognition that the most dangerous drunk drivers cannot be trusted to safely
handle a firearm.  For example, a longitudinal study of California handgun
purchasers found that purchasers with at least one prior DUI conviction and no

---

[9] *See* Ala. Code § 13A-11-72(b); Ark. Code Ann. § 5-73-309(8)(A); Colo.
Rev. Stat. Ann. § 18-12-203(1)(e); Fla. Stat. Ann. § 790.06(2)(f); Ga. Code
Ann. § 16-11-129(b)(2)(J); 10 Guam Code Ann. § 60109.1(b)(6); Haw. Rev.
Stat. § 134-7(c)(1); Ind. Code § 35-47-1-7(5); Kan. Stat. Ann. § 21-6301(a)(13);
Ky. Rev. Stat. Ann. § 237.110(4)(e); Md. Code Ann., Public Safety § 5-
133(b)(4); Mass. Gen. Laws ch. 140, § 131(d)(iii)(A); Mo. Rev. Stat.
§ 571.070.1(2); N.J. Stat. Ann. § 2C:58-3.c.(3); N.C. Gen. Stat. § 14-
415.12(b)(5); Ohio Rev. Code § 2923.13(A)(4); P.R. Laws Tit. 25, § 462a(a)(3);
S.C. Code Ann. § 16-23-30(A)(1); S.D. Codified Laws § 23-7.7.1(3); W. Va.
Code § 61-7-7(a)(2).

other criminal history were more than twice as likely to be arrested for a violent crime within 12 years after the handgun purchase, compared to purchasers with no criminal record. *See* Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers*, 180 JAMA: Internal Med. 35, 38 (2019).

Indeed, this Court already recognized that the specific offense for which Williams was convicted is a serious, dangerous offense and that a person convicted of that offense can constitutionally be disarmed under Section 922(g)(1). In *Holloway*, the Court rejected a pre-*Bruen* as-applied challenge to Section 922(g)(1) by a person with the same disqualifying offense. 948 F.3d at 172-77; *see also Williams v. Attorney General*, No. 19-2964, 2022 WL 1499279, at *2 (3d Cir. May 12, 2022) (pre-*Bruen* decision in this case recognizing that "because Williams brings the same legal challenge on remarkably similar facts as Holloway, his case must meet the same fate"). Under *Range*, the "multifactored seriousness inquiry" relied upon in *Holloway* "no longer applies." *Range*, 69 F.4th at 101 (quotation marks omitted). But nothing in *Range* (or *Bruen*) casts doubt on *Holloway*'s extensive discussion of how serious and dangerous this DUI offense is. *See, e.g.*, *Holloway*, 948 F.3d at 167 ("Drunk driving is a dangerous and often deadly crime."); *id.* at 176

33

(describing "a second DUI at the highest [blood-alcohol content]" as a "serious" crime). Williams's offense is far from what some members of this Court described in *Range* as a "small-time offense" indicating no "threat to society," 69 F.4th at 112 (Ambro, J., concurring). Thus, while the precedent governing this case differs from that applied in *Holloway*, the result should be the same: Section 922(g)(1) can constitutionally be applied to persons convicted of the Pennsylvania felony-equivalent offense of recidivist drunk driving at the highest rate of intoxication.

### 3. The district court's holding reflects an unwarranted extension of this Court's decision in *Range*.

The district court did not question the seriousness or dangerousness of Williams's drunk driving conviction. To the contrary, the district court emphasized "that Plaintiff's offenses were serious and his conduct . . . dangerous." Appx11. Indeed, the court was "quite concerned about the prospect of granting access to firearms to persons who have demonstrably abused alcohol." Appx11. And it stated that its decision was not intended to cast doubt on "the dangerousness of drunk driving" and "of combining firearm use and alcohol consumption." Appx11. The district court nonetheless concluded that its hands were effectively tied by this Court's decision in *Range*. Appx10, 12.

34

That conclusion rests on a misunderstanding of a precedent that this Court took pains to emphasize is "a narrow one." *Range*, 69 F.4th at 106; *see also id.* at 104 n.9 (reasoning that the government had not shown a sufficient basis to "disarm someone like Range"); *id.* at 104-05 (reasoning that "the Government does not successfully analogize" historically disarmed groups "to Range and his individual circumstances"); *id.* at 105 (rejecting "attempts to analogize" historical laws "to Range's situation"); *id.* at 106 ("hold[ing] that the Government has not shown" that there is a sufficient basis for "depriving Range of his Second Amendment right to possess a firearm"); *id.* (concluding that "the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms").

Under *Range*, the relevant question is whether "applying § 922(g)(1) to [Williams]" is "'consistent with the Nation's historical tradition of firearm regulation.'" 69 F.4th at 103 (quoting *Bruen*, 597 U.S. at 24). In determining whether application of a felon-dispossession law is consistent with that tradition, the court's task is not—as the district court perceived it—to determine whether historically "regulated conduct itself is analogous to" the specific conduct underlying the challenger's offense. Appx12. Courts must discern and apply "constitutional *principles*" from historical materials. *Bruen*,

35

597 U.S. at 31 (emphasis added) (quotation marks omitted); *see also, e.g.*, *Binderup*, 836 F.3d at 368-69 (Hardiman, J., concurring in part and concurring in the judgments) (discussing a "principle to inform our understanding of the original public meaning of the text of the Second Amendment," and reasoning that such a principle can be discerned even where "dispossessory regulations" that would be consistent with that principle "were few and far between in the first century of our Republic"); *Range*, 69 F.4th at 117 (Krause, J., dissenting) (reasoning that a Second Amendment analysis "look[s] to match history in principle, not with precision").

