No. 24-1091

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

EDWARD A. WILLIAMS,

Plaintiff-Appellee,

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

———————————

### VOLUME I OF APPENDIX
### (Pages 1-43)

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

JACQUELINE C. ROMERO
  *United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
KEVIN B. SOTER
  *Attorneys, Appellate Staff
  Civil Division, Room 7222
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 305-1754*

## TABLE OF CONTENTS

**Page**

**Volume I**

1. Notice of Appeal (Jan. 12, 2024), Dkt. 86 ........................................... Appx1

2. Order (Nov. 14, 2023), Dkt. 83 ........................................................ Appx3

3. Memorandum (Nov. 14, 2023), Dkt. 82 ............................................. Appx4

4. Memorandum (Apr. 1, 2019), Dkt. 43 .............................................. Appx15

**Volume II**

5. Docket Entries ............................................................................... Appx44

6. Third Declaration of Edward A. Williams
   (dated Sept. 18, 2023; filed Sept. 21, 2023), Dkt. 72-1 ..................... Appx53

7. Pennsylvania State Police Criminal Record Check
   (dated Mar. 22, 2017; filed Sept. 21, 2023), Dkt. 72-2 (pp. 3-4) ......... Appx60

8. Declaration and Report of Robert Gordon
   (dated Nov. 14, 2018; filed Sept. 21, 2023), Dkt. 72-2 (pp.10-40) ...... Appx62

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| EDWARD A. WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> MERRICK B. GARLAND, et al., <br><br> Defendants. | Civil Action No 17-CV-2641 |

### NOTICE OF APPEAL

PLEASE TAKE NOTICE that all Defendants hereby appeal to the United States Court of

Appeals for the Third Circuit from this Court's November 14, 2023 Memorandum (ECF No. 82) and

Order (ECF No. 83).

Dated:  January 12, 2024                    Respectfully submitted,


JACQUELINE C. ROMERO                  BRIAN M. BOYNTON
United States Attorney                       Principal Deputy Assistant Attorney General

/s/ Anthony D. Scicchitano____         LESLEY FARBY
ANTHONY D. SCICCHITANO              Assistant Branch Director
Assistant United States Attorney
Pennsylvania Bar No. 208607             TAISA M. GOODNATURE
U.S. Attorney's Office, E.D. Pa.          New York Bar No. 5859137
615 Chestnut St., Suite 1250             Trial Attorney
Philadelphia, PA 19106                    U.S. Department of Justice
Telephone:  (215) 861-8380              Civil Division, Federal Programs Branch
Email:  Anthony.Scicchitano@usdoj.gov  1100 L Street, N.W.
                                          Washington, DC 20005
                                          Telephone: (202) 514-3786
                                          Fax: (202) 616-8470
                                          Email:  Taisa.M.Goodnature@usdoj.gov

                                          *Counsel for Defendants*

Appx1

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Notice of Appeal was filed through the CM/ECF system, which will provide electronic notice to the following counsel:

Adam J. Kraut (akraut@saf.org)
Joshua Prince (Joshua@PrinceLaw.com)

/s/ Anthony D. Scicchitano
ANTHONY D. SCICCHITANO
Assistant United States Attorney

**Appx2**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD A. WILLIAMS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| MERRICK B. GARLAND, et al., | : | NO. 17-2641 |
| | : | |
| Defendants.[1] | : | |
| | : | |
| | : | |

**ORDER**

AND NOW, this 14th day of November, 2023, upon consideration of Plaintiff's Motion

for Summary Judgment (ECF No. 72) and Defendants' Motion for Summary Judgment (ECF

No. 73), and all papers submitted in support thereof or in opposition thereto, it is hereby

**ORDERED** that Plaintiff's Motion is **GRANTED** for the reasons set forth in the accompanying

Memorandum.  Accordingly, it is **FURTHER ORDERED** that Defendants' Motion is

**DENIED**.

    **IT IS SO ORDERED.**


                                        BY THE COURT:

                                        /s/ John Milton Younge
                                        **Judge John Milton Younge**

---

[1] Plaintiff originally brought this action on June 1, 2017, against the United States of America, Attorney General Jeff Sessions, Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives Thomas E. Brandon, and Acting Director of the Federal Bureau of Investigation Andrew McCabe.  (ECF No. 1.)  Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Merrick Garland, Director Steven Dettelbach, and Director Christopher Wray are automatically substituted as Defendants in this action.

Appx3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDWARD A. WILLIAMS,                       :
                                          :
    Plaintiff,                            :
                                          :         Civil Action
        v.                                :
                                          :         No. 17-cv-2641
MERRICK B. GARLAND, et al.,               :
                                          :
    Defendants.[1]                        :
                                          :
                                          :

**<u>MEMORANDUM</u>**

**J. Younge**                                        **November 14, 2023**

## I.    INTRODUCTION

Currently before this Court is Plaintiff Edward A. Williams' Fourth Motion for Summary Judgment (ECF No. 72) and Defendants' Third Motion for Summary Judgment (ECF No. 73). The Court finds these motions appropriate for resolution without oral argument.  Fed. R. Civ. Pr. 78; L.R. 7.1(f).  For the reasons set forth in this Memorandum, Plaintiff's Motion is Granted. Accordingly, Defendants' Motion is Denied.

## II.    FACTUAL BACKGROUND

Plaintiff Edward A. Williams was first arrested for driving under the influence (hereinafter "DUI") in April 2000 in State College, Pennsylvania.  *See* Defendants' Statement of Undisputed Material Facts (hereinafter "SUMF") ¶¶ 2-4, ECF No. 74; *Williams v. Barr*, 379 F.

---

[1] Plaintiff originally brought this action on June 1, 2017, against the United States of America, Attorney General Jeff Sessions, Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives Thomas E. Brandon, and Acting Director of the Federal Bureau of Investigation Andrew McCabe.  (ECF No. 1.)  Pursuant to Federal Rule of Civil Procedure 25(d), Attorney General Merrick Garland, Director Steven Dettelbach, and Director Christopher Wray are automatically substituted as Defendants in this action.

Supp. 3d 360, 365 (E.D. Pa. 2019), *aff'd sub nom. Williams v. Att'y Gen.*, No. 19-2694, 2022

WL 1499279 (3d Cir. May 12, 2022), *reh'g granted and opinion vacated*, No. 19-2694, 2022

WL 3544391 (3d Cir. Aug. 18, 2022).  Following that arrest, Plaintiff participated in

Pennsylvania's Accelerated Rehabilitative Disposition (hereinafter "ARD") program.  SUMF ¶

4, ECF No. 74; *Williams*, 379 F. Supp. 3d at 365.  Although completion of an ARD program

offers a defendant the opportunity to dismiss his pending charges, it may nonetheless be

construed as a conviction for the purpose of computing a sentence for a subsequent DUI.  *See* 75

Pa. Cons. Stat. §§ 3803(a)(1), 3806(a)(1).  Plaintiff was arrested a second time for DUI in

Philadelphia, Pennsylvania in 2001, but these charges were dismissed for unknown reasons.  *See*

SUMF ¶¶ 5-8, ECF No. 74.  In 2004, Plaintiff was arrested in Philadelphia, Pennsylvania for

DUI for the third time.  *Williams*, 379 F. Supp. 3d at 365.

At his third arrest, Plaintiff's breathalyzer test revealed that his blood alcohol content was

at least 0.223, well above the legal limit of 0.08.  SUMF ¶ 14, ECF No. 74; *Williams*, 379 F.

Supp. 3d at 365; 75 Pa. Cons. Stat. § 3802(a).  In 2005, Plaintiff was convicted of DUI at the

highest rate of intoxication, which, based on his prior offense in 2000, is a first-degree

misdemeanor punishable by up to five years in prison.  *See Williams*, 379 F. Supp. 3d at 365; 75

Pa. Cons. Stat. §§ 1104, 3802(c), 3803(b)(4), 3806(a).  Plaintiff was sentenced to between ninety

days and two years in prison, but he was permitted to serve his custodial sentence under house

arrest because of a medical condition.  SUMF ¶ 16, ECF No. 74; *Williams*, 379 F. Supp. 3d at

365.  This conviction disqualified him from possessing a firearm under 18 U.S.C. § 922(g)(1).

Plaintiff still occasionally drinks.  SUMF ¶ 18, ECF No. 74.

### III.    PROCEDURAL HISTORY

Plaintiff filed this action on June 1, 2017, as an as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(1), which prohibits him from possessing a firearm due to his 2005 DUI conviction.  *See* Complaint, ECF No. 1.  Plaintiff thus seeks declaratory and injunctive relief exempting him from criminal liability for possession of a firearm under Section 922(g)(1) and its related laws and regulations based on that conviction.  *See id.*

On September 14, 2017, Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Defendants' Motion to Dismiss, ECF No. 5.)  Plaintiff opposed and cross-moved for summary judgment.  (Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss, ECF No. 8; Plaintiff's First Motion for Summary Judgment, ECF No. 9.)  Judge Robert Kelly held that Plaintiff had pleaded a prima facie as-applied Second Amendment claim under *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016), *abrogated by Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), and denied both Motions.[2]  (Order, ECF Nos. 13 & 14.)

