No. 24-1091

# In the
# United States Court of Appeals
# for the Third Circuit

◆

**EDWARD A. WILLIAMS,**

*Plaintiff–Appellee,*

v.

**ATTORNEY GENERAL OF THE UNITED STATES, et al.,**

*Defendants–Appellants.*

◆

Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 2:17-cv-02641

◆

**BRIEF OF THE APPELLEE**

◆

JOSHUA PRINCE, ESQ.
PRINCE LAW OFFICES, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 313-0416
Joshua@PrinceLaw.com

*Counsel for Appellee*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF THE ISSUE ...............................................................2

STATEMENT OF THE CASE ................................................................3

    **A.**   **Statutory Background** ............................................................3

    **B.**   **Factual Background** ...............................................................4

SUMMARY OF ARGUMENT ................................................................8

STANDARD OF REVIEW ...................................................................11

ARGUMENT ........................................................................................12

    **A.**   **The Proper Analysis Post-*Bruen* and *Range*** ....................12

    **B.**   **Mr. Williams and His Proposed Conduct are Protected by the Second Amendment** ...............................................................14

    **C.**   **The Government Cannot Establish that Section 922(g)(1), *As-Applied* to Mr. Williams, is Consistent with the Nation's Tradition of Firearm Regulation** .........................................16

        *i.*   *Alcohol intoxication has been a general societal problem that has persisted since the 18th century*................................20

        *ii.*  *Even if,* arguendo, *this Court considers the issue before it an unprecedented societal concern or dramatic technological change, the Government fails to prove any relevantly similar law to Section 922(g)(1)'s application to Mr. Williams*...................22

        *iii.* *Legislative authority to disarm has been rejected by this Court*......27

        *iv.* *An untethered "seriousness" or "dangerousness" inquiry is not part of the relevant analytical framework*................................30

     *v.*   *Even if,* arguendo, *this Court considers dangerousness, the Government has failed to establish that Mr. Williams is likely to act dangerously with a firearm* ....................................................34

**CONCLUSION** ..................................................................................36

**CERTIFICATE OF COMPLIANCE** .................................................37

# TABLE OF AUTHORITIES

## CASES

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ............................................. 12, 15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................................... passim

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................................... 19

*Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) ................................................................................................... 19

*Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024) ................................................................................................... 18

*McDonald v. Chicago*, 561 U.S. 742 (2010) ........................................................... 28

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ................... passim

*Range v. Attorney Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) ................................................................................................... passim

*Sprint Communications Co. v. APCC Servs., Inc.,* 554 U.S. 269 (2008) ............... 17

*State v. Shelby*, 90 Mo. 302, 2 S.W. 468 (1886) ...................................................... 25

*Stradford v. Secretary Pa. Dep't of Corr.*, 53 F.4th 67 (3d Cir. 2022) .................... 11

*United States v. Alston*, 5:23-CR-021-FL-1, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023) ............................................................................... 23

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ....................................... passim

*United States v. Duarte*. ___ F.4th ___ 2024 WL 2068016 (9th Cir. May 9, 2024) ................................................................................................. 14, 23

## STATUTES

18 Pa. Cons. Stat. § 106 ............................................................................................. 4

18 Pa. Cons. Stat. § 1104 ........................................................................................ 3, 4

18 Pa. Cons. Stat. § 6105 ........................................................................7, 29

18 U.S.C. § 921 ......................................................................................3, 6

18 U.S.C. § 922 ...................................................................................passim

75 Pa. Cons. Stat. § 3802 ........................................................................3, 4

75 Pa. Cons. Stat. § 3803 ........................................................................3, 4

## INTRODUCTION

Throughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did the government disarm individuals who used drugs or alcohol at one time from possessing guns at another. A few states banned carrying a weapon while *actively under the influence*, but those statutes did not emerge until well after the Civil War. Section 922(g)(3)—the first federal law of its kind—was not enacted until 1968, nearly two centuries after the Second Amendment was adopted.

In short, our history and tradition may support some limits on *an intoxicated person's* right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his past [] usage.

*United States v. Daniels*, 77 F.4th 337, 340 (5th Cir. 2023) (emphasis added).

Appellee Edward Williams (hereinafter "Mr. Williams" or "Appellee"), desiring to exercise his fundamental, individual right to purchase, own, possess, and utilize a firearm for purposes of self-defense of himself and his family, [1] filed suit, complaining that the Appellants collectively and individually prohibited a particular class of persons, including himself, from purchasing, owning, possessing, keeping, bearing, or otherwise utilizing firearms and ammunition as a result of a misdemeanor driving under the influence (hereinafter "DUI") conviction, where no one was injured, there was no property damage, and his

---

[1] *See* Appx56-58, ¶¶ 15, 18, 25.

conduct did not involve a firearm, in violation of his rights as protected by the Second Amendment. [2] And the District Court agreed.

Consistent with the U.S. Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) and this Court's *en banc* decision in *Range v. Attorney Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), it is clear that Appellants' enforcement of such a prohibition violates Mr. Williams' fundamental, constitutionally protected right to keep and bear arms as provided for in the Second Amendment. In fact, there can be no dispute, post-*Bruen*, that there is nothing in the Constitution's text nor the Nation's historical tradition of firearm regulation – as elucidated by the *Bruen* and *Range* decisions, as well as, the Fifth Circuit's decision in *Daniels* – that supports the categorical ban that the prior and continuing enforcement of Appellants' law imposes on Mr. Williams and as such, Appellants' law and enforcement thereof violates the Second Amendment

## STATEMENT OF THE ISSUE

The Second Amendment to the U.S. Constitution protects "the right of the people to keep and bear Arms." U.S. CONST. amend. II. For a governmental restriction on this right to be constitutional, the government must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the

---

[2] *Id*. at 55-56, ¶¶ 9, 18.

outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 20. Thus, the issue presented is whether the district court correctly held that 18 U.S.C. § 922(g)(1), which prohibits possession of firearms or ammunition by a person who has been convicted of "a crime punishable by imprisonment for a term exceeding one year," is unconstitutional as applied to Appellee Edward Williams, who was convicted on one occasion of driving under the influence, pursuant to 75 Pa. Cons. Stat. § 3802(c). *See* Appx5, 13, 17; 75 Pa. Cons. Stat. §§ 3802(c), 3803(b)(4); 18 Pa. Cons. Stat. § 1104(1).

