No. 24-1091

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

EDWARD A. WILLIAMS,

Plaintiff-Appellee,

v.

ATTORNEY GENERAL OF THE UNITED STATES, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania

———————————

## REPLY BRIEF FOR APPELLANTS

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

JACQUELINE C. ROMERO
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB
KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7222*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 305-1754*

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY .......................................................... 1

ARGUMENT ................................................................................................. 2

Under this Court's precedent, the Second Amendment allows Congress
    to disarm most felons, including Williams. ........................................... 2

    A.    Williams misconstrues the analytical framework set forth in
        *Bruen* and *Range*. ........................................................................... 2

    B.    Section 922(g)(1) is constitutional as applied to Williams. .......... 14

        1.    Congress can disarm persons convicted of serious
             crimes or crimes linked to dangerousness with
             firearms. ................................................................ 14

        2.    Felony-equivalent offenses for recidivist drunk driving
             are serious, dangerous crimes. .......................................... 20

CONCLUSION ........................................................................................... 27

COMBINED CERTIFICATIONS

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Binderup v. Attorney General*,
   836 F.3d 336 (3d Cir. 2016) ........................................................ 8

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................. 3, 6, 13, 14, 15

*Drummond v. Robinson Township*,
   9 F.4th 217 (3d Cir. 2021) ....................................................... 10

*Holloway v. Attorney General*,
   948 F.3d 164 (3d Cir. 2020), *abrogated on other grounds by*
   *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ........................... 20, 21

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) ................................................. 4, 16

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995) ................................................................ 9

*New York State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. 1 (2022) ............................................. 3, 5, 6, 7, 8, 9, 10, 13, 18, 26

*Range v. Attorney General*,
   69 F.4th 96 (3d Cir. 2023), *petition for cert. filed*,
   No. 23-374 (U.S. Oct. 5, 2023) .............................. 2, 3, 8, 14, 18, 19, 20, 22

*United States v. Bullock*,
   679 F. Supp. 3d 501 (S.D. Miss. 2023), *appeal pending*,
   No. 23-60408 (5th Cir. filed July 28, 2023) ............................................. 11

*United States v. Canada*,
   No. 22-4519, 2024 WL 2807182 (4th Cir. June 3, 2024) ..................... 12, 13

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023), *petition for cert. filed*,
   No. 23-376 (U.S. Oct. 5, 2023) ......................................................... 16, 17

*United States v. Duarte*,
   101 F.4th 657 (9th Cir.), *petition for reh'g en banc filed*,
   No. 22-50048 (9th Cir. May 14, 2024) ............................................. 11, 12

ii

*United States v. Gay*,
   98 F.4th 843 (7th Cir. 2024) .................................................................... 12

*United States v. Harper*,
   689 F. Supp. 3d 16 (M.D. Pa.), *appeal pending*,
   No. 23-2604 (3d Cir. filed Sept. 6, 2023) ................................................ 11

*United States v. Neal,*
   Nos. 20-cr-335 et al., 2024 WL 833607 (N.D. Ill. Feb. 7, 2024),
   *appeal pending*, No. 24-1220 (7th Cir. filed Feb. 12, 2024) ..................... 11, 12

*United States v. Perez-Garcia*,
   96 F.4th 1166 (9th Cir. 2024) .................................................................... 6

*United States v. Prince,*
   No. 22-cr-240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023),
   *appeal pending*, No. 23-3155 (7th Cir. filed Nov. 8, 2023) ........................ 11

*United States v. Quailes,*
   688 F. Supp. 3d 184 (M.D. Pa.), *appeal pending*,
   No. 23-2533 (3d Cir. filed Aug. 24, 2023) ................................................ 11

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir.), *cert. granted*,
   143 S. Ct. 2688 (2023) ............................................................................. 10

*Vidal v. Elster*,
   No. 22-704, 2024 WL 2964139 (U.S. June 13, 2024) ........................ 6, 8, 16

## Statutes:

18 U.S.C. § 921(a)(20) .................................................................... 26

18 U.S.C. § 922(g)(1) ...................................................................... 1

18 Pa. Cons. Stat. § 6105(c)(3) ..................................................... 25

75 Pa. Cons. Stat. § 3802(c) .......................................................... 20

75 Pa. Cons. Stat. § 3803(b)(4) ..................................................... 20

**Other Authorities:**

Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers*, 180 JAMA: Internal Med. 35 (2019) ....................................................... 24

Grace Lee et al., Am. Psychological Ass'n, *Resource Document on Mental Health Issues Pertaining to Restoring Access to Firearms* (2020), https://perma.cc/4LC2-4W68 ............................................. 23, 24

2 *The Documentary History of the Ratification of the Constitution* (Merrill Jensen ed., 1976) ....................................................... 15

## INTRODUCTION AND SUMMARY

As explained in the government's opening brief, history establishes that legislatures may disarm those who commit serious crimes as well as those whose possession of firearms would be dangerous—and that legislatures may make these determinations on a categorical basis.  The disarmament of recidivist drunk driving offenders such as plaintiff Edward Williams falls squarely within each of those historical traditions.  Not only is recidivist drunk driving itself a serious crime, but it also reflects dangerous conduct that correlates with an increased risk of violence and death in the context of firearm possession.  Williams thus cannot establish that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him.