What matters for purposes of the Second Amendment is whether application of Section 922(g)(1) today comports with relevant historical principles, regardless of whether similar criminal offenses were specifically associated with disarmament in the Founding era. *Cf. Bruen*, 597 U.S. at 47 (making clear that in applying the principle that legislatures may prohibit "'dangerous and unusual weapons,'" the governing test looks to the use of the weapons "today" (quoting *Heller*, 554 U.S. at 627)); *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting) (reasoning that a legislature may disarm a category of persons "based on present-day judgments" about the appropriate scope of that category). Thus, as discussed above, a court's task

36

under *Range* is first to ascertain that the relevant principles supporting Section 922(g)(1) allow disarmament for serious or dangerous crimes, and then to evaluate whether Williams's offense fits within either or both of those categories.

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 597 U.S. at 30. The decisions of some district courts since *Range* make it evident that clarification is necessary to comport with that principle. *See United States v. Quailes*, No. 1:21-cr-176, 2023 WL 5401733, at *1-2 (M.D. Pa. Aug. 22, 2023) (holding that Congress may not disarm an armed career criminal with four convictions for trafficking heroin and cocaine); *United States v. Harper*, No. 1:21-cr-236, 2023 WL 5672311, at *1 (M.D. Pa. Sept. 1, 2023) (holding that Congress may not disarm a person with "thirteen prior felony and eight misdemeanor convictions," including for "armed robberies and drug trafficking").[10]

---

[10] The government has appealed both decisions to this Court, which has held the cases pending the Supreme Court's decision in *Rahimi* and its disposition of the petition for a writ of certiorari in *Range*. *See United States v. Quailes*, No. 23-2533 (3d Cir. filed Aug. 24, 2023); *United States v. Harper*, No. 23-2604 (3d Cir. filed Sept. 6, 2023).

Three conceptual errors appear to undergird the district court's decision here. *First*, to the extent the district court believed that the only form of history that matters is a history of regulation, that is not correct. The Supreme Court has consulted "a variety of legal and other sources" in assessing the Second Amendment's original meaning, *Heller*, 554 U.S. at 605, including English history, *id.* at 598-600; analogous provisions in state constitutions, *id.* at 600-03; Second Amendment precursors, *id.* at 604-05; commentary, *id.* at 605-10, 616-19; case law, *id.* at 610-14; and legislative debates, *id.* at 614-16. *See also Bruen*, 597 U.S. at 20-21. The district court did not accord appropriate weight to the relevant principles that are reflected in the full array of relevant historical sources.

*Second*, in assessing historical firearm regulations, a court's task is not to isolate each historical precursor and ask if it differs from the challenged regulation in some way. A court must instead examine the historical evidence as a whole; determine whether it establishes a category of permissible regulation (such as "dangerous and unusual weapons," *Bruen*, 597 U.S. at 21, 47 (quoting *Heller*, 554 U.S. at 627), or "sensitive places," *id.* at 30-31); and determine whether the challenged law fits that category. Moreover, even if "the historical record yields relatively few" regulations applying a general

38

principle, the absence of "disputes regarding the lawfulness of such prohibitions" can demonstrate that the principle is "settled." *Id.* at 30 (discussing "sensitive places"). The historical evidence here shows that the Second Amendment permits laws disarming persons on the basis of serious or dangerous crimes. And there is nothing in the historical evidence to suggest that any distinctions between modern felon-dispossession statutes and the relevantly analogous historical regulations arose because of constitutional concerns about disarming persons convicted of serious or dangerous crimes.

*Third*, an absence of a history of similar regulations may be "relevant" to the Second Amendment inquiry, *Bruen*, 597 U.S. at 26, but it is not dispositive. Nothing in the Second Amendment effectively limits modern legislatures to the specific types of firearms regulations that existed at the Founding. To the contrary, *Bruen* made clear that modern firearms laws can comply with the Second Amendment even if they lack "historical *twin*[s]." *Id.* at 30. That is especially important in "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 27. Of course, the Founders had no concern about allowing recidivist drunk drivers to bear arms. The invention and proliferation of the motor vehicle effected "dramatic technological changes" well after the Founding era, and the Pennsylvania legislature enacted

the recidivist drunk driving statute at issue here in response to "unprecedented societal concerns," *id.  See supra* pp. 4-5; *Holloway*, 948 F.3d at 176.  Nothing in text, history, or precedent supports drawing a negative inference from the absence of a Founding-era law disarming persons who are in some narrow sense "analogous" to today's recidivist DUI offenders.