Following discovery, both Parties moved for summary judgment on October 26, 2018. (ECF Nos. 29 & 30.)  The Court granted Defendants' Motion for Summary Judgment on April 1, 2019, and denied Plaintiff's, finding that Section 922(g)(1) had survived intermediate scrutiny as applied to Plaintiff at the second step of the two-step framework established in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *abrogated by Range*, 69 F.4th.  *See Williams v. Barr*, 379 F. Supp. 3d 360, 364-65 (E.D. Pa. 2019).  The Third Circuit affirmed the Court's grant of summary judgment to Defendants based on *Holloway v. Attorney General*, 948 F.3d 164 (3d Cir.

---

[2] Judge Robert Kelly Ordered that Plaintiff's Motion for Summary Judgment was denied as premature and ordered additional discovery.  (ECF No. 14.)

2020), *abrogated by Range*, 69 F.4th.  This decision, issued after the Court's decision on the Parties' motions for summary judgment, held that a DUI offense under the identical state criminal provision that Plaintiff was convicted of violating excluded the challenger in that case from Second Amendment protections.  *See id.*, 948 F.3d at 177; *Williams v. Att'y Gen.*, No. 19-2694, 2022 WL 1499279, at *2 (3d Cir. May 12, 2022).

Plaintiff filed a petition for rehearing *en banc* following the Supreme Court's decision in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).  (Petition for Rehearing En Banc, *Williams v. Att'y Gen.*, No. 19-2694 (3d Cir. July 18, 2022), ECF No. 60.) Following the rehearing, the Third Circuit vacated the judgment of this Court and remanded to the district court for reconsideration in light of *Bruen*.  *See Williams v. Att'y Gen.*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022); Order, ECF No. 53.

While briefing was underway, subject to this Court's briefing schedule for renewed motions for summary judgment (Scheduling Order, ECF No. 58), the Third Circuit decided *Range v. Attorney General*, 53 F.4th 262, 270 (3d Cir. 2022) and proceeded to grant rehearing *en banc* and to vacate that panel opinion, 56 F.4th 992 (3d Cir. 2023).  The Court granted Plaintiff's unopposed motion to stay proceedings pending the outcome of *en banc* proceedings in *Range*. (Order, ECF No. 64.)  On June 6, 2023, the Third Circuit issued its *en banc* decision in *Range*. *See* 69 F.4th 96.  The Court then amended its scheduling order for briefing on the renewed motions for summary judgment.  (Amended Scheduling Order, ECF No. 71.)  Both parties filed their respective renewed motions for summary judgment on September 21, 2023.  (ECF Nos. 72 & 73.)

## IV.    LEGAL STANDARD

Summary judgment is appropriate if the movant shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012).  To defeat a motion for summary judgment, there must be a factual dispute that is both material and genuine. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 24-49 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008).  A material fact is one that "might affect the outcome of the suit under the governing law[.]"  *Anderson*, 477 U.S. at 248.  A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party."  *Id*.

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact.  *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016).  When the movant is the defendant, they have the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case."  *Burton v. Teleflex Inc.,* 707 F.3d 417, 425 (3d Cir. 2013).  If the movant sustains their initial burden, "the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial."  *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249; *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).  In doing so, the court must construe the facts and inferences in the light most

favorable to the non-moving party.  *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001).  Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.

## V.    DISCUSSION

Prohibiting Plaintiff's possession of a firearm due to his DUI conviction is a violation of his Second Amendment rights as it is inconsistent with the United States' tradition of firearms regulation.  The Constitution "presumptively protects" individual conduct plainly covered by the text of the Second Amendment, which includes an individual's right to keep and bear arms for self-defense.  *Bruen*, 142 S. Ct. at 2126.  Protected individuals presumptively include all Americans.  *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).  The Supreme Court has held that an individual's conduct may fall outside of Second Amendment protection "[o]nly if a firearm regulation is consistent with this Nation's historical tradition."  *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).  This standard differs from the oft-used means-end scrutiny that the Supreme Court has held does not apply in the Second Amendment context.  *Bruen*, 142 S. Ct. at 2127.  If it has been determined that the Second Amendment applies to a person and their proposed conduct, the government bears the burden of proving that "its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Id*.

The Third Circuit has recently addressed Section 922(g)(1)'s disarmament of those convicted of crimes punishable by a term of imprisonment exceeding one year in *Range v. Attorney General*.  69 F.4th.  The Court determined that Bryan Range, who had a qualifying

conviction under Section 922(g)(1) for making a false statement to obtain food stamps and who

wished to possess firearms to hunt and to defend himself, could not be denied his Second

Amendment right to possess a firearm due to that conviction.  *See id.*  The Third Circuit held this

was a "narrow ruling", intended to apply to Mr. Range and "people like Range."  *Id.* at 106.  This

Court finds that the narrow analysis in *Range* also applies to the Plaintiff here.

      A.    *The Second Amendment Protects Plaintiff and His Proposed Conduct.*

      The Third Circuit determined in *Range* that the Second Amendment does not only belong

to "law-abiding citizens" but presumptively belongs to all people, who may then be subjected to

the stripping of associated rights.  *Id.* at 101-03.  Therefore, the Second Amendment applies to

Plaintiff despite his criminal history.  Additionally, the Second Amendment clearly covers

Plaintiff's petition to possess a firearm contrary to the prohibitions of Section 922(g)(1).  *See id.*

at 103 (finding that Range's request to possess a rifle and shotgun to hunt and defend himself is

clearly protected conduct).  Therefore, Second Amendment protections apply to both the Plaintiff

and his proposed conduct.

      B.    *Section 922(g)(1) is Inconsistent with the United States' History of Firearm*
              *Regulation As Applied to Plaintiff.*

      The Government has not met its burden in proving that the prohibition on Plaintiff's

possession of a firearm due to his DUI conviction is consistent with historical firearms

regulations.  Finding a historical tradition of similar firearms regulations "requires that the

government identify a well-established and representative historical *analogue*, not a historical

*twin*."  *Bruen*, 142 S. Ct. at 2133.  A modern regulation that would not have been contemplated

during the Founding Era can be found relevantly similar to then-existing regulations by

considering "how and why the regulations burden a law-abiding citizen's right to armed self-

defense."  *Id*.  That federal law has, over the past century, allowed for the disarmament of certain

**Appx10**

types of convicted criminals does not satisfy the constitutional issues raised by applying Section 922(g)(1) to all convictions punishable by more than a year of imprisonment. *Range*, 69 F.4th at 104. Instead, the Court must consider more longstanding limitations on firearm possession to "demarcat[e] the scope of [the] constitutional right." *Id.* The historical firearms regulations provided by the Government are not sufficiently analogous to the case considered here to satisfy its burden.

Although this Court remains quite concerned about the prospect of granting access to firearms to persons who have demonstrably abused alcohol, it is not convinced that the general dangerousness of drunk driving and of combining firearm use and alcohol consumption establishes that DUIs must therefore be considered sufficiently analogous to historical examples of 'dangerous' conduct that have previously served as grounds for disarmament. The Government has offered statutes and cases for the Court's consideration of where the right to possess a firearm has been permissibly stripped from those deemed dangerous. (Government's Memorandum in Support of Motion for Summary Judgment (hereinafter "Govt.'s Memo"), pp. 11-13, ECF No. 73.) Accordingly, the Government argues that the legislature, through Section 922(g)(1), does not violate the Second Amendment in its determination that individuals convicted of crimes punishable by more than one year of imprisonment, like Plaintiff, are dangerous to society and can therefore be stripped of their right to possess a firearm. (Govt.'s Memo, p. 13, ECF No. 73.)

In no way does the Court dispute the dangerousness of drunk driving or of combining firearm use and alcohol consumption, and it acknowledges that Plaintiff's offenses were serious and his conduct during his convictions in 2004 and 2005 dangerous. However, that legislatures have historically labelled certain groups and conduct dangerous for the purposes of disarmament

does not, in of itself, create a historical analogue to the present-day prohibition on firearm

possession by those convicted of DUIs.  The *Range* Court had rejected the argument that status-

based restrictions on 'dangerous' groups identified as such by the legislature would constitute an

appropriate analogy to Section 922(g)(1) today.  69 F.4th at 104-05; *see also Bruen*, 142 S. Ct. at

2134 (noting that legislatures are not empowered to "eviscerate the general right to publicly carry

arms for self-defense" with overbroad categorizations).  Historical regulations on persons

deemed dangerous do not present a sufficient historical analogue without showing that the

regulated conduct itself is analogous to Plaintiff's.

Similarly, the Court finds the Government's argument that Section 922(g)(1) can be

appropriately applied to Plaintiff because of historical regulations on the possession of a firearm

by a presently intoxicated person unavailing.  The Government points to several regulations

permitting the disarmament of drunk or intoxicated persons.  (Govt.'s Memo, pp. 13-14, ECF

No. 73.)  None of these regulations allude to disarmament lasting beyond the individual's state of

intoxication, and none provided for permanent disarmament, as Section 922(g)(1) does.