## STATEMENT OF THE CASE

### A.    Statutory Background

Federal law prohibits any person from purchasing or possessing firearms or ammunition if he has been convicted of a "crime punishable by imprisonment for a term exceeding one year" under 18 U.S.C. § 922(g)(1). The definition of a "crime punishable by imprisonment for a term exceeding one year" does not include offenses "classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B).

Under Pennsylvania law, when an individual has one prior DUI offense and commits a second DUI at the highest rate of alcohol (blood alcohol level of 0.16 or higher), upon conviction, the offense is punishable by a maximum term of

imprisonment of five years. *See* 75 Pa. Cons. Stat. §§ 3802(c), 3803(b)(4); 18 Pa. Cons. Stat. § 1104(1).

### B.    Factual Background

In 2000, Williams was pulled over in State College, Pennsylvania, arrested, and charged with driving under the influence with a blood alcohol level over 0.10. Appx4. He entered into Pennsylvania's Accelerated Rehabilitative Disposition program and was sentenced to 12 months of probation, required alcohol safety driving classes, surrender of his driver's license, and payment of court costs. Appx5. Williams's 2000 DUI charge was dismissed and expunged after he completed the Accelerated Rehabilitative Disposition (hereinafter "ARD") program. Appx54, ¶ 6.

In 2004, Williams was pulled over in Philadelphia for DUI. Appx5. He charged and subsequently convicted, pursuant to 75 Pa. Cons. Stat. § 3802(c), whereby, he was sentenced to "passive house arrest until electronic monitor[ing] is available" for 90 days, ordered to pay costs, a fine of $1,500.00, and complete any recommended drug and alcohol treatment. Appx5, 55 ¶ 8. Because of Mr. Williams' prior ARD DUI offense, his conviction was a first-degree misdemeanor punishable by up to five years' imprisonment. *Id*.; *see* 75 Pa. Cons. Stat. § 3803(b)(4); *see also* 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1).

At no point, in relation to the two instances of DUI, did any property damage or any injury to another occur. Appx55, ¶ 9. Moreover, Mr. Williams has held a job as a construction manager for the past thirty-one (31) years, where he has managed projects, which include the Curran-Fromhold Correctional Facility, PA Convention Center, Septa Railworks project, the Commodore Barry Bridge, Interstate 95, and the NJ Transportation maintenance facilities. *Id*., ¶¶ 12-13. Mr. Williams is tasked with field inspections, project management, cost control, problem solving, developing and maintaining CPM project schedules for contractors, and relaying updates during the construction period. *Id*., ¶ 14.

In or about late December of 2014, Mr. Williams, concerned for the safety of himself and his family, attempted to procure a License to Carry Firearms ("LTCF") and was denied. Appx56, ¶ 15. After challenging the denial, he was only made aware that he was prohibited from obtaining a LTCF. *Id*., ¶ 16. It was not until Mr. Williams spoke with Attorney Joshua Prince on or about November 5, 2015, that for the first time, he was informed that his sole conviction in 2004 for DUI was a federally prohibiting offense, which prevented him from lawfully possessing firearms and ammunition. *Id*., ¶ 17. As a result, Mr. Williams brought the underlying action before the district court.

Contrary to Appellants' disingenuous allegations that Mr. Williams *knowingly* possessed firearms and ammunition after his 2004 conviction

(Appellants' Brief at 7, 41), the record in this matter is explicitly clear that : (1) Mr. Williams believed that he had been convicted of a misdemeanor of the second degree, as reflected on his court docket sheet, [3] which would *not* have triggered a prohibition under 18 U.S.C. § 922(g)(1), as it was a state law misdemeanor crime that could not have been punished by more than two years in jail; [4] (2) Mr. Williams was never informed that he was prohibited from purchasing, owning, possessing, and utilizing firearms and ammunition as a result of his 2004 DUI conviction until November 5, 2015, when he was informed of such by the undersigned; [5] (3) an attorney retained by Mr. Williams in February of 2015 advised him that he was not prohibited and thereafter, on February 12, 2015, submitted a letter to the Pennsylvania State Police advising that Mr. Williams had only been convicted of non-prohibiting misdemeanor and therefore was not

---

[3] In fact, still as of today – May 28, 2024 – the Commonwealth of Pennsylvania's records specifies that the grading of his 2004 offense is that of a misdemeanor of the second degree, which is not federally prohibiting. *See* https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=MC-51-CR-0902161-2004&dnh=iA%2BF7vRuRtiPD2JaV4oaSA%3D%3D  (reflecting under Final Disposition "M2")

[4] *See* 18 U.S.C. § 921(a)(20) declaring that the "term 'crime punishable by imprisonment for a term exceeding one year' does not include-- … (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." Pursuant to 18 Pa.C.S. § 106(b)(7), a misdemeanor of the second degree cannot be punished by more than two years in jail.

[5] Appx56-57, ¶¶ 16, 17.

prohibited; [6] (4) while Mr. Williams was on probation, the Pennsylvania State

Police and Bureau of Alcohol, Tobacco, Firearms and Explosives told him that he

could continue to work for a federal firearms licensee, where he sold firearms [7] and

approved him for purchases of firearms [8]; and, (5) Mr. Colosimo testified that he

inquired of ATF and the City, as to whether Mr. Williams was prohibited and ATF

and the City told him that Mr. Williams was fine in continuing in his job duties,

including possessing firearms and ammunition, after performing a background

check on Mr. Williams. [9] Of importance, after becoming aware that he was

prohibited after the undersigned's discussion with him on November 5, 2015, Mr.