Williams offers no persuasive response to the government's historical evidence.  Instead, he primarily asks this Court to hold that a modern legislature cannot bar a felon from possessing deadly weapons, no matter how serious or dangerous his or her offense conduct, unless Founding-era legislatures disarmed persons for a parallel criminal offense.  But Williams misunderstands the inquiry called for under the Second Amendment and, in so doing, asks this Court to conduct an analysis that threatens to call into question a legislature's authority to disarm persons convicted of any number of unquestionably serious and dangerous offenses, such as murder, robbery, drug

trafficking, and domestic abuse, to name just a few. Williams fails to demonstrate that Founding-era legislatures legislated to the full extent of their constitutional authority, and his arguments are particularly anomalous in the context of the numerous crimes—including recidivist drunk driving of an automobile—that were nonexistent at the Founding. The Court should reject Williams's invitation to so extend its "narrow" decision in *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc), *petition for cert. filed*, No. 23-374 (U.S. Oct. 5, 2023).

## ARGUMENT

### UNDER THIS COURT'S PRECEDENT, THE SECOND AMENDMENT ALLOWS CONGRESS TO DISARM MOST FELONS, INCLUDING WILLIAMS.

In his challenge to Section 922(g)(1), Williams argues that legislatures lack authority to prevent felony offenders of recidivist drunk driving laws from obtaining lethal weapons. In doing so, he invites this Court to adopt an analytical approach that would contradict precedent as well as the Nation's historical tradition of firearm regulation. The Court should decline this invitation.

### A.   Williams misconstrues the analytical framework set forth in *Bruen* and *Range*.

The Supreme Court has made clear that "the right secured by the Second Amendment is not unlimited," and the Court has described "longstanding

prohibitions on the possession of firearms by felons" as "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 626, 627 n.26 (2008). Williams does not engage with these pronouncements in his response brief, nor does he grapple with this Court's post-*Heller* precedent holding that Section 922(g)(1) can constitutionally be applied to persons convicted of the same Pennsylvania recidivist drunk-driving statute at issue here. Williams instead premises his challenge on the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and this Court's decision in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), *petition for cert. filed*, No. 23-374 (U.S. Oct. 5, 2023). But as the government explained in its opening brief (at 15-16), *Bruen* reaffirms the many aspects of Second Amendment doctrine that rest on the premise that the Amendment protects only law-abiding and responsible citizens, not felons. And while this Court in *Range* held Section 922(g)(1) unconstitutional as applied to a civil plaintiff with a decades-old state-law misdemeanor conviction for understating his income on a food stamps application, the Court also took pains to emphasize that its decision was a "narrow one" limited to "people like Range." *Range*, 69 F.4th at 106.

Williams seeks to transform that narrow holding by offering the same arguments that would preclude Congress from disarming many individuals

convicted of serious or dangerous crimes.  As the government explained in detail in its opening brief (at 19-28), historical tradition establishes at least two principles that support felon disarmament: (1) legislatures may disarm individuals who have committed serious crimes and (2) legislatures may disarm individuals whose possession of firearms would endanger themselves or others.  As the government further explained, Section 922(g)(1)'s constitutionality under *Range* is properly tethered to "'present-day judgments'" about whether application of the statute is consistent with one of these traditional categories of firearm regulation.  Gov't Br. 36-37 (quoting *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting)).  And those present-day judgments reflect that Williams's recidivist drunk driving offense, which was punishable by five years' imprisonment, is both serious and dangerous.  Gov't Br. 29-34.

In Williams's view (Pl. Br. 30-34), an inquiry into the seriousness or dangerousness of the felony triggering Section 922(g)(1)'s application "is not part of the relevant analytical framework" under *Range* and *Bruen*.  According to Williams, that analytical framework should instead hinge on the inference that, because the Founders do not appear to have enacted laws disarming persons for "utilizing a conveyance of any form, while intoxicated" (Pl. Br. 21), *Bruen* and *Range* bar Congress from disarming similar persons today.