### 4.  The government preserves arguments foreclosed by *Range*.

The government preserves its argument that Williams's challenge should fail regardless of the foregoing analysis because text, history, tradition, and Supreme Court precedent establish that Congress may categorically disarm individuals who have been convicted of crimes that satisfy the common definition of felony—that is, crimes punishable by imprisonment for more than one year.  *See* Petition for a Writ of Certiorari at 7-22, *Garland v. Range*, No. 23-374 (U.S. Oct. 5, 2023), 2023 WL 6623648.  We note that since *Bruen*, three courts of appeals have upheld Section 922(g)(1) and have agreed that it is not susceptible to individualized as-applied challenges.  *See United States v. Jackson*, 69 F.4th 495, 502 (8th Cir.), *petition for cert. filed*, No. 23-6170 (U.S. Nov. 28, 2023); *Vincent v. Garland*, 80 F.4th 1197, 1202 (10th Cir.), *petition for cert. filed*, No. 23-683 (U.S. Dec. 1, 2023); *United States v. Dubois*, No. 22-10829, 2024 WL 927030, at *3-6 (11th Cir. Mar. 5, 2024).

40

The government also preserves the alternative argument that, even if Section 922(g)(1) were subject to individualized Second Amendment challenges, courts should not award relief beyond "a purely prospective declaratory judgment." *Range*, 69 F.4th at 135 (Krause, J., dissenting). Evaluation of such a remedy in this case could place greater weight on Williams's repeated possession and use of firearms before filing this suit. Despite his disqualifying 2005 conviction, Williams continued to own approximately 20 firearms until 2014; worked until 2010 at a gun store and range where he handled firearms and ammunition daily; and made multiple false statements about his disqualifying conviction on firearms license and purchase applications, even though one of his responsibilities at the gun store and range where he worked was to understand such applications and ensure that customers could legally purchase firearms. *See* Appx17-18; *supra* p. 7. In *Range*, however, the Court appears to have determined that as-applied challenges to Section 922(g)(1) are to be resolved on an offense-by-offense basis, with certain disqualifying offenses rendering the statute "invalid *ab initio*" and little or no weight placed on conduct post-dating the disqualifying conviction—no matter what the evidence might show about that conduct. *Range*, 69 F.4th at 132 (Krause, J., dissenting); *see, e.g., id.* at 106 (majority

opinion) ("Bryan Range challenged the constitutionality of 18 U.S.C.

§ 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann.

§ 481(a).").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

JACQUELINE C. ROMERO
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB

 */s/ Kevin B. Soter*
KEVIN B. SOTER
*Attorneys, Appellate Staff
Civil Division, Room 7222
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
California Bar No. 324524
(202) 305-1754
kevin.b.soter@usdoj.gov*

March 2024

## COMBINED CERTIFICATIONS

1.      Government counsel are not required to be members of the bar of this Court.

2.      This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,532 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

3.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.      This document was scanned for viruses using CrowdStrike Falcon Sensor version 7.11.18110.0, and no virus was detected.


        _/s/ Kevin B. Soter_____
        Kevin B. Soter

**ADDENDUM**

# TABLE OF CONTENTS

18 U.S.C. § 921 ............................................................................... A1

18 U.S.C. § 922 ............................................................................... A1

75 Pa. Cons. Stat. § 3802 (excerpts) ........................................... A2

75 Pa. Cons. Stat. § 3803 (excerpts) ........................................... A3

75 Pa. Cons. Stat. § 3804 (excerpts) ........................................... A3

## 18 U.S.C. § 921

### § 921. Definitions

(a) As used in this chapter--

. . .

(20) The term "crime punishable by imprisonment for a term exceeding one year" does not include--

(A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

(B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

## 18 U.S.C. § 922

### § 922. Unlawful acts

. . .

(g) It shall be unlawful for any person--

(1) who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year;

. . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

A1

**75 Pa. Cons. Stat. § 3802 (excerpts)**

**§ 3802. Driving under the influence of alcohol or controlled substance**

**(a) General impairment.—**

(1) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving, operating or being in actual physical control of the movement of the vehicle.

(2) An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08% but less than 0.10% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

**(b) High rate of alcohol.—**An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.10% but less than 0.16% within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

**(c) Highest rate of alcohol.—**An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is 0.16% or higher within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.

\*\*\*

**75 Pa. Cons. Stat. § 3803 (excerpts)**

**§ 3803. Grading**

\*\*\*

**(b) Other offenses.—**

\*\*\*

(4) An individual \*\*\* who violates section 3802(c) or (d) and who has one prior offense commits a misdemeanor of the first degree.

\*\*\*

**75 Pa. Cons. Stat. § 3804 (excerpts)**

**§ 3804. Penalties**

\*\*\*

**(c) Incapacity; highest blood alcohol; controlled substances.—** \*\*\* [A]n individual who violates section 3802(c) or (d) shall be sentenced as follows:

\*\*\*

(2) For a second offense, to:

(i) undergo imprisonment of not less than 90 days;

(ii) pay a fine of not less than $1,500;

(iii) attend an alcohol highway safety school approved by the department; and

(iv) comply with all drug and alcohol treatment requirements imposed under sections 3814 and 3815.

\*\*\*