Certainly, this Court agrees that using a firearm while intoxicated is dangerous, but historical

regulations which momentarily disarmed certain individuals for temporary mental incapacity

cannot be considered similar to the sanction of permanent disarmament for past DUI convictions.

As noted in *Range*, "government confiscation of the instruments of crime," including to prevent

an imminent crime, "differs from a status-based lifetime ban on firearm possession."  69 F.4th at

105.  As stated in *Bruen*, the Court must consider the "how and why" behind Second

Amendment restrictions to determine whether the modern articulation is relevantly similar to its

proposed historical analogue.  142 S. Ct. at 2133.  The language in the regulations offered by the

Government suggests an interest in protecting the public from an inevitable danger caused by

allowing a presently intoxicated person to use a firearm.  (Govt.'s Memo, pp. 13-14, ECF No. 73.)  Section 922(g)(1)'s prohibition on firearm possession for those convicted of a DUI cannot, without significant speculation by the Court, be considered as having a substantially similar purpose.

Additionally, a DUI cannot be considered to belong to the class of convictions – namely for crimes of violence – for which there is a longstanding regulatory tradition justifying permanent disarmament.  The Federal Firearms Act defines a crime of violence as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(1)(D)(3); *see also* Comprehensive Crime Control Act of 1984, 18 U.S.C. § 16 (using nearly identical language); *but see United States v. Davis*, 139 S. Ct. 2319, 2324 (2019) (finding that the secondary definition of a crime of violence in that statute was unconstitutionally vague).  In *Leocal v. Ashcroft*, the Supreme Court found that, under 18 U.S.C. § 16, a Florida DUI cannot be considered a crime of violence because it lacked a mens rea requirement, as does the relevant Pennsylvania statute here.  543 U.S. 1, 4, 7-8 (2004).  Therefore, Plaintiff's DUI cannot be categorically defined as a crime of violence for which there may be historical support for Second Amendment restrictions.

For all these reasons, the Court finds that the Government has not carried its burden in proving that the United States' tradition of firearm regulation supports stripping an individual of their right to possess a firearm because they had previously driven while intoxicated.  The application of Section 922(g)(1) to Plaintiff, therefore, constitutes a violation of his Second Amendment rights, and the Court finds that Plaintiff is entitled to the requested relief.

## VI.    CONCLUSION

The Plaintiff's Motion for Summary Judgment is Granted, and Defendants' Motion for

Summary Judgment is Denied.

An appropriate Order follows.

**IT IS SO ORDERED.**

BY THE COURT:

/s/ John Milton Younge
**Judge John Milton Younge**

**Appx14**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD A. WILLIAMS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 17-2641 |
| | : | |
| WILLIAM P. BARR, Attorney General of the United States, THOMAS E. BRANDON, Deputy Director and Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, and UNITED STATES OF AMERICA, | : : : : : : : : | |
| | : | |
| Defendants. | : | |
| | : | |

**<u>MEMORANDUM</u>**

**ROBERT F. KELLY, Sr. J.**                                    **APRIL 1, 2019**

Federal law generally prohibits the possession of firearms by individuals who have been convicted of a crime punishable by a term of imprisonment exceeding one year.  *See* 18 U.S.C. § 922(g)(1).  There is an exception from this prohibition for individuals who have been convicted of a state law misdemeanor that is punishable by a term of imprisonment of two years or fewer, 18 U.S.C. § 921(a)(20)(B), or those whose conviction has been expunged, set aside, or for which the individual has been pardoned, *id.* § 921(a)(20).

In 2005, Plaintiff Edward A. Williams ("Williams") was convicted in Pennsylvania of driving under the influence ("DUI") at the highest rate of intoxication with a prior offense, a first-degree misdemeanor punishable by a term of imprisonment of up to five years.  He brings this action against Defendants William P. Barr (Attorney General of the United States), Thomas E. Brandon (Deputy Director and Acting Director of the Bureau of Alcohol, Tobacco, Firearms

and Explosives), Christopher A. Wray (Director of the Federal Bureau of Investigation), and the

United States of America (collectively, the "Government"), contending that § 922(g)(1) is

unconstitutional as applied to him.[1]  Presently before the Court are the parties' Motions for

Summary Judgment, along with numerous responses and replies to the respective motions.  For

the reasons that follow, Williams' Motion for Summary Judgment is denied, and the

Government's Motion for Summary Judgment is granted.

## I.      BACKGROUND

In April 2000, Williams was in State College, Pennsylvania, where he was pulled over,

arrested, and charged with DUI based on his blood alcohol content ("BAC") being over .10%.[2]

(Pl.'s Statement of Undisputed Material Facts ("Pl.'s SUMF") in Supp. Mot. Summ. J. ¶¶ 1, 3;

Gov't's Statement of Undisputed Material Facts ("Gov't's SUMF") in Supp. Mot. Summ. J. ¶¶

2-3.)  Williams entered into Pennsylvania's Accelerated Rehabilitative Disposition ("ARD")

program and was sentenced to twelve months of probation, required alcohol and driver's safety

classes, surrender of his driver's license, and payment of court costs.  (Pl.'s SUMF ¶ 4; Gov't's

SUMF ¶ 4.)  Acceptance into the ARD program may be construed statutorily as a conviction for

purposes of computing sentences on subsequent DUI convictions.[3]  *See* 75 Pa. Cons. Stat. §

3806(a)(1).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted the current Attorney General of the United States, William P. Barr, in place of former Attorney General Jeff Sessions.  Likewise, the current Director of the FBI, Christopher A. Wray, has been substituted in place of former Director Andrew G. McCabe.

[2] The parties have filed the instant Motions for Summary Judgment under seal pursuant to the Privacy Stipulation and Order of Confidentiality.  (*See* Doc. No. 23.)  Williams' Brief in Support of his Motion for Summary Judgment (Doc. No. 29-4), along with his Statement of Undisputed Material Facts (Doc. No. 29-2), contain redactions about his April 2000 arrest and subsequent acceptance into Pennsylvania's ARD program.  However, the Court includes these facts in this Opinion because Williams has already provided them publicly in an unredacted format in his Complaint, (Compl. ¶¶ 8, 19-22), first Motion for Summary Judgment, (Doc. No. 9-1 ¶¶ 1-6), and first Statement of Undisputed Material Facts, (Doc. No. 9-2 at 2-3).

[3] A defendant may move for a court order dismissing the DUI charge when he or she has successfully completed the ARD program.  *See* Pa. R. Crim. P. 319.  When the judge orders dismissal of the charge, the judge must also order

**Appx16**

In November 2001, Williams was arrested in Philadelphia for DUI.  (Gov't's SUMF ¶ 5.)

The charges were dismissed for unknown reasons.  (*Id.* ¶ 8.)

On September 7, 2004, Williams was once again pulled over in Philadelphia for DUI.

(*Id.* ¶ 9; Pl.'s SUMF ¶ 7.)  He was arrested, charged, and subsequently found guilty at trial in

2005 of DUI at the highest rate of intoxication in violation of 75 Pa. Cons. Stat. § 3802(c).

(Gov't's SUMF ¶ 15; Pl.'s SUMF ¶¶ 7-8.)  Although Williams was arrested at approximately

2:00 a.m., a test conducted at 3:20 a.m. indicated his BAC to be .223%.  (*See* Gov't's SUMF ¶

15; *see also* Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-00039.)  He was sentenced

on June 15, 2006 to ninety days to two years in prison; mandatory attendance at Alcohol

Highway Safety School; a $1,500 fine, $180 in court costs, and a surcharge of $100; license

suspension for eighteen months; and imposition of an ignition interlock.  (*See* Gov't's Mem. Law

Supp. Mot. Summ. J., Ex. C at MCP-000016, 000019.)  The judge allowed Williams to serve his

sentence on passive house arrest until electronic monitoring was available due to Williams'

medical condition.  (*See* Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-000019.)

Because Williams' conviction was under 75 Pa. Cons. Stat. § 3802(c) and he had a prior offense,

it was considered a first-degree misdemeanor.  *See* 75 Pa. Cons. Stat. § 3803(b)(4).  First-degree

misdemeanors in Pennsylvania carry a maximum sentence of up to five years of imprisonment.

*See* 18 Pa. Cons. Stat. § 106(b)(6).  Accordingly, federal law disqualified him (and continues to

do so) from possessing a firearm under § 922(g)(1).

Although Williams knew his license to carry a firearm had been revoked due to his 2005

DUI conviction, he continued to own approximately twenty firearms until 2014, including semi-

automatic guns, revolvers, and shotguns.  (Gov't's SUMF ¶¶ 19-21.)  Further, between 1994 and

---

the expungement of the defendant's arrest record.  *See* Pa. R. Crim. P. 320(a).  Although Williams' April 2000 DUI
charge was expunged, we will consider it his first DUI because it may be statutorily construed as such.