Williams immediately divested himself of all firearms and ammunition and

---

[6] *See* Supp. Appx6-7, a February 12, 2025, letter from the Law Offices of Andrew
G. Gay, Jr., LLC (declaring, *inter alia*, "as the Court designated this offense as an
ungraded misdemeanor, punishable by not more than one (1) year…[m]y client's
prior conviction [] does not appear to be a disqualifying event under 18 Pa.C.S.A.
6109(e)(iii) or Section 6109(e)(viii). Additionally, based on the enclosed
documents, Mr. Williams does not appear to be a prohibited individual pursuant to
18 Pa.C.S.A. 6105(b), or Section 6105(c)(3).")
[7] *See* Supp. Appx10, lns. 12-21 (highlighting from original submitted by
Appellants before the district court).
[8] *See* Supp. Appx11, lns 13-20 (highlighting from original submitted by Appellants
before the district court); Supp. Appx12, lns. 2-24.
[9] *See* Supp. Appx13-16 (highlighting from original submitted by Appellee before
the district court).

refrained from acquiring any firearms or ammunition, [10] no different than Mr. Range, when he became aware of his prohibition. [11]

In 2017, Williams filed this lawsuit challenging the constitutionality of Section 922(g)(1) as applied to him.

## SUMMARY OF ARGUMENT

Prohibiting Williams from possessing a firearm consequent to a conviction for DUI is a clear violation of his Second Amendment protected right to keep and bear arms, as such prohibition is inconsistent with any longstanding tradition of firearms regulation in the United States. It is settled law that the guarantee of the Second Amendment includes "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). Under the test established by the Supreme Court in *Bruen*, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 24. Consistent with this Court's recent *en banc* decision in *Range*, there can be no dispute that Mr. Williams

---

[10] Appx57, ¶¶ 20-23; Supp. Appx8-10;  Supp. Appx12, lns. 20-24 (highlighting from original submitted by Appellants before the district court).

[11] *Range*, 69 F.4th at 99 (declaring, "After researching the reason for the denial, Range learned he was barred from buying a firearm because of his 1995 conviction. Range then sold his deer-hunting rifle to a firearms dealer.")

belongs to "the people" and that his desire to possess firearms is protected by the

Second Amendment. 69 F.4th 96 (3d Cir. 2023).

When a regulation impedes the exercise of this constitutional right, "the

government must then justify its regulation by demonstrating that it is consistent

with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

The test announced by the Supreme Court in *Bruen* "requires courts to assess

whether modern firearms regulations are consistent with the Second Amendment's

text and historical understanding." *Id*. at 26. While the historical tradition need not

be a "historical twin," the tradition of a state, [12] around the time of Founding, must,

at a minimum, be a historical analogue to be relevant. *Id*. at 17, 30.

As to what constitutes an analogue, the *Bruen* court explained that there are two

conceptual pathways. If the modern regulation addresses "a general societal

problem that has persisted since the 18th century," then "the lack of a distinctly

similar historical regulation addressing that problem is relevant evidence that the

challenged regulation is inconsistent with the Second Amendment." *Id*. at 26. But

if a modern law addresses "unprecedented societal concerns or dramatic

technological changes," it calls for a "more nuanced approach." *Id*. at 27. We must

reason by analogy to determine whether older regulations are "relevantly similar"

---

[12] *See Bruen*, 597 U.S. at 66-68 (finding the statutes of territories deserving of "little weight" because they were "localized," and "rarely subject to judicial scrutiny").

to the modern law. *Id* at 28-29. In relation to whether two laws are "relevantly similar," the *Bruen* court explained that two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Id*. at 27-29. Moreover, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are central considerations when engaging in an analogical inquiry." *Id*. at 29 (internal citations and quotation marks omitted).

In this matter, the Government has failed to identify any longstanding historical regulation sufficiently analogous to justify the application of the firearms prohibition in 18 U.S.C. § 922(g)(1) to an individual convicted of DUI. Instead, the Government urges this Court to find in the historical record a sweeping proposition that legislatures may disarm any individuals who have "committed serious crimes" or who they believe "would endanger themselves or others" [13] if they possessed firearms. Appellant's Brief at 25. The Government's interpretation flies in the face of this Court's *en banc* decision in *Range*, which rejected the argument that historical status-based restrictions on groups the legislature identified as dangerous

---

[13] It is interesting that the Government now embraces a "dangerousness" analysis, after arguing against such in *Range*, as acknowledged by this Court in its decision, declaring "[t]he Government replies that 10 of the 15 judges in *Binderup* and the Court in *Holloway* and *Folajtar* rejected dangerousness or violence as the touchstone." 69 F.4th at 104 n.9.

could be analogized to Section 922(g)(1). 69 F.4th at 104-05; *see also Bruen*, 597 U.S. at 31 (noting that defining categories too broadly would "eviscerate the general right to publicly carry arms for self-defense"). It also fails to provide any evidence to contradict this Court's acknowledgement that the earliest federal regulations prohibiting possession of firearms by criminals "applied only to *violent criminals.*" *Range*, 69 F.4th at 104. The Government has not indicated anything in the historical record in support of the proposition that there is any longstanding tradition of permanently disarming individuals on the basis of any conduct analogous to Williams' conviction for DUI. Consequently, this Court should apply its precedent in *Range* to find that the Government has failed to justify its regulation under the test set forth in *Bruen*, and affirm the District Court's decision that Williams cannot be constitutionally prohibited under Section 922(g)(1) from exercising his Second Amendment protected rights on the basis of a DUI conviction.

## STANDARD OF REVIEW

This Court reviews the district court's order granting summary judgment de novo. *Stradford v. Secretary Pa. Dep't of Corr.*, 53 F.4th 67 (3d Cir. 2022).

## ARGUMENT

### A.    The Proper Analysis Post-*Bruen* and *Range*

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Prior to the Court's recent decision in *Bruen*, it had already explicitly held that the Second Amendment protects one's right to possess a firearm – specifically a handgun in the case before the Court – in one's home, to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the . . . of being armed and ready for offensive or defensive action" and "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. at 592; *see also Caetano v. Massachusetts*, 577 U.S. 411, 413–14 (2016)(Alito J., concurring) (holding that the Second Amendment also protects the right to possess and use stun guns in public). The issue that predominated the federal courts, *pre*-Bruen, was the appropriate analysis or framework a court was to utilize when assessing a Second Amendment challenge.