Williams's proposed method of constitutional analysis profoundly distorts *Bruen* and *Range*.  These precedents do not reduce the interpretation of the Second Amendment to a rote archival search for Founding-era laws that match the challenged statute to such a close degree.  Rather, consistent with the Supreme Court's usual methods of constitutional interpretation, courts must use text, history, and tradition to discern the "constitutional *principles*" that delimit Congress's power to regulate firearms. *Bruen*, 597 U.S. at 31 (emphasis added) (quotation marks omitted).  Put another way, courts must ask whether the challenged statute fits within a "historic and traditional *category*" of firearm regulation.  *Id.* at 25 (emphasis added) (alteration and quotation marks omitted).  In evaluating constitutional challenges to Section 922(g)(1), the Court should recognize two such categories of permissible regulation: laws disarming persons who have committed serious crimes and laws disarming persons whose firearm possession poses a danger to themselves or others.  *Bruen* and *Range* then call for an evaluation of whether application of the challenged statute to the challenger in a particular case fits within either of these categories.

As the government explained in its opening brief (at 38-40), Williams's proposed approach to constitutional adjudication rests on several conceptual errors.  As an initial matter, "although traditional firearm regulations are an

important form of historical evidence, they are not the only one." *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024). As in interpreting other constitutional provisions, the Supreme Court has consulted "a variety of legal and other sources" in assessing the Second Amendment's original meaning, *Heller*, 554 U.S. at 605, including English history, *id.* at 598-600; analogous provisions in state constitutions, *id.* at 600-03; Second Amendment precursors, *id.* at 603-05; commentary, *id.* at 605-10, 616-19; case law, *id.* at 610-14; and legislative debates, *id.* at 614-16. *See also Bruen*, 597 U.S. at 20-21. Williams invites the Court to look past the constitutional principles reflected in those legal and historical sources and instead focus exclusively on historical regulations.

Moreover, in assessing historical firearm regulations, a court's task is not to isolate each historical precursor and ask if it differs from the challenged regulation in some way. *See, e.g.*, Pl. Br. 23-27. Such a "divide-and-conquer approach," *Perez-Garcia*, 96 F.4th at 1191, conflicts with ordinary principles of constitutional interpretation. *See, e.g.*, *Vidal v. Elster*, No. 22-704, 2024 WL 2964139, at *13 (U.S. June 13, 2024) (Barrett, J., concurring in part) (reasoning in the context of a recent First Amendment decision that "hunting for historical forebears on a restriction-by-restriction basis is [not] the right way to analyze the constitutional question"). Instead, under a proper Second

Amendment analysis, a court looks to the historical evidence as a whole, determines whether it establishes a tradition of permissible regulation, and assesses whether the challenged law fits within that category.

Nor is Williams correct in contending (Pl. Br. 19-22) that *Bruen* created a two-tiered test under which Section 922(g)(1) can be applied to him only if there were "distinctly similar"—as opposed to "relevantly similar"—historical analogues. *Bruen* set out a variety of guideposts for "assess[ing] whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. One such guidepost is that, if a modern regulation "addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation" can be "relevant evidence" in considering the constitutionality of the modern regulation. *Id.* But if the Court had meant that such evidence of historical silence would be alone dispositive, it would have said so rather than calling the evidence merely "relevant." And the overarching question a court is analyzing when it evaluates historical regulations is whether a modern regulation is "analogous enough" to "historical precursors" to "pass constitutional muster." *Id.* at 30. The touchstone for that analysis is whether the historical and modern regulations are "relevantly similar," particularly with respect to "two metrics: how and why the regulations burden a law-

abiding citizen's right to armed self defense." *Id.* at 29.  The Court was clear that the government need not identify a historical "dead ringer" to craft a modern firearm regulation consistent with the Second Amendment.  *Id.* at 30.

Williams's approach would effectively limit modern legislatures to the specific types of firearm regulations that existed at the Founding.  But *Bruen* made clear—and *Range* reiterated—that modern firearm laws can comply with the Second Amendment even if they lack "'historical *twin*[s].'"  *Range*, 69 F.4th at 103 (quoting *Bruen*, 597 U.S. at 30).  Consistent with usual modes of constitutional interpretation, it cannot be the case that a modern law's constitutionality depends entirely on whether a "distinctly similar law" (Pl. Br. 21) happened to exist at the Founding.  *See Elster*, 2024 WL 2964139, at *11 n.5 (majority opinion) ("[H]istory-focused approaches to constitutional scrutiny do not typically require a historical twin." (citing *Bruen*, 597 U.S. at 30)); *see also, e.g.*, *Binderup v. Attorney General*, 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) (recognizing that "novelty does not mean unconstitutionality," and thus Section 922(g)(1)'s constitutionality cannot turn on whether the Founding generation enacted statutes "denying the right to keep and bear arms to people convicted of crimes"(alteration and quotation marks omitted)).