2010, he worked as a sales manager, firearms instructor, and range safety officer at a gun store and range called "Colosimo's."[4]  (*Id.* ¶ 22.)  During this period, some of which included his federal firearm and ammunition prohibition, Williams physically handled firearms and ammunition every day as part of his job responsibilities.  (*Id.* ¶¶ 24-25.)  As part of his employment, Williams also had the responsibility for ensuring that those who wished to purchase firearms at Colosimo's could do so under federal and state law.  (*Id.* ¶ 27.)  Additionally, he was responsible for understanding the paperwork that was needed to complete those purchases, such as the Pennsylvania state firearms application.  (*Id.* ¶ 28.)

Nevertheless, Williams in 2007 submitted an application to purchase a Glock-23.  (*Id.* ¶ 31.)  In paragraph thirty-two of the Pennsylvania State Police Application/Record of Sale, Williams checked the "no" box when asked, "Are you charged with, or have you ever been convicted of a crime punishable by imprisonment for a term exceeding one year?  This is the maximum sentence that you 'could have received,' not the actual sentence you did receive." (Gov't's SUMF ¶ 31, Ex. A ("Williams Dep."), Ex. 7.)  Williams successfully completed the purchase of the firearm based on his representations in the application.  (*Id.* ¶ 35.)

In December 2014, Williams attempted to obtain a license to carry firearms out of the desire to protect his family and himself in the home.  (Pl.'s SUMF ¶ 14.)  He was denied and subsequently submitted a challenge to the Pennsylvania State Police in January 2015.  (Gov't's SUMF ¶ 39.)  In his challenge form, Williams checked the "yes" boxes when asked whether he had ever been arrested in Pennsylvania and, if so, whether the arrest resulted in a conviction. (Williams Dep., Ex. 6 at 2.)  He wrote in the form, however, that his conviction was an ungraded misdemeanor.  (*Id.*)

---

[4] Colosimo's has since shut down after pleading guilty to federal criminal charges for falsifying ATF paperwork. (Gov't's SUMF ¶ 30.)

Appx18

Williams has worked as a construction manager for the past twenty-five years.  (Pl.'s SUMF ¶ 11.)  He has managed numerous projects, including the Curran-Fromhold Correctional Facility, the Pennsylvania Convention Center, the "SEPTA Railworks Project," the Commodore Barry Bridge, and the Interstate 95 and New Jersey Transportation maintenance facilities.  (*Id.* ¶ 12.)  His job duties include the preparation of day-to-day monitoring of various construction projects in New Jersey, Pennsylvania, and Delaware; attending project meetings on a monthly basis; and assisting contractors with cost control, project management, scheduling, and "claims/time impact analysis as needed."  (*Id.* ¶ 13.)

Williams filed suit in this Court on June 1, 2017, contending that § 922(g)(1) is unconstitutional as applied to him pursuant to the United States Court of Appeals for the Third Circuit's decision in *Binderup v. Att'y Gen. U.S. of Am.*, 836 F.3d 336 (3d Cir. 2016) (en banc). On September 14, 2017, the Government filed a motion to dismiss for failure to state a claim. On October 13, 2017, Williams filed a motion for summary judgment.  In a series of Orders dated December 1, 2017, the Court denied the Government's motion to dismiss and denied Williams' motion for summary judgment as premature.  After a period of discovery, the instant Motions for Summary Judgment followed.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and

identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

## III.    DISCUSSION

### A.    As-Applied Second Amendment Challenges in the Third Circuit

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In the seminal decision of *District of Columbia v. Heller*, the Supreme Court of the United States held that the "core" of the Second Amendment is the right of "law-

**Appx20**

abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. 570, 635 (2008), and that this right is "unconnected with militia service," *id.* at 582.  The Supreme Court recognized, however, that the individual right is "not unlimited."  *Id.* at 626.  The Court provided a non-exhaustive list of "presumptively lawful regulatory measures," such as "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27 & n.26.

The first precedential, post-*Heller* Third Circuit decision involving the Second Amendment was *United States v. Marzzarella*, a case involving an as-applied challenge.  614 F.3d 85, 88 (3d Cir. 2010).  In *Marzzarella*, the defendant argued that 18 U.S.C. § 922(k), which bars the possession of any firearm with an obliterated serial number, violated his Second Amendment right to keep and bear arms as recognized by *Heller*.  *Marzzarella*, 614 F.3d at 88.  The court derived from *Heller* "a two-pronged approach to Second Amendment challenges."  *Id.* at 89.  First, the court considers "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  *Id.*  If it does not, the challenged law stands.  *Id.*  If it does, then the law must be evaluated under intermediate scrutiny.  *Id.* at 89, 97.  If the law passes muster under intermediate scrutiny, it is constitutional.  *Id.* at 89.  If it fails intermediate scrutiny, the law is unconstitutional.  *Id.*  In *Marzzarella*, the court ultimately held that even if § 922(k) burdened protected conduct, it withstood intermediate scrutiny because the statute reasonably fit with the substantial government interest of "preserving the ability of law enforcement to conduct serial number tracing."[5]  *Id.* at 98.

---

[5] The court also stated that the law would survive strict scrutiny, which requires the law to "be 'narrowly tailored to serve a compelling state interest.'"  *Marzzarella*, 614 F.3d at 99 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465 (2007)).

The Third Circuit next addressed the Second Amendment the following year in *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011), *overruled in part by Binderup*, 836 F.3d at 349-50. In *Barton*, the defendant raised facial and as-applied challenges to 18 U.S.C. § 922(g)(1), the statute at issue in the instant case.[6]  633 F.3d at 172-73.  The court quickly disposed of the defendant's facial challenge, concluding that "because *Heller* requires that we 'presume,' under most circumstances, that felon dispossession statutes regulate conduct which is unprotected by the Second Amendment, Barton's facial challenge must fail."  *Id.* at 172.  The court next confirmed the availability of as-applied challenges under the Second Amendment, *id.* at 173, and held that "[t]o raise a successful as-applied challenge, [the challenger] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections," *id.* at 174.  Because Barton's prior convictions— possession of cocaine with intent to distribute and receipt of a stolen firearm (along with his admissions to selling a firearm with an obliterated serial number to a confidential police informant that were at issue in the case at bar)—were closely related to violent crime, the court concluded he lacked Second Amendment rights.  *Id.*

The Third Circuit next addressed the Second Amendment en banc in *Binderup*, a consolidated appeal that involved two as-applied challenges to § 922(g)(1).  One of the challengers, Daniel Binderup, was convicted in Pennsylvania state court of corrupting a minor, a misdemeanor subject to possible imprisonment of up to five years.  *Binderup*, 836 F.3d at 340. Julio Suarez, the other challenger, was convicted in Maryland state court of unlawfully carrying a handgun without a license, a misdemeanor subject to possible imprisonment of not fewer than

---

[6] A facial challenge asserts that "the law is unconstitutional in all of its applications."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  "Unlike a facial challenge, an as-applied challenge 'does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.'"  *Binderup*, 836 F.3d at 345 (quoting *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011)).

thirty days and not more than three years.  *Id.*  Eight years later, Suarez was convicted in

Maryland state court of DUI, but the conviction was not subject to § 922(g)(1).  *Binderup*, 836

F.3d at 340.

Both challenges succeeded, and the Third Circuit became the first federal Court of

Appeals to hold § 922(g)(1) unconstitutional in any of its applications.  *See Medina v. Whitaker*,

913 F.3d 152, 155 (D.C. Cir. 2019).  The en banc court split sharply on the reasoning, however,

with Judge Ambro writing a plurality opinion (joined by two other judges), Judge Hardiman

writing an opinion concurring in part and concurring in the judgments (joined by four other

judges), and Judge Fuentes writing an opinion concurring in part, dissenting in part, and

dissenting in the judgments (joined by six other judges).  After taking into account the votes of

concurring and dissenting judges, and that "when no single rationale explaining the result enjoys

the support of a majority of the Court, its holding 'may be viewed as that position taken by those

Members who concurred in the judgments on the narrowest grounds,'" Judge Ambro's opinion

controls the analysis of as-applied challenges in the Third Circuit.  *See Binderup*, 836 F.3d at

356-57; *Miller v. Sessions*, 356 F. Supp. 3d 472, 479 (E.D. Pa. 2019); *United States v. Brooks*,

341 F. Supp. 3d 566, 588 (W.D. Pa. 2018); *King v. Sessions*, No. 17-884, 2018 WL 3008527, at

*3 (E.D. Pa. June 15, 2018); *United States v. Brooks*, No. 17-250, 2018 WL 2388817, at *2

(W.D. Pa. May 24, 2018); *Gurten v. Sessions*, 295 F. Supp. 3d 511, 519 (E.D. Pa. 2018); *Keyes

v. Sessions*, 282 F. Supp. 3d 858, 869 (M.D. Pa. 2017); *Jefferies v. Sessions*, 278 F. Supp. 3d

831, 839 (E.D. Pa. 2017); *Zedonis v. Lynch*, 233 F. Supp. 3d 417, 424-25 (M.D. Pa. 2017).

Judge Ambro's opinion held that, when "[r]ead together, *Marzzarella* and *Barton* lay out

a framework for deciding as-applied challenges to gun regulations."  *Binderup*, 836 F.3d at 346.