The Court in *Bruen*, beyond declaring on several occasions that the Second Amendment was the codification of "a pre-existing right" (597 U.S. at 20, 25, 34, 50), explained that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. To counter this presumptive protection, the government must

"affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. In fact, *Bruen* could not be clearer in its holding that it is *the government* that bears the burden of justifying its firearm regulations. *See id.* at 24 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."); *id.* at 33-34 (explaining "the burden falls on respondents"); *id.* at 38-39 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)).

The *Bruen* Court eschewed a two-step analysis, instead, calling courts to look to the "text, as informed by history." *Id.* at 19. To determine whether a restriction is constitutional, the Court explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 24. It is the Government's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*. at 19; *see also id.* at 60 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.").

In *Range*, when seeking to apply this test, this Court declared that "we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct" and "[i]f it does, the government now bears the burden of proof: 'it must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Range*, 69 F.4th at 101–03 (quoting *Bruen*, 597 U.S. at 19).

Accordingly, Mr. Williams proceeds under this analysis, even though, there cannot be any real dispute that he is of the People that is protected by the Second Amendment, his proposed conduct—purchasing, possessing, carrying, and utilizing firearms for purposes of self-defense—is covered by the Second Amendment, based on the binding precedent from the U.S. Supreme Court and this Court, and there exists no historical tradition of stripping individuals such as himself from their right to keep and bear arms.

### B.    Mr. Williams and His Proposed Conduct are Protected by the Second Amendment

As this Court noted in *Range*, 69 F.4th at 101-03, all people possess Second Amendment protected rights, not just the law-abiding. [14] And as this Court

---

[14] *See also*, *United States v. Duarte*. ___ F.4th ___ 2024 WL 2068016, at *10 (9th Cir. May 9, 2024), where the Ninth Circuit held that an individual with five prior non-violent state convictions was one of the People to which the Second Amendment applies.

correctly noted, a contrary interpretation would allow legislators to decide "whom to exclude from the people" and that such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label. And that deference would contravene *Heller*'s reasoning that 'the enshrinement of constitutional rights necessarily takes certain policy choices off the table.'" *Range*, 69 F.4th at 102–03 (internal citations omitted). Under such clear precedent, there can be no doubt that Williams is a part of "the People" to whom the Second Amendment applies and the Government's brief is devoid of any argument that Mr. Williams is not one of the People.

The Government also does not dispute that Mr. Williams' proposed conduct—to purchase and possess a firearm for the defense of himself and his family [15]—is protected by the Second Amendment. Nor could it, as it is settled law that the guarantee of the Second Amendment includes "the individual right to possess and carry weapons in case of confrontation" and "extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 592, 582; *see also Caetano v. Massachusetts*, 577 U.S. at 413–14 (Alito J., concurring) (holding that the Second Amendment also protects the right to possess and use stun guns in public); *Bruen*, 597 U.S. at 8 (holding that right to possess firearms for self-defense extends outside the home). And "[w]hen the Second Amendment's plain

---

[15] Appx58. ¶¶ 15, 24-25.

text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. In applying this standard to the plaintiff's proposed course of conduct in *Range*, this Court found it to be an "easy question," holding that "Range's request—to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by *Heller*." 69 F.4th at 103. Like Mr. Range, Mr. Williams seeks only to exercise his right to possess a firearm for the defense of himself and his family. [16] Consistent with this Court's decision in *Range*, there can be no dispute that Mr. Williams belongs to "the people" and that his desire to possess firearms is protected by the Second Amendment. 69 F.4th at 96.

### C. The Government Cannot Establish that Section 922(g)(1), *As-Applied* to Mr. Williams, is Consistent with the Nation's Tradition of Firearm Regulation

As acknowledged by this Court in *Range*, 69 F.4th at 101, *Bruen* could not be clearer in its holding that it is *the government* that bears the burden of justifying that its firearm regulation "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. 1 at 19, 24, 33-34, 38. While the burden is clearly on Appellants to establish that their law is consistent with the Nation's historical tradition of firearm regulation, there is simply no way for them to establish any historical tradition, as there exist no historical tradition of

---

[16] *Id.*

firearm disarmament laws relative to being in or on any mode of conveyance, while intoxicated and the Government cites none. [17]

In addressing what constitutes the Nation's historical tradition of firearm regulation, *Bruen* explains that "when it comes to interpreting the Constitution, not all history is created equal." 597 U.S. at 34. That is why courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id* at 35. "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms came '75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 36 (quoting *Heller*, 554 U.S. at 614); *see also Sprint Communications Co. v. APCC Servs., Inc.,* 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). In fact, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 592 U.S. at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

---

[17] As discussed *infra*, instead of attempting to identify a particular historical analogue as require by *Bruen*, the Government instead asserts that Congress may generally disarm felons or persons whose possession would pose a danger to themselves or others. Appellants' Brief at 13-34.

*Bruen* thus establishes that this Court must prioritize Founding era evidence, while evidence from around the "mid- to late- 19th century" is at most "secondary." *Id.* at 36-37. "19th-century evidence [is] treated as mere confirmation of what the Court thought had *already been established*" in the Founding era. *Id.* (emphasis added). Thus, 1791 is the relevant time to "peg[] . . . the public understanding of the right." *Bruen*, 597 U.S. at 37; *see also*, *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2024) (holding that even in relation to challenges of state regulations, "the Second Amendment should be understood according to its public meaning in 1791" and not at the time of the enactment of the Fourteenth Amendment).

While the historical tradition need not be a "historical twin," the tradition of a state, [18] around the time of Founding, must, at a minimum, be a historical analogue to be relevant. *Id*. at 17, 30. But a single historical analogue around the time of Founding of a state is not a tradition; rather, it is a mere aberration or anomaly, with no followers. [19] Even two or three historical analogues of the states

---

[18] *See Bruen*, 597 U.S. at 66-68 (finding the statutes of territories deserving of "little weight" because they were "localized," and "rarely subject to judicial scrutiny").