Past lawmakers' failure to adopt a given regulation does not necessarily (or even ordinarily) reflect doubts about its constitutionality. Rather, the idea of adopting such a regulation may have never occurred to the Founders; may not have been considered a high priority; or may have been viewed as unnecessary, impractical, or politically inexpedient. None of these considerations would provide a basis for concluding that the legislature's action today infringes a constitutional right. *Cf. McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 373 (1995) (Scalia, J., dissenting) ("Quite obviously, not every restriction upon expression that did not exist in 1791 or in 1868 is *ipso facto* unconstitutional . . . .").

In any event, even assuming *Bruen* established a two-tiered test, the less stringent of Williams's proposed standards—relevant similarity—would apply here. As Williams acknowledges (Pl. Br. 22), whatever the standard is in other situations, analogical reasoning based on relevantly similar historical statutes is appropriate when a modern regulation addresses "unprecedented societal concerns or dramatic technological changes," *Bruen*, 597 U.S. at 27. The Founders plainly had no concern about allowing deadly weapons into the hands of persons who are convicted of felonies for repeatedly violating laws against driving motor vehicles while intoxicated. Founding-era "mode[s] of conveyance" (Pl. Br. 17) do not present remotely the same "societal

problem[s]" for legislators as the modern motor vehicle, *Bruen*, 597 U.S. at 26-27—which of course did not exist at the time of the Founding. And Williams errs in seeking to avoid that logic by framing the relevant societal problem at an extremely high level of generality (gun regulations enacted "to protect society," Pl. Br. 20), only to turn around and demand far more granular Founding-era regulations—like a Founding-era regulatory apparatus for recidivist drunk stagecoach drivers. Thus, the existence (or lack thereof) of such specific Founding-era laws lends no insight into whether Section 922(g)(1)'s application to Williams is the sort of regulation that "'our ancestors'" would "'have accepted,'" *Bruen*, 597 U.S. at 30 (quoting *Drummond v. Robinson Township*, 9 F.4th 217, 226 (3d Cir. 2021)).

The decisions of some courts since *Bruen* and *Range* make it evident that clarification of the proper approach to Second Amendment analysis is necessary. The Fifth Circuit, for example, has wrongly held that the Second Amendment prevents Congress from disarming persons subject to domestic-violence protective orders. *See United States v. Rahimi*, 61 F.4th 443, 448 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023). And in the felon-dispossession

context, some courts have relied upon an analysis similar to that suggested by Williams to reach conclusions that are alarming and plainly incorrect.[1]

Like Williams, courts reaching these untenable results have focused on whether the specific disqualifying felonies that trigger Section 922(g)(1)'s disability could be "trace[d] back to an analogous, Founding-era predecessor." *United States v. Duarte*, 101 F.4th 657, 691 (9th Cir.), *petition for reh'g en banc filed*, No. 22-50048 (9th Cir. May 14, 2024).  But that approach could suggest that no modern offense could *ever* serve as a basis for disarmament because many

---

[1] *See, e.g.*, *United States v. Duarte*, 101 F.4th 657, 661-63 (9th Cir.) (holding Section 922(g)(1) unconstitutional as applied to a person who knowingly violated this longstanding federal law notwithstanding his five felony convictions, including possession of a firearm by a felon and possession of a controlled substance for sale), *petition for reh'g en banc filed*, No. 22-50048 (9th Cir. May 14, 2024); *United States v. Quailes*, 688 F. Supp. 3d 184, 187-88 (M.D. Pa.) (holding Section 922(g)(1) unconstitutional as applied to an armed career criminal with four convictions for trafficking heroin and cocaine), *appeal pending*, No. 23-2533 (3d Cir. filed Aug. 24, 2023); *United States v. Harper*, 689 F. Supp. 3d 16, 19-20 (M.D. Pa.) (holding Section 922(g)(1) unconstitutional as applied to a person with "thirteen prior felony and eight misdemeanor convictions," including for "armed robberies and drug trafficking"), *appeal pending*, No. 23-2604 (3d Cir. filed Sept. 6, 2023); *United States v. Bullock*, 679 F. Supp. 3d 501, 505-06, 506 n.2 (S.D. Miss. 2023) (holding Section 922(g)(1) unconstitutional as applied to a person with felony convictions for manslaughter, aggravated assault, fleeing law enforcement, and attempted aggravated assault of a law-enforcement officer), *appeal pending*, No. 23-60408 (5th Cir. filed July 28, 2023); *United States v. Neal*, Nos. 20-cr-335 et al., 2024 WL 833607, at *12-13 (N.D. Ill. Feb. 7, 2024) (holding that Section 922(g)(1) is facially unconstitutional), *appeal pending*, No. 24-1220 (7th Cir. filed Feb. 12, 2024); *United States v. Prince*, No. 22-cr-240, 2023 WL 7220127, at *11 (N.D. Ill. Nov. 2, 2023) (same), *appeal pending*, No. 23-3155 (7th Cir. filed Nov. 8, 2023).

modern crimes—including recidivist drunk driving—were "nonexistent" at the Founding. *Id.* And this flawed approach could further suggest that Section 922(g)(1) is unconstitutional in *every* application because, as far as the government is aware, specific felon-dispossession statutes were not widely enacted until well after the Founding. *See United States v. Neal*, Nos. 20-cr-335 et al., 2024 WL 833607, at *9 (N.D. Ill. Feb. 7, 2024) (holding Section 922(g)(1) unconstitutional on its face because "the problem of firearm-related violence existed in the 18th century," but scholars have not found evidence of widespread felon-dispossession laws before "the 20th century"), *appeal pending*, No. 24-1220 (7th Cir. filed Feb. 12, 2024).