The court synthesized *Marzzarella* and *Barton*, concluding that *Marzzarella*'s two-pronged

approach still applies, and that *Barton* identifies the "two hurdles" an individual must overcome at the first step of the *Marzzarella* framework. *Id.* at 346-47. At step one, a challenger must prove "that a presumptively lawful regulation burdens his Second Amendment rights." *Id.* To do so, per *Barton*, a challenger must "(1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Id.* at 347 (internal citations omitted). The Third Circuit held that the burden is on the challenger at step one, and cautioned that the challenger's showing "must also be strong," which is "no small task." *Id.* If the challenger succeeds at step one, the second step of the *Marzzarella* analysis requires the Government to demonstrate that the regulation satisfies intermediate scrutiny. *Id.* at 347, 353.

At the first hurdle of step one of the *Marzzarella* framework, the challenger must first identify "the historical justification for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their Second Amendment rights." *Id.* at 348. The Third Circuit explained that "the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* (citations omitted). Those who have committed or are likely to commit a violent offense (one in which actual or attempted violence is an element) "undoubtedly qualify as 'unvirtuous citizens' who lack Second Amendment rights." *Id.* (citations omitted). But because *Heller* did not confine the "presumptively lawful regulation" of felon dispossession statutes to only violent felons, the Third Circuit held that the category of "unvirtuous citizens" extends to "any person who has committed a serious criminal offense, violent or nonviolent." *Id.* That is, "persons who have committed serious crimes forfeit the right to possess firearms much the way they 'forfeit

**Appx24**

other civil liberties, including fundamental constitutional rights.'" *Id.* at 349 (quoting *Barton*, 633 F.3d at 175).

The second hurdle of step one of the *Marzzarella* framework requires the challenger to distinguish himself from the historically barred class by demonstrating that he was not convicted of a "serious crime." *Id.* Although "there are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights," the Third Circuit applied four factors for assessing the seriousness of an offense: (1) whether the state legislature enacted the crime as a misdemeanor or felony; (2) whether the offense was violent; (3) the actual punishment the challenger received; and (4) whether there is a cross-jurisdictional consensus regarding the seriousness of the crime. *Id.* at 351-53.

### B. Application to Williams

#### 1. Step One: Whether § 922(g)(1) Burdens Williams' Second Amendment Rights

Under § 922(g)(1), a person convicted of a crime punishable by more than one year of imprisonment is disqualified from possessing a firearm. *See* 18 U.S.C. § 922(g)(1). Williams' conviction was a first-degree misdemeanor punishable by a term of imprisonment of up to five years under Pennsylvania law, making him subject to the "presumptively lawful" firearm ban.[7] To overcome the presumption, step one of the *Marzzarella* framework requires him to make a strong showing that his second DUI at the highest rate of intoxication was not "serious."

---

[7] As we noted above, a state law misdemeanor that is punishable by two years of imprisonment or fewer is not federally prohibiting under § 922(g)(1). *See* 18 U.S.C. § 921(a)(20)(B). Because Williams' maximum sentence for his second DUI was up to five years' imprisonment, he does not get the carve-out of § 921(a)(20)(B). Further, Williams' disqualifying conviction has not been expunged or set aside, nor has he been pardoned. *See id.* § 921(a)(20).

**Appx25**

a.    The *Binderup* Factors

Turning to the first factor, the *Binderup* plaintiffs were convicted of state law misdemeanors.  *See Binderup*, 836 F.3d at 351.  The Third Circuit explained that "[m]isdemeanors are, and traditionally have been, considered less serious than felonies."  *Id.*  Indeed, "a state legislature's classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying."  *Id.*  And although some misdemeanors involve conduct more dangerous than felonies, "Congress may not overlook so generally the misdemeanor label, which, in the Second Amendment context, is also important."  *Id.* at 351-52.  In this case, because Williams' disqualifying offense was a misdemeanor, this factor weighs in his favor.[8]

The second factor requires the Court to consider whether violence was an element of the offense.  *See id.* at 352.  In doing so, "we look only to a crime's elements rather than the way it actually was committed."  *Id.* at 352 n.4.  Here, Williams was convicted of DUI at the highest rate of intoxication, an offense that contains no element of violence.  *See* 75 Pa. Cons. Stat. § 3802(c).[9]  Accordingly, this factor also weighs in his favor.[10]

---

[8] In support of its position that Williams cannot carry his burden at step one, the Government points to Pennsylvania legislative history indicating that the DUI laws are considered serious.  (Gov't Mem. Law Supp. Mot. Summ. J. 12.)  The legislative history shows that the legislators believe Pennsylvania is "tough" on DUI offenders because of the potential sentences for the offenses.  (*Id.*)  However, the maximum sentence is not dispositive on the issue of whether an offense is serious, and the legislature did not see a repeat DUI offender at the highest rate of intoxication to be so serious as to label the conduct a felony.  *See Binderup*, 836 F.3d at 352.

[9] 75 Pa. Cons. Stat. § 3802(c) provides that "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is 0.16% or higher within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle."

[10] Given that the Third Circuit twice stated that those who have committed or are likely to commit a crime in which violence (actual or attempted) is an element are "undoubtedly" unvirtuous citizens who lack Second Amendment rights, *Binderup*, 836 F.3d at 348, 352, it is unclear why this is even a factor in determining the seriousness of the challenger's offense.  In other words, it appears a crime of violence is per se disqualifying and that no further analysis would be necessary.

**Appx26**

The parties significantly dispute the weight the Court should give to the third and fourth factors. The third factor looks to the actual sentence the challenger received for the offense. *See Binderup*, 836 F.3d at 352. In *Binderup*, Daniel Binderup was sentenced to three years of probation and a $300 fine, plus court costs and restitution. *Id.* Julio Suarez was given a suspended sentence of 180 days' imprisonment and a $500 fine. *Id.* The Third Circuit stated that both plaintiffs received a "minor sentence," as "severe punishments are typically reserved for serious crimes." *Id.* The court emphasized that the punishments reflected the sentencing judges' assessment of how minor the offenses were because neither plaintiff received a single day of jail time. *Id.*

Williams relies significantly on the United States District Court for the Middle District of Pennsylvania's decision in *Holloway v. Sessions*, 349 F. Supp. 3d 451 (M.D. Pa. 2018), a case that nearly mirrors the instant matter. Holloway, like Williams, was convicted of DUI at the highest rate of intoxication with a prior offense. *Id.* at 454. Holloway was sentenced to ninety days of imprisonment with work release, a fine of $1,500, completion of recommended drug and alcohol treatment, and sixty months' probation. *Id.* Through the work release program, Holloway reported for work each day but was otherwise confined to county prison for the remainder of the time. *Id.* at 455.

Despite the plaintiff in *Holloway* actually being sentenced to imprisonment, the court concluded that the sentence was "relatively minor." *Id.* at 457. The court reasoned that, unlike Julio Suarez's sentencing judge, who had the discretionary authority to give a suspended sentence of 180 days' imprisonment, Holloway's sentencing judge lacked such authority. *Id.* The court stated that Holloway's sentence was "relatively minor" as compared to the one-year threshold in § 922(g)(1) and the five-year maximum penalty he faced under Pennsylvania law.

**Appx27**

*Holloway*, 349 F. Supp. 3d at 457.  Additionally, the court reasoned that Holloway's assignment to the work release program showed the minor nature of his sentence because "the sentencing judge did not find Holloway to pose a significant risk to public safety."  *Id.*

Williams compares his sentence to the *Binderup* and *Holloway* plaintiffs' sentences, arguing it was "hardly severe relative" to the others.  (Pl.'s Br. Supp. Mot. Summ. J. 19.)  He claims that his sentence of ninety days of passive house arrest was "in essence, probation."  (*Id.*)  The Government contends that Williams' sentence of ninety days to two years of imprisonment was severe.  In particular, the Government claims that Williams would have served ninety days in jail if not for his medical condition.  (Gov't Resp. Opp'n Pl.'s Mot. Summ. J. 11.)  Additionally, the Government argues that the maximum sentence of two years of imprisonment is probative of the sentencing judge's determination that Williams' offense was serious.  (*Id.* at 11-12.)

Along with fines and other conditions, Williams was sentenced to ninety days to two years of imprisonment for his violation of 75 Pa. Cons. Stat. § 3804(c).  We do not give much weight to the Government's characterization of Williams' sentence being two years, as the sentencing judge specifically noted that Williams was "[t]o be paroled after completing the minimum sentence without further order of the court."  (Gov't Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-000022.)  That is, although the judge's split sentence gives a maximum two-year term of imprisonment, the judge effectively sentenced Williams to ninety days.  Therefore, we believe ninety days is the relevant sentence term for our consideration of whether Williams' offense was "serious."

An added wrinkle is that the sentencing judge allowed Williams to serve the ninety days "on passive house arrest until electronic monitoring [was] available due to [a] medical

14

**Appx28**

condition."[11]  (*Id.*)  Williams contends his sentence of house arrest shows that the judge did not believe his offense was worthy of any jail time.  (Pl.'s Br. Supp. Mot. Summ. J. 19.)  The Government, on the other hand, notes that Williams would have served his sentence in jail if not for his medical condition.  (Gov't Resp. Opp'n Pl.'s Mot. Summ. J. 11.)