[19] *See Heller*, 554 U.S. at 632 (2008) ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence.")

around the time of Founding are at best a trend and not a tradition,[20] especially

when short-lived. [21]

As to what constitutes an analogue, the *Bruen* court explained that there are

two conceptual pathways. If the modern regulation addresses "a general societal

problem that has persisted since the 18th century," then "the lack of a distinctly

similar historical regulation addressing that problem is relevant evidence that the

challenged regulation is inconsistent with the Second Amendment." *Id*. at 26. But

if a modern law addresses "unprecedented societal concerns or dramatic

technological changes," it calls for a "more nuanced approach." *Id*. at 27. We must

reason by analogy to determine whether older regulations are "relevantly similar"

to the modern law. *Id* at 28-29. In relation to whether two laws are "relevantly

similar," the *Bruen* Court explained that two laws are "relevantly similar" if they

share a common "why" and "how"; they must both address a comparable problem

(the "why") and place a comparable burden on the rightsholder (the "how"). *Id* at

27-29.

---

[20] *See Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (finding that two historical statutes "falls far short of establishing that [a regulated activity] is wholly outside the Second Amendment as it was understood" in 1791); *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014) ("[C]itation to a few isolated statutes—even to those from the appropriate time period—fall[s] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment.") (internal quotation marks omitted).

[21] *See Bruen*, 597 U.S. at 69 ("[T]hese territorial restrictions deserve little weight because they were . . . short lived.")

       i.      *Alcohol intoxication has been a general societal problem that has persisted since the 18th century*

As Appellants argue that 18 U.S.C. 922(g)(1) and its inclusion of those who commit DUI is to protect society (Appellants' Brief at 2-3, 23-34), the proper analysis is for Appellants to prove "a distinctly similar historical regulation addressing that problem," around the time of the Founding. *Bruen*, 597 U.S. at 26 However, Appellants' brief is wholly devoid of any law, around the time of Founding or even prior to the Federal Firearms Act of 1961, [22] that stripped, in perpetuity, an individual of his right to keep and bear arms as the result of utilizing a conveyance of any form, while under the influence of alcohol. Appellants before the District Court even admitted that "alcohol misuse is not a new phenomenon," as they must, since the Founding generation was extremely familiar with alcohol intoxication. [23, 24] In fact, "[t]hey drank from crack of dawn to crack of

---

[22] *See* Pub. L. No. 87-342, 75 Stat. 757 (1961).

[23] John Adams claimed that Americans "exceed all other and millions of people in the world in this degrading, beastly vice of intemperance." Letter from John Adams to William Willis (Feb. 21, 1819), in 10 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 365, 365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856); *see also* David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSPS. ON CRIME & JUST. 51, 52 (1998)(finding that "[i]n the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)").

[24] W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 10 (1981) ("[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined .... But after 1800, as the quantity of spirits consumed increased, the total quantity of alcohol

dawn…[t]hey drank while working and *while travelling across half a continent*." [25] And as an illustration, "[d]uring one arduous seventeen-hour, sixty-six mile trip across Virginia, the stage stopped ten times, and two of the passengers had drinks at each way station: ten drinks apiece. Such habits led one foreign observer to conclude that 'the American stage coach stops every five miles to water the horses and *brandy the gentlemen!*'" [26] Or perhaps even more illustrative in relation to stage drivers, they would have "a drink whenever he stopped to water the horses at a wayside inn, and often travelled with a whiskey bottle on the seat next to him." [27] And on a trip from Nashville to Alexandria, "one passenger noted that only one driver had not drunk on the road." [28] Yet, the Government fails to point to *any* distinctly similar law to Section 922(g)(1)'s purported elimination of Mr. Williams' Second Amendment protected rights as a result of utilizing a conveyance of any form, while intoxicated, even though alcohol misuse has been a general societal problem that has persisted since the 18th century. To the contrary, the Government admits that "the Founders had no concern about allowing recidivist drunk drivers to bear arms." Appellants' Brief at 39.

---

consumed from all sources increased until it reached a peak of nearly 4 gallons per capita in 1830.").

[25] *Id*. at 21.

[26] *Id*. at 18 (emphasis in original).

[27] *Id*. at 141.

[28] *Id*.

While the Government attempts to contend that advancements in the form of transportation technology permit this Court to ignore the binding *Bruen* precedent (*id.*), the Court was explicit that where a general societal problem has existed since the 18th century, the Government bears the burden to establish a distinctly similar historical regulation addressing that problem, which it has failed to do in this matter. *Bruen,* 597 U.S. at 26.

> ii.    *Even if,* arguendo*, this Court considers the issue before it an unprecedented societal concern or dramatic technological change, the Government fails to prove any relevantly similar law to Section 922(g)(1)'s application to Mr. Williams*

While Mr. Williams believes the Court should analyze this matter under the "distinctly similar historical regulation" framework, discussed *supra*, in the event the Court disagrees, the laws cited to by Government are not "relevantly similar" to Section 922(g)(1)'s application to Mr. Williams. As discussed *supra*, if a modern law addresses "unprecedented societal concerns or dramatic technological changes," a court must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law; whereby, two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Bruen*, 597 U.S. at 27-29.

Despite the prevalence of alcohol and alcohol abuse, as discussed *supra*, the Appellants have failed to identify *any* restrictions at or around the time of the

Founding that approximate Section 922(g)(1)'s broad sweep and perpetual

prohibition. [29] Rather, the Government, in its desire to strip Mr. Williams of his

constitutionally protected rights in perpetuity, argued before the District Court [30]

that several laws prohibiting individuals from discharging or purchasing firearms,

*while intoxicated*, are somehow relevantly similar; although it took no time to

explain "why" and "how," because if it did, its house of cards would come crashing

down. In fact, the same laws previously cited to by the Appellants were offered by

---

[29] *See*, *United States v. Alston*, 5:23-CR-021-FL-1, 2023 WL 7003235, at *4
(E.D.N.C. Oct. 24, 2023)(declaring, that "[t]he government points to laws from
colonial Virginia, New York, and Rhode Island that forbade shooting guns at
drinking events, in taverns, or on certain holidays. [] None of these laws, however,
forbade the possession or acquisition of firearms; they outlawed only the active use
of such weapons at sensitive times. The government's reference to nineteenth
century laws limiting the intoxicated from using firearms similarly falls short
where those laws apply only to actually intoxicated persons, not persons likely so
to become."