As multiple courts of appeals have recognized, regardless of whether as-applied challenges to Section 922(g)(1) are available, the statute's facial constitutionality cannot seriously be questioned. *See United States v. Canada,* No. 22-4519, 2024 WL 2807182, at *1 (4th Cir. June 3, 2024) (explaining that all "analytical path[s]"—text, history, tradition, and precedent—"lead to the same destination: Section 922(g)(1) is facially constitutional" because it has a plainly legitimate sweep); *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024) (rejecting the contention that Section 922(g)(1) is "unconstitutional, root and

branch").[2] Yet Williams fails to offer this Court a principled basis for focusing the analysis in this case on the history of alcohol-related firearm regulations (Pl. Br. 20-27) without suggesting that Section 922(g)(1) is invalid in a variety of other applications where the specific felony may not trace back to a Founding-era disarmament law. *Bruen* and *Range* cannot mean that to uphold Section 922(g)(1)'s constitutionality as applied to persons "convicted of a drive-by-shooting, carjacking, armed bank robbery, or even assassinating the President of the United States," *Canada*, 2024 WL 2807182, at *1, a court would need to find Founding-era firearm laws regulating some 18th-century counterpart to today's drive-by shooter, carjacker, armed bank robber, or assassin. That would be like suggesting that Congress cannot ban civilians from possessing nuclear weapons because there were no such restrictions at the time of the Founding. The Supreme Court has made clear that is not what the Second Amendment means. *See Bruen*, 597 U.S. at 47 (recognizing that in applying the principle that legislatures may prohibit "'dangerous and unusual weapons,'" the governing test looks to the use of the weapons "today" (quoting *Heller*, 554 U.S. at 627)).

---

[2] As noted in the government's opening brief (at 40-42), the government preserves arguments foreclosed by *Range*, including the argument that Section 922(g)(1) is not susceptible to individualized as-applied challenges (as three circuits have held since *Bruen*).

For these reasons, Williams's challenge to Section 922(g)(1) does not properly turn on what regulations the Founders chose to enact with respect to a person who is, in some narrow sense, an 18th-century predecessor to today's recidivist drunk driver.  Instead, the Court should make clear that Section 922(g)(1) is constitutional as applied to a person with a disqualifying felony that is serious or that indicates the person would endanger himself or others if armed.  It should then recognize that, under today's standards, Williams's recidivist drunk driving offense fits within each of those categories, providing two independent bases for rejecting his as-applied challenge.  The analytical approach the government has offered here is consistent with the usual modes of interpretation and with the Supreme Court's assurances that felon-dispossession statutes are "presumptively lawful regulatory measures."  *Heller*, 554 U.S. at 626, 627 n.26.  Williams, by contrast, effectively offers the Court a roadmap for invalidating Section 922(g)(1) "in a substantial amount of cases." *Range*, 69 F.4th at 111 (Ambro, J., concurring).  That "must be wrong in view of the answer the Supreme Court has already supplied." *Id.*

## B. Section 922(g)(1) is constitutional as applied to Williams.

### 1. Congress can disarm persons convicted of serious crimes or crimes linked to dangerousness with firearms.

As the opening brief explained, two independent principles from the Nation's historical tradition of firearm regulation support Section 922(g)(1),

including in its application to Williams.  *First*, historical tradition allows
Congress to disarm persons convicted of serious crimes.  This source of
legislative authority is evident in Founding-era capital punishment laws, Gov't
Br. 19-20; laws extinguishing civil rights, Gov't Br. 20; laws disarming persons
upon conviction for certain specific crimes, Gov't Br. 20-21; and a "'highly
influential'" source indicating that some of the most ardent Founding-era
supporters of enshrining a right to bear arms in the constitution recognized that
legislatures were authorized to disarm persons "'*for crimes committed*, or real
danger of public injury from individuals,'" Gov't Br. 21-22 (first quoting *Heller*,
554 U.S. at 604; and then quoting 2 *The Documentary History of the Ratification of
the Constitution* 598 (Merrill Jensen ed., 1976) (emphasis added in opening
brief)).