We believe Williams' sentence falls in between the *Binderup* plaintiffs' sentences and the *Holloway* plaintiff's sentence.  The *Binderup* plaintiffs respectively received probation and a suspended prison sentence, which the Third Circuit deemed to be "minor" due to the lack of jail time.  The plaintiff in *Holloway* received a term of actual imprisonment for ninety days with participation in the work release program, meaning he was actually confined to county jail except when he reported to work.  Even assuming Williams' sentence of ninety days of house arrest (as opposed to ninety days of imprisonment, as the Government argues) is the operative sentence for the Court to consider, it is certainly more severe than the sentences the plaintiffs received in *Binderup*.  Because house arrest is a form of confinement, it seriously restricts an individual's liberty in a way that probation does not.  *See McKenzie v. Att'y Gen. of U.S.*, 452 F. App'x 88, 90-91 (3d Cir. 2011) (stating that under the Immigration and Nationality Act, "home confinement [is] a serious restriction of [the plaintiff's] liberty and qualifie[s] as imprisonment"); *Beahm v. Burke*, 982 F. Supp. 2d 451, 461 (E.D. Pa. 2013) (stating that "while house arrest is not a prison sentence *per se*, it is considered 'confinement'").  Therefore, we cannot agree with Williams' characterization that ninety days of house arrest is equivalent to probation.

Williams' sentence is, however, less severe than the plaintiff's sentence in *Holloway*, a sentence which the court found to be "relatively minor."  Nevertheless, we believe the severity of Williams' sentence leans slightly in favor of the Government.  Although Williams was given the

---

[11] The sentencing judge could have sentenced Williams to house arrest even in the absence of a medical condition. *See* 42 Pa. Cons. Stat. §§ 9763, 9804; 37 Pa. Code § 451.52.  The Government agrees with this as well.  (*See* Gov't's Reply in Supp. Defs.' Mot. Summ. J. 2.)

**Appx29**

minimum sentence under 75 Pa. Cons. Stat. § 3804(c)(2), the sentence still restricted his liberty due to its custodial nature. We simply cannot overlook the fact that the Pennsylvania legislature deemed a second DUI at the highest rate of intoxication to be so serious as to mandate a minimum ninety-day term of confinement. *See id.* Because Williams, unlike the plaintiffs in *Binderup*, received a custodial sentence for his second DUI at the highest rate of intoxication, this factor leans slightly in favor of the Government.

The fourth and final factor requires the Court to look to whether there is a cross-jurisdictional consensus regarding the seriousness of Williams' offense. In *Binderup*, one plaintiff was convicted of corrupting a minor, a crime that "some states treated . . . as serious crimes . . . but the vast majority of states [did] not." *Binderup*, 836 F.3d at 352. Additionally, the conduct "arguably would have been criminal in a few other states because his 17-year-old sexual partner was his employee, yet it still would have been legal in many states." *Id.* Regarding the other plaintiff in *Binderup*, who was convicted of carrying a handgun without a license, the court noted that although "some states punish the unlicensed carrying of a concealed weapon as a serious crime, more than half prescribe a maximum sentence that does not meet the threshold of a traditional felony (more than one year in prison) and others do not even require a specific credential to carry a concealed weapon." *Id.*

After consideration of the fifty-state surveys the parties have submitted in connection with their Motions, we believe Williams has easily met his burden regarding the cross-jurisdictional analysis. Although all states criminalize DUI, there is no clear consensus among the states regarding the seriousness of Williams' offense. For instance, a second DUI at the BAC that Williams had (.223%) would result in only eleven other states punishing his conduct by a term of imprisonment exceeding one year (the traditional threshold for a felony). (*See* Gov't's

Mem. Law Supp. Mot. Summ. J., Ex. R ("Gov't's DUI Chart"); Pl.'s Br. Supp. Mot. Summ. J.,

Ex. C ("Pl.'s DUI Chart").)  Of those eleven states, four would classify the offense as a felony.

(*See* Gov't's DUI Chart; Pl.'s DUI Chart.)  Accordingly, given that Williams' conduct would

meet the traditional definition of a felony in only eleven other states, he has shown that there is

no consensus regarding the seriousness of his offense.  *See Binderup*, 836 F.3d at 352 (stating

that one of the challengers' offense was not serious because *more than half of the states* would

prescribe a maximum sentence that would not meet the traditional definition of a felony).

The Government attempts to stretch this factor to include states whose maximum

sentence for Williams' offense is prescribed at "*approximately* one year or more."  (Gov't's

Resp. Opp'n Pl.'s Mot. Summ. J. 13) (emphasis added).  The Government argues that 76% of

states establish a maximum possible punishment for an offense like Williams' at "about one year

or more."  (*Id.*)  Thus, the Government claims that 76% is clearly a consensus regarding the

seriousness of the offense at issue.

We reject the Government's invitation to extend the cross-jurisdictional analysis to

include offenses where the maximum possible punishment approaches one year.  In setting forth

this factor, the Third Circuit described the states criminalizing Julio Suarez's offense, noting that

"more than half prescribe a maximum sentence that does not meet the threshold of a traditional

felony."  *Binderup*, 836 F. 3d at 352.  Accordingly, when assessing the cross-jurisdictional

factor, it is appropriate for the Court to consider (1) the legality of the conduct in the various

states, and (2) the number of states that prescribe a maximum sentence that meets the definition

of a traditional felony (those offenses that are punishable by *more* than one year in prison).  *See*

*id.*  The Third Circuit has set the barometer for the second consideration of this factor at the

**Appx31**

threshold of a traditional felony, and we do not accept the Government's argument to lower the bar.

To summarize, Williams' offense was a misdemeanor, a label that is "a state legislature's . . . powerful expression of its belief that the offense is not serious enough to be disqualifying." *Id.* at 351. Although Williams was sentenced to a form of confinement for ninety days (a factor that weighs slightly in favor of the Government), violence was not an element of the offense. Significantly, Williams has provided evidence that only eleven other states would punish his conduct by more than one year in prison, necessitating in the conclusion that there is a general consensus of the nonserious nature of the offense. Despite the maximum punishment, Williams has thus carried his high burden of showing that his misdemeanor was not serious. Accordingly, he has distinguished himself from those persons historically excluded from the right to bear arms.

### b.    Additional Arguments

The Government makes the additional argument that Williams' post-conviction conduct makes him an "'unvirtuous citizen' who is no longer entitled to the Second Amendment's benefits." (Gov't's Mem. Law Supp. Mot. Summ. J. 17.) In particular, the Government points to Williams' admissions during his deposition that he continued to own firearms through 2014 and handled them during his employment at a gun store, a time in which he was federally prohibited from doing so; his answer of "no" on a Pennsylvania State Police firearms application, where he was asked whether he had been convicted of a crime punishable by over one year of imprisonment or a misdemeanor punishable by over two years of imprisonment; and his notation that he had been convicted of an ungraded misdemeanor when he challenged his eligibility to carry a firearm in 2015. (*See id.* at 18.) This string of conduct, the Government

**Appx32**

contends, "readily qualifies" Williams "as an 'unvirtuous citizen' who is not eligible for Second Amendment protection." (*Id.*)

We must reject the Government's argument, as the Third Circuit expressly stated that the only inquiry at step one of the *Marzzarella* framework is determining the seriousness of the disqualifying offense. *See Binderup*, 836 F.3d at 350 ("[T]he seriousness of the purportedly disqualifying offense is our sole focus throughout *Marzzarella*'s first step.), *id.* ("[O]nly the seriousness of the purportedly disqualifying offense determines the constitutional sweep of statutes like § 922(g)(1) at step one."), *id.* at 354 n.7 ("[E]vidence of how individuals have lived their lives since committing crimes is irrelevant under *Marzzarella*'s first step."). Indeed, after one of the *Binderup* plaintiffs' disqualifying offense, he was convicted eight years later of DUI. *Id.* at 340. Nevertheless, the fact that he had a subsequent conviction played no part in the Third Circuit's analysis at *Marzzarella*'s first step. Accordingly, Williams' post-conviction conduct is irrelevant at this juncture, and we reject the Government's position that any language to the contrary in *Binderup* is merely dicta.

### 2.    *Step Two: Intermediate Scrutiny*

Now that Williams has succeeded at step one of the *Marzzarella* framework, the burden next shifts to the Government to demonstrate that the law satisfies intermediate scrutiny.[12] *See id.* at 347, 353. Under intermediate scrutiny, the Government "must assert a significant,

---

[12] Williams "acknowledges the Third Circuit's precedent in *Binderup*," but "respectfully calls into question" its two-pronged approach. (Pl.'s Br. Supp. Mot. Summ. J. 21.) Williams argues that, in light of the Supreme Court's decisions in *Heller* and *McDonald v. City of Chic.*, 561 U.S. 742 (2010), we should not apply any level of scrutiny at this point and the analysis should end (in other words, he prevails). If we deem a constitutional scrutiny test should apply, Williams contends it should be strict scrutiny rather than intermediate scrutiny.