    *See also*, *United States v. Duarte*. ___ F.4th ___ 2024 WL 2068016 (May 9,
2024) where the Ninth Circuit recently vacated convicted-felon Steven Duarte's
conviction under 18 U.S.C. § 922(g)(1). Duarte had five prior prohibiting
convictions including: vandalism, felon in possession of a firearm, possession of a
controlled substance, and two convictions for evading a peace officer. *Duarte* at
*2. The Ninth Circuit, in discounting similar arguments to those made by the
Government here, held that "the burdens and justifications (*Bruen*'s 'how' and
'why') for laws disarming disfavored groups at the Founding are not "distinctly
similar" to § 922(g)(1) to justify its blanket ban on non-violent felons from
possessing firearms." *Id*. at *22.

[30] No such argument is found in Appellants' brief before this Court; however, as
the Government may attempt to raise these contentions for the first time in a reply
brief, Appellee will address them.

Appellants and addressed as being wholly insufficient for establishing relevant similarity by the Fifth Circuit in *Daniels*. As the court declared:

> Founding-era statutes concerning guns and alcohol were few. They were also limited in scope and duration. The laws that did exist had two primary concerns: (1) the misuse of weapons while intoxicated and (2) the discipline of state militias.

> Consider the first group of statutes. In 1656, Virginia banned "shoot[ing] any gunns at drinkeing." But in historical context, that was not a disarming regulation like § 922(g)(3). Virginia was a brand-new colony at the time. The 1656 statute was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking. Not only was the statute enacted for a different purpose, but it did not even ban gun possession or carry—it only prevented the colonists from misusing the guns they did have during bouts of drinking.

> Another law, passed by New York in 1771, prohibited citizens from firing guns from December 31 to January 2 because of the "great Damages" done by those "intoxicated with Liquor" during New Year's celebrations. The statute had a similar purpose as § 922(3) does—preventing public harm by individuals under the influence. Nevertheless, the law was strikingly narrow. It applied on only three days out of the year; it only prevented firing guns (not possessing them); and it applied only to those under the influence, not habitual drinkers.

> Beyond that duet of colonial regulations—separated by over a century—the government identifies no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if that intoxication was routine.

> Instead, the government points to a second group of statutes regulating militia service. For example, a soldier could be "disarm[ed]" if he showed up for militia service in New Jersey "disguised in Liquor." Pennsylvania did the same in 1780. For related reasons, dram shops were prohibited from selling to local soldiers.

Those laws, however, are even less probative. For one thing, their purpose is different. They exist to ensure a competent military—a service-member cannot perform his duties if he is impaired. Furthermore, the limitations applied only to the militia; none of the laws spoke to the ability of militiamen to carry outside of their military service. At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public.

Given the prevalence of drinking at the Founding, that handful of laws puts the government on shaky footing. The government has failed to identify any relevant tradition at the Founding of disarming ordinary citizens who consumed alcohol.

77 F.4th at 345–46.

And the court, in relation to the Reconstruction Era evidence offered by the

Appellants, declared:

The government's Reconstruction-era evidence, though stronger, still falls short of the history and tradition that could validate § 922(g)(3).

Between 1868 and 1883, three states prohibited carrying firearms while intoxicated: Kansas, Missouri, and Wisconsin. Missouri's law was challenged under the state constitution but was upheld by the Missouri Supreme Court. *State v. Shelby*, 90 Mo. 302, 2 S.W. 468 (1886). The opinion acknowledged that the state constitution "secure[d] to the citizen the right to bear arms in the defense of his home, person, and property." *Id*. at 469. But the court reasoned that if the state could regulate the "manner in which arms may be borne," there is "no good reason ... why the legislature may not do the same thing with reference to the condition of the person who carries such weapons." *Id*. The ban on intoxicated carry was therefore "in perfect harmony with the constitution." *Id*.

Those laws come closer to supporting § 922(g)(3), but they are notably few. The *Bruen* Court doubted that three colonial-era laws could suffice to show a tradition, let alone three laws passed eighty to ninety years after the Second Amendment was ratified. *See* 597 U.S. at 46.

25

More fatally, § 922(g)(3) is substantially broader than the postbellum intoxication laws. On *Bruen*'s two axes of relevant similarity, the postbellum laws and § 922(g)(3) share a common "why": preventing public harm by individuals who lack self-control and carry deadly weapons. But the "how" is different. At most, the postbellum statutes support the banning the carry of firearms *while under the influence*. Section 922(g)(3) bans all possession, and it does so for an undefined set of "user[s]," even if they are not under the influence.

As applied to Daniels, § 922(g)(3) is a significantly greater restriction of his rights than were any of the 19th-century laws…Indeed, under the government's reasoning, Congress could ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the postbellum intoxicated carry laws. The analogical reasoning *Bruen* prescribed cannot stretch that far.

A further problem with the Reconstruction-era statutes is precisely that they emerged during and after Reconstruction. *Bruen* did not discount the relevance of late-19th-century history, but it insisted that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 597 U.S. at 28. A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later. *Id*.; see also id. at 80-81 (Barrett, J., concurring). When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the "text controls." *Id*. at 36 (emphasis added).

…

And even if late-century practice sheds some dim light on Founding-era understandings, the most the Reconstruction-era regulations support is a ban on gun possession *while an individual is presently under the influence*.

77 F.4th at 346-48 (emphasis added)(internal citations updated).

Thus, as acknowledged by the Fifth Circuit, while there *may* be sufficient

historical tradition for the Government to establish a prohibition on individuals

while *currently* under the influence, in no instance have the Appellants provided any historical tradition for precluding an individual, in perpetuity, from purchasing, owning, possessing, and utilizing firearm as a result of a two-decade old alcohol-related offense. Or stated slightly differently, the Government has not demonstrated a historical tradition of imposing a comparable burden (the "how") – permanent disarmament – in connection with a comparable justification (the "why") – a nonviolent offense involving alcohol, as none of the cited examples prohibited the ownership of firearms and the supermajority of the Appellants' previously cited to laws merely prohibited the discharge or carrying of a firearm, while currently intoxicated. Thus, Section 922(g)(1) sweeps FAR more broadly than the laws cited to by the Appellants, as it prohibits Mr. Williams from purchasing, owning, possessing, and utilizing a firearm and ammunition in every manner and in perpetuity.