 *Second*, historical tradition allows Congress to disarm categories of
persons whose convictions indicate that they would pose a danger to
themselves or others if armed.  This independent source of legislative authority
is evident in English law, the influential Second Amendment precursor just
discussed (which contemplates disarmament for "real danger of public
injury"), nineteenth-century sources, and an enduring tradition dating back to
the seventeenth century of American legislatures disarming such persons—
without any indication that these regulations were believed to be incompatible

with the right to keep and bear arms. Gov't Br. 23-24 (quotation marks omitted); *see* Brief for the United States at 13-27, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023), 2023 WL 5322645 (collecting sources). Indeed, there is widespread agreement among courts and commentators that, at a minimum, legislatures can disarm felons whose crimes reflect that they would be dangerous if armed. *See, e.g.*, *Kanter*, 919 F.3d at 456-58 (Barrett, J., dissenting) (reasoning based on historical sources that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety"); *see also Elster*, 2024 WL 2964139, at \*17 (Barrett, J., concurring in part) ("Congress is entitled to make categorical judgments, particularly where heightened scrutiny does not apply.").

Williams does not meaningfully dispute the government's account of the historical record, and he offers no historical evidence of his own suggesting that either seriousness or dangerousness provides an impermissible principle for a legislature to rely upon when enacting firearm regulations. Instead, his primary response to the government's historical evidence is to rely extensively on the Fifth Circuit's decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), *petition for cert. filed*, No. 23-376 (U.S. Oct. 5, 2023), which held that neither this Nation's undisputed history of disarming those whose firearm possession was deemed dangerous, nor historical regulations addressing

firearms and alcohol specifically, supported the disarmament of an individual who used drugs several times per month. *See* Pl. Br. 1, 2, 24-26, 30-32; *Daniels*, 77 F.4th at 339. But the Fifth Circuit's analysis in *Daniels* is plagued by many of the same shortcomings that pervade that court's decision in *Rahimi*. And as the government has explained elsewhere, *Daniels* was likewise wrongly decided. *See, e.g.*, Second Supplemental Letter Brief for the United States at 5-6, *United States v. Harris*, No. 21-3031 (3d Cir. Nov. 15, 2023); Petition for a Writ of Certiorari, *United States v. Daniels*, No. 23-376 (U.S. Oct. 5, 2023). In any event, *Daniels* is inapposite on its own terms, given that Williams was disarmed not solely because of his history of severe intoxication, but rather because he has already demonstrated, on several occasions, his willingness to engage in criminal conduct while intoxicated that directly endangers not only his life, but also the lives of others. As the Fifth Circuit emphasized, "Daniels is not a felon," *Daniels*, 77 F.4th at 343; Williams, by contrast, indisputably falls within the scope of the federal felon-dispossession law.

Williams also seeks to equate the methodology set forth in the government's brief with "the interest-balancing test previously rejected by the Supreme Court." Pl. Br. 28. But as explained above, it is Williams's approach to Second Amendment adjudication, not the government's, that misconstrues the methodology the Supreme Court has prescribed in *Heller* and *Bruen*. Under

*Heller* and *Bruen*, courts must "apply faithfully the balance struck by the founding generation *to modern circumstances.*" *Bruen*, 597 U.S. at 29 n.7 (emphasis added). That is all the government has asked this Court to do when applying historical principles to evaluate as-applied challenges to Section 922(g)(1).

While legislatures historically made these judgments on a categorical basis, Williams errs in suggesting that the government has proposed to grant legislatures "'unreviewable power to manipulate the Second Amendment.'" Pl. Br. 29 (quoting *Range*, 69 F.4th at 103). The government acknowledges that Congress's power to disarm persons who have committed serious crimes or persons whose crimes indicate dangerousness "is subject to meaningful, judicially enforceable limits." Reply Brief for the United States at 13, *Rahimi*, No. 22-915 (Oct. 25, 2023). Courts may therefore properly review a disqualification's breadth, as well as a legislature's judgment that a category of persons committed serious offenses or offenses that indicate the persons belonging to that category would pose a danger if armed. Courts may ask, for example, whether these judgments are supported by evidence, common sense, or the judgments of other American legislatures today or over time.

Williams likewise errs in suggesting (Pl. Br. 27) that this Court's decision in *Range* forecloses the government's arguments here. *Range* implicitly rejected

the government's argument that a conviction for *any* crime punishable by more than one year categorically provides a constitutional basis to disarm a person. *See Range*, 69 F.4th at 101-03. But it did so in the context of a prospective declaratory judgment action brought by a person who was subject to Section 922(g)(1) because he had been convicted of a state-law misdemeanor for misrepresenting his income on an application for food stamps. *See id.* at 98. While this Court has concluded that the historical evidence submitted by the government in that one case did not support applying Section 922(g)(1) to persons "like Range," *id.* at 104 n.9, 106, this Court has not yet announced the standards it will apply when evaluating Section 922(g)(1)'s constitutionality as applied to the many felons who are nothing like Range. In developing those standards, the Court cannot disregard informative historical evidence on the ground that the evidence the government cited in *Range* did not suffice to disarm the particular challenger in that case.