We obviously reject Williams' arguments concerning whether part two of the *Marzzarella* framework should even exist and, if so, what level of scrutiny applies. The Third Circuit determined in *Marzzarella* that intermediate scrutiny was the appropriate form of means-end scrutiny for as-applied Second Amendment challenges, and it reaffirmed that holding in *Binderup*. It goes without saying that we will not apply a different framework from that which binding Third Circuit precedent requires. Moreover, counsel for Williams has made the identical argument in other cases, which has been soundly rejected. *See Miller*, 356 F. Supp. 3d at 483 n.13; *Holloway*, 349 F. Supp. 3d at 460 n.9.

substantial, or important interest; there must also be a reasonable fit between that asserted

interest and the challenged law, such that the law does not burden more conduct than is

reasonably necessary." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106,

119 (3d Cir. 2018) (quoting *Drake v. Filko*, 724 F.3d 426, 436 (3d Cir. 2013)).  The Third

Circuit stated that there can be "[n]o doubt § 922(g)(1) is intended to further the government

interest of promoting public safety by 'preventing armed mayhem,' an interest that is both

important and compelling." *Binderup*, 836 F.3d at 353 (internal citation omitted) (citing *United

States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010)).  However, the Government must still prove

"the appropriateness of the means it employs to further its interest." *Id.*

In *Binderup*, the Third Circuit held that the Government failed to satisfy its burden of

intermediate scrutiny because the record contained "no evidence explaining why banning people

like [the plaintiffs] (*i.e.*, people who decades ago committed similar misdemeanors) from

possessing firearms promotes public safety." *Id.* at 353-54.  As a general matter, the government

relied on studies that showed felons commit violent crimes more frequently than non-felons, and

that the denial of handgun purchases to convicted felons showed a twenty to thirty percent

reduction in the risk of later criminal activity.  *Id.* at 354.  Because the studies estimated the

likelihood that incarcerated felons would reoffend after their release from prison, and the

plaintiffs in *Binderup* were neither felons nor incarcerated, the Third Circuit held that no

reasonable conclusions could be drawn "about the risk posed by their possession of firearms

from such obviously distinguishable studies." *Id.*

The government also relied on studies that it contended were relevant to each plaintiff's

situation.  Regarding Daniel Binderup, the government cited studies from several states that

would classify him as a sex offender due to his conduct.  *Id.*  The Third Circuit rejected the

**Appx34**

government's position, stating that the "sex-offender specific studies focus on people who were incarcerated." *Id.* at 355. Therefore, it would not be helpful "to draw inferences about the usefulness of disarming Binderup from those off-point studies." *Id.* Regarding Julio Suarez, the government relied on a study "indicating that California handgun purchasers in 1977 'who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses,' were more likely than people with no criminal histories to be charged later with a violent crime." *Id.* (citation omitted). The Third Circuit stated that the study addressed the risk of recidivism only within fifteen years of a conviction for an unspecified nonviolent firearm-related offense. *Id.* Thus, this study was also off-point, as "[c]ommon sense tells us that recidivism rates would change with the passage of an additional 11 years (Suarez was convicted 26 years ago) and vary based on the circumstances of the prior conviction." *Id.*

In this case, the Government relies heavily on the expert report of Daniel Webster ("Dr. Webster"), ScD, a Professor of Health Policy and Management, Co-Director for Research at the Center for the Prevention of Youth Violence, and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health.[13] (Gov't Mem. Law Supp. Mot. Summ. J., Ex. S ("Webster Report") at 1.) Dr. Webster earned a Masters of Public Health from the University of Michigan in 1985 and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health in 1991. (*Id.* at 2.) In short, most of his academic teaching and scholarship since 1985 has focused on studies relevant to gun-related injuries and violence. (*See id.*)

---

[13] Williams "objects" separately to Dr. Webster's expert report, listing numerous objections in numbered paragraphs that can be described at best as scattershot. (*See* Doc. No. 29-6.) Williams has not technically moved to exclude Dr. Webster's report. Nevertheless, even construing his "objections" to be a motion, all of his contentions go to the weight the Court should give to the expert report, not the report's admissibility. Accordingly, Williams' objections to Dr. Webster's report are denied.

Appx35

Dr. Webster ultimately opines that there is a reasonable fit between prohibiting DUI misdemeanants from possessing firearms and public safety.  Among other things, he states that individuals convicted of drunk driving, especially repeat offenders and those with high BACs at the time of their arrests, have higher rates of drug abuse, alcohol abuse, and psychiatric disorders, (*id.* at 4); that "[t]here is a large body of scientific evidence indicating that people who abuse alcohol are at a substantially increased risk of committing acts of violence" and suicidal behavior, (*id.* at 6-8); and that "[e]mpirical evidence shows that DUI/DWI offenders are more likely to commit violent or firearms-related offenses," (*id.* at 9).  The last of these opinions is relevant for our purposes.

Dr. Webster describes a study that Dr. Garen Wintemute led that is most relevant to the instant matter.  (*Id.*)  In that study, Dr. Wintemute drew upon data from a random sample of 5,923 persons under the age of fifty "who purchased a handgun from a licensed retail firearm dealer in California in 1977 and were stratified by whether or not the person had a prior adult (age 18 years and older) criminal history of any kind at the time the handgun was purchased." (*Id.*)  In an effort to examine the relationship between prior alcohol-related convictions and the risk of future arrests for crimes involving violence and/or firearms, Dr. Wintemute and his colleagues limited their analysis to 1,272 handgun purchasers with prior alcohol-related convictions (77.8% of whom had DUI/DWI convictions) and 2,794 handgun purchasers with no prior criminal history.  (*Id.*)  Importantly, follow-up on the sample was done in 1991.  Dr. Webster describes in his report that

> [t]he most relevant findings were the most straight-forward[:]
> 32.8% of handgun purchasers with prior alcohol convictions versus
> 5.8% of handgun purchasers with no criminal history were arrested
> for a crime involving violence and/or firearms – a 5.6-fold
> difference.  Those with a prior alcohol offense had a similar
> disproportionate risk for being arrested for the most serious crimes

**Appx36**

> (FBI Index – murder, rape, robbery, aggravated assault), 15.9%
> versus 2.7% among those with no record of prior offenses. . . .
> Regression analysis conducted to control for other risk factors and
> generate estimates of independent effects indicated that having a
> history of even a single prior conviction for an alcohol-related
> crime was associated with a 4-fold increased risk of being arrested
> for a crime of violence or firearm-related crime.

(*Id.* at 9-10.)  Accordingly, he concludes that "DUI/DWI offenses are therefore robust predictors of future violent and firearms-related offenses."  (*Id.* at 15.)

The parties represent that the *Holloway* court had a nearly identical version of Dr. Webster's report before it.  (Pl.'s Br. Supp. Mot. Summ. J. 37; Gov't's Mem. Law Supp. Mot. Summ. J. 22.)  In *Holloway*, the court gave no weight to Dr. Webster's report.  *See Holloway*, 349 F. Supp. 3d at 461-62.  With respect to Dr. Webster's description of Dr. Wintemute and colleagues' study of California handgun purchasers in 1977 and follow-up in 1991, the court reasoned simply that "[w]ithout questioning the validity of the study's methodology, we find that this study alone does not adequately establish a substantial fit between Holloway's disarmament and the government's compelling interest in preventing armed mayhem."  *Id.* at 461.  The court nevertheless concluded that the government presented "*no* evidence indicating that individuals like" the plaintiff were so potentially irresponsible that they should be prohibited from possessing a firearm.  *Id.* at 462 (emphasis added).  Williams naturally argues that we should follow the court's reasoning in *Holloway*.

The *Holloway* court did not find that the study was off-point as the Third Circuit found the empirical evidence to be in *Binderup*, but apparently believed the government's evidence was not substantial enough.  The Third Circuit, however, expressly noted that "[p]arties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction."

**Appx37**

*Binderup*, 836 F.3d at 355.  The problem with the empirical evidence in *Binderup* was that the government's evidence did not contain reliable statistics that individuals with the plaintiffs' backgrounds were more likely "to misuse firearms or were otherwise irresponsible or dangerous."  *Id.*

We must respectfully disagree with *Holloway* and conclude that the Government has met its burden of intermediate scrutiny.  Dr. Wintemute's study shows that, as compared to individuals with no prior criminal record, there is a significant statistical increase in the likelihood that an individual will be arrested for a crime involving a firearm or violence when that person has an alcohol-related conviction.[14]  (*See* Webster Report at 9) (citing Garen J. Wintemute et al., *Firearms, Alcohol and Crime: Convictions for Driving Under the Influence (DUI) and Other Alcohol-Related Crimes and Risk for Future Criminal Activity Among Authorised Purchasers of Handguns*, Injury Prevention, Vol. 24 at 68-72 (2018)).  Indeed, the study found that 32.8% of handgun purchasers with a prior alcohol-related offense were arrested for a crime involving violence and/or a firearm, versus 5.8% of handgun purchasers with no prior criminal history.  (*Id.*)  When regression analysis was conducted to control for other risk factors, it showed that having a single prior conviction for an alcohol-related crime was associated with a four-fold increase in risk of being arrested for a crime of violence or firearm-related crime.  (*Id.* at 9-10.)  Importantly, these statistics pertain to a fourteen-year period between the handgun purchase in 1977 and the follow-up in 1991.