### iii.    <u>Legislative authority to disarm has been rejected by this Court</u>

While Appellants spend a decent portion of their brief contending that, in essence, legislators can categorically disarm whomever they want, such was explicitly rejected by this Court in *Range*. Specifically, this Court declared:

> At root, the Government's claim that only "law-abiding, responsible citizens" are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people." We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). And that

deference would contravene *Heller*'s reasoning that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S. at 636; see also *Bruen*, 597 U.S. at 26 (warning against "judicial deference to legislative interest balancing").

69 F.4th 102–03 (internal citations updated).

Furthermore, accepting the proposition relied upon by the Government to justify its regulation – that legislatures may decide when an offense is "serious" enough or an individual potentially "dangerous" enough to warrant the stripping of his or her Second Amendment protected rights – would effectively reintroduce the interest-balancing test previously rejected by the Supreme Court in *Heller*, *McDonald*, and *Bruen*, wherein the Court expressly declined to adopt any test that would weigh a protected interest against "the statute's salutary effects upon other important governmental functions." *Heller*, 554 U.S. at 634 (quoting *Id*. at 689-90) (internal quotation marks omitted); *see also McDonald v. Chicago*, 561 U.S. 742, 790-91 (2010) (holding that the Second Amendment does not permit judges to assess the costs and benefits of firearms restrictions), *Bruen*, 597 U.S. at 22-23.

While the Government argues that the classification of DUI as a serious and dangerous offense is beyond doubt, it offers no discernable methodology by which the seriousness or dangerousness of any given offense may be proven via analogy to the historical record as required by *Bruen*. In effect, this would leave courts with no other recourse but to independently evaluate the seriousness or dangerousness of current conduct to determine whether they are sufficient to justify a restriction

on an individual's Second Amendment protected rights, in direct contradiction to the holding in *Heller* that "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." 554 U.S. at 634.

Alternatively, if the determination as to when conduct is sufficiently "serious" or "dangerous" to strip away Second Amendment protected rights is to be left entirely to the legislature, we are left with exactly the type of "extreme deference" that this Court rejected in *Range* because it would "give legislatures unreviewable power to manipulate the Second Amendment by choosing a label." 69 F.4th at 102-03.

But even if, *arguendo*, this Court were to reconsider permitting legislators to usurp our constitutionally protected rights, the Government finds itself in an untenable position, where the Pennsylvania General Assembly has found that only individuals, who drive under the influence "on three or more separate occasions within a five-year period" should be precluded from *purchasing* firearms and, even then, the purchasing-disability has an automatic ten-year expiration date. [31]

---

[31] *See* 18 Pa.C.S. § 6105 (c)(3). It also bears noting that if an individual were convicted of three DUIs in a six-year period, the individual would not be under any state disability. In fact, an individual could have ten or more DUIs and still not be prohibited under state law, unless three of the DUIs occurred in a five-year period

iv.    *An untethered "seriousness" or "dangerousness" inquiry is not part of the relevant analytical framework*

It is quite interesting that although the Government acknowledges that this Court in *Range* expressly declined to adopt a dangerousness standard (Appellants' Brief at 18), and it was the Government that argued *against* a dangerousness standard in *Range*, [32] it now contends that a seriousness or dangerousness standard is appropriate.  Regardless, to the extent this Court elects to consider a dangerousness standard, the Appellants' arguments are unavailing, as the dangerousness of drunk drivers *as a class* does not address the relevant inquiry required by *Bruen*: whether permanently prohibiting Mr. Williams is "consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

As the *Daniels'* Court declared on this exact issue and in relation to the same examples,

> Indeed, any ability to implement a "dangerousness principle" is fenced in by at least two strictures in the applicable caselaw. On the one hand, the legislature cannot have unchecked power to designate a group of persons as "dangerous" and thereby disarm them. Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively "dangerous" and eliminate their Second Amendment rights without judicial review. That would have "no true limiting

---

and if so, the individual would still be permitted to retain possession of the firearms he owned but would simply be prohibited from purchasing new firearms.
[32] *See*, 69 F.4th at 104 n.9. (declaring that "[t]he Government replies that 10 of the 15 judges in *Binderup* and the Court in *Holloway* and *Folajtar* rejected dangerousness or violence as the touchstone.")

principle," *Rahimi*, 61 F.4th at 454, and would render the Second Amendment a dead letter.

On the other hand, we cannot inspect a legislature's judgment of dangerousness using traditional standards of scrutiny. *Bruen* forbids us from balancing a law's justifications against the burden it places on rightsholders. 597 U.S. at 19, 22. Imagine, for example, that a state legislature disarms all men, citing statistics that men commit more violent crimes than do women. Before *Bruen*, we would have considered whether the evidence supporting male dangerousness was substantial enough—and whether the law was sufficiently tailored—to justify such a categorical restriction on gun rights. But *Bruen* forswears that kind of review. *Bruen*, 597 U.S. at 22-24. Similarly, imagine that the government bars all convicted cybercriminals from owning guns, referencing the "dangerousness" of cybercrime. Cybercrime is assuredly dangerous, but in a different way than is violent crime. Applying a standard of scrutiny, we might have interrogated whether Congress had adequately demonstrated that someone who spreads ransomware or pirates television shows is likely to be dangerous with a firearm. Again, *Bruen* heads that analysis off at the pass. *Id*.

How, then, do we square the post-*Bruen* circle? To remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a general notion of "dangerousness." The government must show that a historical danger-based disarmament is analogous to the challenged regulation. We must use *Bruen*'s "why" and "how" analysis to assess whether the Founding-era restriction is relevantly similar to the modern one. We must ask: Why was the group considered dangerous at the Founding and therefore disarmed? And why does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, how did the historical regulation limit the rights of the dangerous class? And how does the modern regulation do so?

Applying *Bruen*'s framework to the proffered analogues, *it follows that the government's theory of danger-based disarmament falls apart*. The government identifies no class of persons at the Founding (or even at Reconstruction) who were "dangerous" for reasons comparable to marihuana users. Marihuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and

other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities who the Founders thought threatened violent revolt.