Williams thus provides no basis for disregarding the seriousness or dangerousness of an offense when evaluating as-applied challenges to Section 922(g)(1). In "narrow[ly]" holding Section 922(g)(1) unconstitutional "as applied to [Range]," *Range*, 69 F.4th at 106, this Court referred to numerous details of the disqualifying offense that concern its seriousness and its dangerousness. *Id.* at 98-99. And Judge Ambro's concurrence described the

crime at issue as "a small-time offense" to "receive food stamps for [Range's] family," *id.* at 112 (Ambro, J., concurring).  The Second Amendment does not override Congress's judgment to disarm persons who are convicted of crimes that are more serious, more dangerous, or both.

### 2. Felony-equivalent offenses for recidivist drunk driving are serious, dangerous crimes.

Whether this Court evaluates Williams's offense under the seriousness principle, the dangerousness principle, or both, his constitutional challenge to Section 922(g)(1) fails.

As the government explained in its opening brief—and Williams has not seriously disputed in response—a recidivist offense for operating a vehicle at twice the legal blood-alcohol content is a serious crime indicating reckless disregard for human life.  "All three branches of the federal government have recognized as much."  *Holloway v. Attorney General*, 948 F.3d 164, 174 (3d Cir. 2020), *abrogated on other grounds by Range*, 69 F.4th 96.  Courts have repeatedly referred to the dangerousness of drunk driving, and legislatures and the Executive Branch agree.  *Id.*; *see* Gov't Br. 29-34.  Williams's disqualifying offense, moreover, makes him a particularly dangerous and serious offender: the reason why he was exposed to five years' imprisonment was that he was a recidivist who drove with a blood-alcohol content more than double the legal limit.  *See* 75 Pa. Cons. Stat. §§ 3802(c), 3803(b)(4); *see also* Appx17.

Common sense, legislative judgment, and empirical evidence all point in the same direction: felony-equivalent recidivist drunk drivers who have repeatedly demonstrated they cannot responsibly account for danger to themselves or others while operating a motor vehicle similarly cannot be trusted to safely possess firearms. *See* Gov't Br. 29-34. Indeed, this Court has already recognized in *Holloway* that the specific offense for which Williams was convicted is a serious, dangerous offense and that a person convicted of that offense can constitutionally be disarmed under Section 922(g)(1). *See* 948 F.3d at 172-77. As this Court recognized, "[d]runk driving is a dangerous and often deadly crime," and a recidivist offense at a high blood-alcohol content level is a "serious" crime. *Id.* at 167, 176. While the multifactor test applied in *Holloway* no longer controls this Court's analysis, the ultimate result remains sound: Section 922(g)(1) can be constitutionally applied to persons convicted of the recidivist drunk driving offense at issue here.

Williams asks (Pl. Br. 30, 33-35) the Court to disregard "the dangerousness of drunk drivers *as a class*" and to instead focus its analysis on him, a single member of that class. He asserts (Pl. Br. 33) that under a dangerousness standard, "the Government has the burden to establish that Mr. Williams—not other DUI convicts—would be likely to act in a manner dangerous to society." But in making this argument, Williams fails to refute

the government's showing in its opening brief that legislatures may disarm, on a categorical basis, groups whose possession of firearms would be dangerous. Gov't Br. 24-26.  For example, Williams does not contest that Founding-era legislatures disarmed Loyalists as a class, without inquiring whether each individual Loyalist had a history of dangerousness or violence.  That history forecloses any argument that the Government must make individualized findings to support the disarmament of each person whose firearm possession is barred pursuant to Section 922(g)(1).

As the government explained in its opening brief (at 41-42), this Court appears to have determined in *Range* that as-applied challenges to Section 922(g)(1) are to be resolved on an offense-by-offense basis, with certain disqualifying offenses rendering the statute "invalid *ab initio*" and little or no weight placed on conduct post-dating the disqualifying conviction—no matter what the evidence might show about that conduct.  *Range*, 69 F.4th at 132 (Krause, J., dissenting); *see, e.g.*, *id.* at 106 (majority opinion) ("Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a).").  If this Court had intended to establish a framework that includes a more fact-intensive, individualized analysis, that could have more appropriately been accomplished by limiting relief to "a purely prospective declaratory judgment," *id.* at 135 (Krause, J.,

22

dissenting). Such limited relief might take account of a variety of individualized circumstances while ensuring that persons who have never sought such a remedy may be prosecuted if they flout the law without first seeking judicial relief. In the absence of such a limitation, however, the most plausible way to implement *Range* in a manner that would allow persons to conform their conduct accordingly is to look solely to the nature of the disqualifying conviction, making it unnecessary to develop a more individualized record in district court as to the challenger's dangerousness.