Unlike the off-point empirical evidence presented in *Binderup*, Williams falls squarely within Dr. Wintemute's study.  For purposes of charging and sentencing, Williams' disqualifying offense was his second DUI.  At the time he filed this action the conviction was only twelve

---

[14] We again reiterate that nearly 78% of the individuals in Dr. Wintemute's sample were convicted of DUI, the exact offense at issue here.

**Appx38**

years old, and it is not even fourteen years old as of the date of this Opinion.  Dr. Wintemute's

study shows that individuals like Williams, who have been convicted of an alcohol-related

offense within the past fourteen years, have a four to five-fold increase of being arrested for a

subsequent crime of violence or one involving a firearm.  We believe such statistics demonstrate

a reasonable fit between Williams' disarmament and the important government interest of

preventing armed mayhem.  *See Marzzarella*, 614 F.3d at 98 (noting that the "fit between the

challenged regulation and the asserted objective be reasonable, not perfect").  Accordingly, the

Government has carried its burden of demonstrating that § 922(g)(1) survives intermediate

scrutiny.

While we have already determined that the Government has satisfied its burden of

intermediate scrutiny, we must address some of the parties' additional arguments.  First,

Williams counters Dr. Webster's expert report with the expert opinion of Robert M. Gordon,

Ph.D., ABPP, who is board certified in clinical psychology and psychoanalysis.[15]  (Pl.'s Br.

Supp. Mot. Summ. J. 36-37, Ex. J ("Dr. Gordon Report") at 1.)  Dr. Gordon performed an in-

person clinical examination of Williams and ultimately recommends "that Mr. Williams be

allowed to own, possess, carry, and use a firearm" and can do so "without risk to himself or any

other person."  (Dr. Gordon Report at 12.)  Dr. Gordon also takes issue with Dr. Webster's

expert report, noting that "[w]hile Dr. Webster presents some valid correlational research on

groupings of individuals, it has a relatively small predictive value in generalizing to groups" and

---

[15] The Government contends that Dr. Gordon's expert report is unreviewable on summary judgment because it is
unsworn.  (Gov't's Resp. Opp'n Pl.'s Mot. Summ. J. 23-24) (citing *Jackson v. Egyptian Navigation Co.*, 222 F.
Supp. 2d 700, 709 (E.D. Pa. 2002)).  It is true that Dr. Gordon's original expert report was unsworn.  However,
several weeks after Williams filed his Motion for Summary Judgment, he supplemented the expert report with a
declaration from Dr. Gordon that is sworn under the penalty of perjury.  (*See* Doc. No. 40.)  Because the
Government fails to identify any prejudice associated with the original report being supplemented later with a sworn
declaration, we will consider it at this stage of the litigation.  *See Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking
Co.*, 868 F.2d 59, 67 (3d Cir. 1989) (stating that "evidence should not be excluded on summary judgment on
hypertechnical grounds").

**Appx39**

fails to predict the effect of numerous DUI convictions from fourteen to eighteen years ago.  (*Id.* at 7.)  Dr. Gordon also takes issue with, *inter alia*, some of Dr. Webster's report being premised on individuals who suffer from alcohol or abuse issues, as there is no evidence Williams suffers from any kind of dependency.  (*See id.*)

We reject Dr. Gordon's opinion that Williams should be allowed to own, carry, and possess a firearm because he allegedly poses no risk to himself or others.  The Government's burden at step two of the *Marzzarella* framework is not individualistic, but rather focuses on whether the Government can dispossess a class of people who have been convicted of certain crimes.  *See Binderup*, 836 F.3d at 355 (stating that the "[p]arties may use statistics to show that *people who commit certain crimes* have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament. . . ." and that empirical studies could demonstrate an appropriate fit between the plaintiffs' disarmament and the promotion of public safety "if they contained reliable statistical evidence that *people with the [plaintiffs'] backgrounds* were more likely to misuse firearms or were otherwise irresponsible or dangerous") (emphasis added); *see also Skoien*, 614 F.3d at 641 ("[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.").  And while Dr. Gordon takes issue with some aspects of Dr. Webster's report, he in no way undermines the empirical evidence that individuals with alcohol-related convictions have a four to five-fold increase of being arrested for a crime of violence or firearm-related offense.

Williams also argues that the Government's prior history of granting relief from federal firearms disabilities undermines the Government's argument at step two of the *Marzzarella* framework.  (Pl.'s Br. Supp. Mot. Summ. J. 28-35.)  Under 18 U.S.C. § 925(c), the United States

Attorney General has the authority to grant relief from federal firearms disabilities if an individual establishes "that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." This provision has been rendered inoperative since 1993, however, as "Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications.'" *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (alteration in original) (quoting *United States v. Bean*, 537 U.S. 71, 74-75 (2002)).  Williams points to four individuals granted relief under § 925(c) who were convicted of crimes that he alleges were similar or more serious than his disqualifying offense.

Under § 925(c), federal law allows an individual to make an application to the Attorney General for relief from a federal firearm disability, which is evaluated on a case-by-case basis. However, examples of people who were granted relief under § 925(c) prior to its defunding are inapposite because, as we explained above, *Marzzarella*'s second prong does not call for an individualized assessment.  While Williams might succeed in an application to the Attorney General under § 925(c) if Congress were to fund it, the fact remains that such evidence plays no role in the analysis that *Binderup* requires.  Indeed, the argument Williams presents here is identical to the plaintiff's argument in *Holloway*, which the court found unpersuasive.  *See Holloway*, 349 F. Supp. 3d at 462.  Accordingly, the examples of individuals who were granted relief under § 925(c) are irrelevant.

We next move to the Government's additional argument concerning part two of the *Marzzarella* framework.  The Government stresses that it satisfies intermediate scrutiny in this case, even in the absence of statistical evidence, because there is evidence in the record that

**Appx41**

Williams "*has already* been engaging in crimes and has been irresponsible since his 2004 DUI conviction."[16]  (Gov't's Mem. Law Supp. Mot. Summ. J. 20) (emphasis in original).  In *Binderup*, the Third Circuit stated that step two looks to the "likelihood that the [plaintiff] will commit crimes in the future," 836 F.3d at 354 n.7, or whether the plaintiff "[is] more likely to misuse firearms or [is] otherwise irresponsible or dangerous," *id.* at 355.  The Government once again points to the fact that Williams continued to own and possess firearms in his personal and employment capacities when he was federally prohibited from doing so; and allegedly made false representations on a 2007 application to purchase a firearm and a 2015 challenge to a denial of his eligibility to carry a firearm.  (Gov't's Mem. Law Supp. Mot. Summ. J. 20-21.)

Several reasons give the Court concern in considering the Government's argument about Williams' conduct after his disqualifying conviction.  First, the Government essentially asks the Court to find criminality in this civil matter.  Williams has not been convicted of any charges due to the aforementioned conduct, nor do the parties represent that he has been charged.  Thus, it would be inappropriate and unwise for the Court to find criminality in the absence of a criminal adjudicative process.  Second, *Binderup* itself lends support for the principle that post-disqualifying convictions, which lack violence or are not firearm-related, play no role in *Marzzarella*'s second step.  One of the *Binderup* plaintiffs was convicted of unlawfully carrying a handgun without a license, a disqualifying offense under § 922(g)(1).  *Binderup*, 836 F.3d at 340.  Eight years later he was convicted of DUI, but that offense was not disqualifying.  *Id.*  In detailing the analysis of part two of the *Marzzarella* framework, the Third Circuit neglected to even mention the subsequent DUI conviction; it played absolutely no role in the court's

---

[16] For clarity, we note that Williams was arrested in 2004, tried and convicted in 2005, and ultimately sentenced in 2006.  (*See* Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-000019, 000020.)

**Appx42**

reasoning.  Accordingly, even if Williams had non-disqualifying convictions after his disqualifying offense, it appears consideration of them would be misplaced.

## IV.    CONCLUSION

Section 922(g)(1) is constitutional as applied to Williams.  While we find that § 922(g)(1) burdens Williams' Second Amendment rights because his disqualifying conviction was not "serious," the law is constitutional as applied because the Government has satisfied its burden of intermediate scrutiny.  The statistical evidence shows that individuals convicted of an alcohol-related offense have a four to five-fold increase of being arrested for a crime of violence or firearm-related offense, as compared to individuals with no prior criminal history.  Therefore, we believe there is a reasonable fit between disarming individuals like Williams, who were convicted of DUI, and the important government interest of preventing armed mayhem.

For the reasons noted above, the Government's Motion for Summary Judgment is granted, and Williams' Motion for Summary Judgment is denied.

An appropriate Order follows.

**Appx43**