The government suggests that, in the spirit of the drafts of the Second Amendment and the Militia Act, marihuana users threaten the public "peace." But at the time of the Founding, that notion referred specifically to violence or rebellion, not generalized public harm. And § 922(g)(3) is not limited to those with a history of violent behavior— not all members of the set of "drug users" are violent. As applied in this case, the government has not shown how Daniels's marihuana use predisposes him to armed conflict or that he has a history of drug-related violence.

Furthermore, even as the Founders were disarming Catholics and politically disaffected citizens, *they left ordinary drunkards unregulated. The government has no meaningful response to the fact that neither Congress nor the states disarmed alcoholics*, the group most closely analogous to marihuana users in the 18th and 19th centuries. As with the government's analogy to mental illness, we must ask: Which are marihuana users more like: British Loyalists during the Revolution? Or repeat alcohol users? The answer is surely the latter.

The government asks us to set aside the particulars of the historical record and defer to Congress's modern-day judgment that Daniels is presumptively dangerous because he smokes marihuana multiple times a month. But that is the kind of toothless rational basis review that *Bruen* proscribes. Absent a comparable regulatory tradition in either the 18th or 19th century, § 922(g)(3) fails constitutional muster under the Second Amendment.

77 F.4th at 353-55 (internal citations updated).

And such is no different than in this matter, as the Appellants have failed to

show a historical danger-based disarmament that is analogous to Section 922(g)(1)

and its application to Mr. Williams. As applied to this case, the Government has not

shown how Williams' two-decades old DUI conviction predisposes him to armed conflict or that he has a history of alcohol-related violence, or *any* violence at all. While the Government attempts to contend that a California study reflects that handgun "purchasers with at least one prior DUI conviction and no other criminal history were more than twice as likely to be arrested for a violent crime within twelve years after the handgun purchase" (Appellants' Brief at 32-33), beyond the fact that we are almost two decades from Mr. Williams' DUI conviction, this study has no bearing on Mr. Williams, as he was not part of the study and, as discussed *supra* and *infra*, he underwent a psychological evaluation, where he was found not to be a threat to himself or others in possession of a firearm.

As this is an *as-applied* challenge, in the event, *arguendo*, the Court considers the Government's dangerous standard, the Government has the burden to establish that Mr. Williams – not other DUI convicts – would be likely to act in a manner dangerous to society. And in that vein, the Government has failed to provide any such evidence and to the contrary, as the Government continually points out, for almost a decade after his conviction, before becoming aware of his prohibition (*see*, *supra*, pgs. 5–8), Mr. Williams possessed firearms and ammunition without incident.

All of the Government's cited studies and propositions (Appellants' Brief at 19-40), under the "why" and "how" analysis, support – *at most* – a temporary ban

on individuals who are *currently* under the influence, not perpetual bans, as imposed by Section 922(g)(1), for individuals who previously committed an alcohol-related offense and whom are currently sober.

> v.     *Even if,* arguendo*, this Court considers dangerousness, the Government has failed to establish that Mr. Williams is likely to act dangerously with a firearm*

In the event, *arguendo*, that this Court finds a historical tradition of firearm regulation that would generally preclude Mr. Williams' challenge, he can distinguish himself from that historical tradition. The Government generally argues that "dangerous drunk drivers cannot be trusted to handle a firearm" (Appellants' Brief at 32), but despite noting that Mr. Williams continued to own firearms for approximately nine years following his conviction and worked in a gun store handling firearms and ammunition on a daily basis for a time, they fail to make any arguments – let alone cite to any evidence of record – that Mr. Williams cannot be trusted to handle a firearm. [33]

Regardless, contrary to the Government's bald contention, Robert Gordon, Ph.D., ABPP, a Board certified clinical psychologist, conducted an examination of Mr. Williams, which consisted of an interview, a battery of psychological tests, and rating Mr. Williams on a psychodiagnostic chart, for the purposes of determining whether Mr. Williams "is fit to be allowed to own, possess, carry, and use a firearm

---

[33] *Id*. at 41.

*without risk to him or any other person.*" [34] In forming his opinion, Dr. Gordon

reviewed a number of documents and performed numerous types of testing. [35]

Psychologist Gordon's report summarizes that (1) Mr. Williams' "MMPI-2

indicates no problems with aggression, good judgment, good impulse control, good

reality testing and no addiction problems;" (2) Mr. Williams has "no current

psychiatric symptoms. He is functioning at the healthy level;" (3) Mr. Williams has

"no psychoneurological impairment;" (4) Mr. Williams has "a very low risk of

violently acting out;" (5) Mr. Williams has "no psychopathic indication;" and (6)

specifies an overall diagnosis of "Normal Personality." [36] Perhaps most

importantly, it also finds that Mr. Williams has "no history of hostile or violent

behaviors" nor a "continuing pattern of aggressive behaviors, which could be a

predictive factor," [37] and concludes that Mr. Williams "has a normal personality,

*without psychopathology and without addition or violent tendencies*" and that "Mr.

Williams may possess a firearm without risk to himself or any other person." [38]

\*        \*        \*        \*

---

[34] *See* Appx63.
[35] *Id.*
[36] *Id.* at 72-74.
[37] Appx73.
[38] Appx73-74.

Accordingly, consistent with *Bruen* and *Range*, the Government is unable to establish any historical tradition of firearm disarmament laws analogous to the one at issue here. Consequently, this Court should apply its precedent in *Range* to find that the Government has failed to justify its regulation under the test set forth in *Bruen*, and that Williams cannot be constitutionally prohibited under § 922(g)(1) from exercising his Second Amendment protected rights on the basis of a DUI conviction.

## CONCLUSION

For the foregoing reasons, this Court should affirm the holding of the trial court and find that Mr. Williams is entitled to summary judgment on the grounds that 18 U.S.C. § 922(g)(1) is unconstitutional as applied.

Dated: May 28, 2024

Respectfully Submitted,

Joshua Prince, Esq.
Attorney ID No. 306521
Joshua@PrinceLaw.com
Prince Law Offices, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
(888) 202-9297, ext 81114

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1.  Attorney Joshua Prince is a member of the bar of this court.

2.  This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,108 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

3.  The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.  This document was scanned for viruses using Bitdefender Virus Scanner v. 3.17.276, and no virus was detected.

Joshua Prince