In any event, Williams fails to distinguish himself as an individual from the class of recidivist drunk drivers who he apparently concedes committed dangerous, serious crimes. On that score, Williams relies principally on the 2018 opinion of a psychologist he retained. *See* Pl. Br. 34-35. But as the American Psychiatric Association's Council on Psychiatry and Law explains, a mental health professional who performs an evaluation of an individual's fitness to possess a firearm "should make clear that any opinion, if given, would be limited only to the impact of an individual's *mental illness* on violence and/or suicide risk." Grace Lee et al., Am. Psychological Ass'n, *Resource Document on Mental Health Issues Pertaining to Restoring Access to Firearms* 3 (2020), https://perma.cc/4LC2-4W68 (emphasis added). Williams was disarmed on the basis of his criminal history, not because of any mental illness.

And in any event, "no psychiatrist [or psychologist] can certify that an individual is safe to possess a firearm under all circumstances for an unlimited time frame," *id.* Williams's proffered report accordingly cannot overcome Congress's determination that his serious recidivist drunk driving offense indicates that his possession of firearms would be dangerous.

Williams's other efforts to rebut the government's showing are likewise unavailing. As the government has noted, a longitudinal study of California handgun purchasers found that purchasers with at least one prior DUI conviction and no other criminal history were more than twice as likely to be arrested for a violent crime within 12 years after the handgun purchase, compared to purchasers with no criminal record. *See* Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers*, 180 JAMA: Internal Med. 35, 38 (2019). Williams believes the Court should ignore this evidence because "he was not part of the study," Pl. Br. 33, but an individual offender's personal participation in an empirical study cannot possibly be a prerequisite for such a study to inform this Court's analysis.

Williams also suggests that he can safely possess firearms because he did so—illegally—"for almost a decade after his conviction." Pl. Br. 33. This Court should decline to countenance the absurd argument that a person may

rely on his longstanding violation of the law to establish that the law does not legitimately apply to him.[3]

Finally, Williams argues that Section 922(g)(1) is unconstitutional as applied to him because the Pennsylvania legislature has enacted a statute that prohibits individuals convicted of driving under the influence at least three times within five years from purchasing or transferring a firearm and provides for restoration of such a person's firearm rights under Pennsylvania law at least 10 years after the most recent disqualifying conviction. *See* Pl. Br. 29 & n.31 (citing 18 Pa. Cons. Stat. § 6105(c)(3)). But a State's decision to regulate conduct less stringently than Congress does not suggest, much less establish, that the federal law at issue is unconstitutional. To the contrary, legislatures at both the federal and state levels routinely legislate to less than the full extent of their constitutional authority. Moreover, if Pennsylvania were inclined, as a policy matter, to render Williams's conviction no longer disabling under

---

[3] As the government explained in its opening brief (at 41), this Court in *Range* appears to have determined that conduct post-dating the disqualifying conviction bears little to no weight in its analysis of the as-applied constitutionality of Section 922(g)(1). Thus, absent a change in controlling precedent, it would appear to be unnecessary to delve into the factual nuances (Pl. Br. 5-8, 33) of the circumstances surrounding Williams's post-conviction firearm possession. In any event, the opening brief did not indicate that Williams has necessarily admitted to every element that would have been necessary to sustain a criminal conviction under Section 922(g)(1), but rather that he plainly handled firearms and ammunition for several years while federal law prohibited him from knowingly doing so.

federal law, the Gun Control Act provides several mechanisms for States to effect such restoration. *See* 18 U.S.C. § 921(a)(20) (exempting from Section 922(g)(1)'s prohibitions one whose "conviction which has been expunged, or set aside or for which [the] person has been pardoned or has had civil rights restored . . . unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms"). But as a constitutional matter, just as a state legislature today cannot expand the scope of the Government's authority in a manner inconsistent with the original meaning of the Second Amendment, *see Bruen*, 597 U.S. at 36, it likewise cannot contract the scope of that authority.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

JACQUELINE C. ROMERO
*United States Attorney*

MARK B. STERN
MICHAEL S. RAAB

*/s/ Kevin B. Soter*

KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7222*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*California Bar No. 324524*
*(202) 305-1754*
*kevin.b.soter@usdoj.gov*

June 2024

## COMBINED CERTIFICATIONS

1.     Government counsel are not required to be members of the bar of this Court.

2.     This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,804 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

3.     The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.     This document was scanned for viruses using CrowdStrike Falcon Sensor version 7.15.18511.0, and no virus was detected.


   */s/ Kevin B. Soter*
   Kevin B. Soter