RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0195p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERICK WILLIAMS,

*Defendant-Appellant.*

⎫
⎪
⎬  No. 23-6115
⎪
⎭

———————————

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:23-cr-20083-1—Sheryl H. Lipman, District Judge.

Decided and Filed:  August 23, 2024

Before:  KETHLEDGE, THAPAR, and DAVIS, Circuit Judges.

———————————

## COUNSEL

**ON BRIEF:**  Brian Daniel Mounce, Unam Peter Oh, FEDERAL PUBLIC DEFENDER'S OFFICE, Memphis, Tennessee, for Appellant.  Jermal Blanchard, UNITED STATES ATTORNEY'S OFFICE, Memphis, Tennessee, for Appellee.

THAPAR, J., delivered the opinion of the court in which KETHLEDGE, J., joined in full, and DAVIS, J., joined in the judgment only.  DAVIS, J. (pp. 32–34), delivered a separate concurring opinion.

———————————

## OPINION

———————————

THAPAR, Circuit Judge.  Erick Williams was indicted for being a felon in possession of a firearm under § 922(g)(1).  He argues the indictment should be dismissed because that statute violates the Second Amendment.  It doesn't, so we affirm.

## I.

Memphis police officers stopped Erick Williams for speeding and driving erratically. As they approached, officers smelled the stench of marijuana and saw an open beer can in the center console. So they ordered Williams out of the car.

After a canine alerted them to the presence of narcotics, officers searched the car. They found a loaded pistol in the trunk. Williams was arrested, and a record check revealed he'd been convicted of at least one prior felony—aggravated robbery.

A federal grand jury indicted Williams for possessing a gun as a felon. *See* 18 U.S.C. § 922(g)(1). Williams moved to dismiss the indictment, arguing that § 922(g)(1) violates the Second Amendment. *See generally N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). The district court denied his motion, and Williams pled guilty, reserving the right to appeal the district court's denial. He now does so.

## II.

Williams argues that § 922(g)(1) violates the Second Amendment both on its face and as applied to him. A facial challenge is the "most difficult challenge to mount successfully" because it requires a defendant to "establish that no set of circumstances exists under which the Act would be valid." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Thus, Williams's facial challenge will fail if § 922(g)(1) is constitutional in even just one of its applications. *See id.* That's a steep climb— one Williams can't make.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Section 922(g)(1), meanwhile, makes it illegal for anyone convicted of "a crime punishable by imprisonment for a term exceeding one year" to possess a firearm.[1]

---

[1] While § 922(g)(1) is commonly known as the "felon-in-possession" law, by its terms it applies to both misdemeanors and felonies punishable by a prison term exceeding a year. For simplicity's sake, we refer to such crimes as "felonies."

Williams doesn't dispute that he's been convicted of a felony.  But he nonetheless argues that § 922(g)(1) violates his Second Amendment right to bear arms.  This question turns on three recent Supreme Court cases.

### A.

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment codified a pre-existing "individual right."  554 U.S. 570, 579–81, 592 (2008).  This right protects the ability to keep, for "lawful purposes," the kinds of weapons in common usage, like those used for self-defense.  *Id.* at 625, 627 (quotation omitted).

As *Heller* emphasized, however, the right "is not unlimited."  *Id.* at 626.  It's not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.*   The Court cautioned that nothing in its opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," like § 922(g)(1).  *Id.*  Such prohibitions, the Court declared, were "presumptively lawful."  *Id.* at 627 n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (explaining *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons'").

*Heller* also made clear that its opinion didn't "clarify the entire field" of the Second Amendment's history.  *Heller*, 554 U.S. at 635.  In reference to felon-dispossession laws, the Court suggested that they required separate "historical justifications."  *Id.*  But because those laws weren't at issue, the Court had no occasion to identify those justifications.

In the years after *Heller*, courts mapped the contours of the right through a combination of historical analysis and means-ends scrutiny.  *See, e.g.*, *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012).  They first asked whether the challenged regulation burdens conduct that historically fell within the scope of the right.  *See id.*  If so, then the court balanced the government's asserted interest against the burden imposed by its regulation.  *See id.*  If the ends justified the means, then the challenger lost.

This court and many others upheld § 922(g)(1) under that framework.  Every court of appeals to consider a facial challenge rejected it.  *See Kanter v. Barr*, 919 F.3d 437, 442 (7th Cir. 2019) (collecting cases).  But results were mixed with as-applied challenges.  Some courts concluded that as-applied challenges could sometimes succeed.  *See, e.g.*, *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010).  In practice, however, those challenges usually failed because the underlying felony was violent or dangerous.  *See id.* at 693; *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014).  Only one court of appeals sustained an as-applied challenge to § 922(g)(1).  *See Binderup v. Att'y Gen.*, 836 F.3d 336, 340, 356 (3d Cir. 2016) (en banc).  The underlying crimes?  Corrupting a minor and carrying a handgun without a license. *Id.*

Other courts simply followed the "presumptively lawful" language of *Heller* and cut off as-applied challenges.  *See, e.g.*, *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Vongxay*, 594 F.3d 1111, 1114–18 (9th Cir. 2010). This court was one of them.  In *United States v. Carey*, we stated, without historical analysis and with a citation only to *Heller*'s "presumptively lawful" language, that "Congress's prohibition on felon possession of firearms is constitutional."  602 F.3d 738, 741 (6th Cir. 2010).  In a similar context, however, we noted that "*Heller* only established a presumption that" categorical disarmament laws were constitutional.  *See Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686–87 (6th Cir. 2016) (en banc) (reviewing as-applied challenge to 18 U.S.C. § 922(g)(4)'s ban on gun possession by the mentally ill).

In sum, post-*Heller*, the courts of appeals that rejected as-applied challenges did so based on *Heller*'s "presumptively lawful" language and without historical analysis.  And the courts of appeals that entertained as-applied challenges rejected them when the underlying felony was violent.

Then came *New York State Rifle & Pistol Association v. Bruen*.  597 U.S. 1 (2022).  That case clarified the analytical framework that applies to Second Amendment challenges.  The *Bruen* Court rejected the use of tiered scrutiny in Second Amendment challenges, in part because means-ends balancing often led courts to "defer to the determinations of legislatures."  *Id.* at 26.

By applying means-ends scrutiny to the Second Amendment, courts had misunderstood the point that the Second Amendment is "the very *product* of an interest balancing by the people" that demands "unqualified deference." *Id.* at 26 (quoting *Heller*, 554 U.S. at 635). Thus, *Bruen* required the government to show that a regulation's infringement on a particular citizen's Second Amendment right was "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

The majority in *Bruen* didn't repeat *Heller*'s "assurances" that felon-in-possession laws were constitutionally permissible. Several Justices, to be sure, did so themselves. *Bruen*, 597 U.S. at 72 (Alito, J., concurring); *id.* at 80–81 (Kavanaugh, J., joined by Roberts, C.J., concurring); *id.* at 129–30 (Breyer, J., joined by Sotomayor and Kagan, JJ., dissenting). But neither the majority nor any separate opinion provided any historical justifications for those laws.

Finally came *United States v. Rahimi*. 144 S. Ct. 1889 (2024). That case elaborated on *Bruen*'s historical inquiry. *Rahimi* emphasized that firearm regulations need not have a historical "twin" to be valid. *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 30); *see also id.* at 1925 (Barrett, J., concurring) (noting that "historical regulations reveal a principle, not a mold"). Instead, the relevant inquiry is whether the challenged regulation is consistent with the "principles that underpin our regulatory tradition."[2] *Id.*

Applying those principles to the defendant in that case, the Court concluded that the statute disarming him was consistent with founding-era regimes that disarmed individuals who posed a threat of safety to others. *Id.* Because Rahimi fit that bill, the statute disarming him was constitutional as applied to him. Notably, *Rahimi* repeated the Court's well-worn statement that felon-dispossession laws were "presumptively lawful." *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.6).

With that background in mind, we turn to Williams's challenge.

---

[2]While *Rahimi* followed *Bruen*'s mandate that courts examine our "historical tradition of firearm regulation," the case clarified the level of generality at which courts compare modern regulations with historical analogues. *See Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 17). When courts engage in historical research, they don't need to find a perfect statutory analogue, rather we must ask whether the challenged regulation is "consistent with the principles that underpin our regulatory tradition." *Id.* at 1898. At the same time, as Justice Barrett noted, while the level of generality is relatively high, it must not be so high that it "waters down the right." *Id.* at 1926.

III.

As an initial matter, we must address whether our precedent upholding § 922(g)(1)'s constitutionality controls the outcome of Williams's case. *See Carey*, 602 F.3d at 741. We're bound by our circuit precedent unless an intervening Supreme Court case "mandates modification" of it, either in outcome or in mode of analysis. *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 (6th Cir. 2021) (quotation omitted); *see Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014) (explaining that the courts of appeals are "bound not only by the holdings" of the Supreme Court, but also by its "mode of analysis") (citing Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989)). In the Second Amendment context, the Supreme Court's mode of analysis has changed since we last upheld § 922(g)(1)'s constitutionality. *Bruen* requires a history-and-tradition analysis that our circuit hasn't yet applied to this statute. That means we must revisit our prior precedent.

To be sure, some courts have concluded that prior precedent controls. In many cases upholding § 922(g)(1), the syllogism goes like this: None of the Court's cases addressed § 922(g)(1) directly, but they all stated that it is "presumptively lawful," and further suggested that the Second Amendment right only extends to "law-abiding, responsible citizens." *See, e.g.*, *Heller*, 554 U.S. at 635; *McDonald*, 561 U.S. at 790; *Bruen*, 597 U.S. at 31. Felons are not "law-abiding, responsible citizens," and felon-in-possession laws are presumptively valid. Thus, the argument goes, the government may disarm individuals who've been convicted of a felony.

Thoughtful panels of other circuits have adopted that line of thinking. *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024); *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024); *Vincent v. Garland*, 80 F.4th 1197, 1200–02 (10th Cir. 2023), *vacated*, No. 23-683, 2024 WL 3259668 (Mem.) (U.S. July 2, 2024).[3] The Eleventh Circuit, for example, concluded

---

[3]After the Supreme Court decided *Rahimi*, it granted certiorari, vacated, and remanded for further proceedings several lower-court decisions addressing § 922(g)(1). This practice is common. The Supreme Court often vacates cases related to recently decided matters so that the courts of appeals can review those matters anew under the revised mode of analysis. *See, e.g.*, *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), *reh'g en banc granted, opinion vacated*, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024); *Range v. Att'y Gen. U.S.*, 69 F.4th 96, 101–02 (3d Cir. 2023) (en banc), *judgment vacated, Garland v. Range*, No. 23-374, 2024 WL 3259661 (Mem.) (U.S. July 2, 2024); *United States v. Jackson*, 69 F.4th 495, 504–05 (8th Cir. 2023), *judgment vacated, Jackson v. United States*, No. 23-6170, 2024 WL 3259675 (Mem.) (U.S. July 2, 2024). Thus, we cite those opinions for their persuasive authority.

that because its pre-*Bruen* cases interpreted *Heller* as limiting the right to "law-abiding, responsible citizens," and *Bruen* was "faithful to *Heller*," *Bruen* "could not have" abrogated its precedent upholding § 922(g)(1). *Dubois*, 94 F.4th at 1292–93. Similarly, the Tenth Circuit concluded that *Bruen* didn't "indisputably and pellucidly" abrogate its pre-*Heller* cases upholding § 922(g)(1). *Vincent*, 80 F.4th at 1202. *Bruen*'s endorsement of background checks, the Tenth Circuit explained, indicated that the Court tacitly approved regulatory measures designed to ensure that only "law-abiding, responsible citizens" could keep and bear arms. *Id.* (quoting *Heller*, 554 U.S. at 635). Thus, under those courts' stare-decisis rules, the pre-*Bruen* precedents controlled post-*Bruen* challenges.

We see things a bit differently than some of our sister circuits, for several reasons. First, other circuits have read too much into the Supreme Court's repeated invocation of "law-abiding, responsible citizens." Second, construing the Second Amendment to apply only to such citizens is inconsistent with both *Heller* and the individualized nature of the right to keep and bear arms. Third, the Supreme Court's decisions in *Bruen* and *Rahimi* supersede our circuit's past decisions on § 922(g).

A.

First, consider other courts' reliance on the "law-abiding, responsible" language from *Heller* and *Bruen*. The Court, to be sure, used that language multiple times throughout those opinions. But neither case used it to define the scope of the right to keep and bear arms. To the contrary, in *Heller*, the Court explained that the right "belongs to all Americans," not an "unspecified subset." 554 U.S. at 580–81. And while *Bruen* discussed the rights of "ordinary, law-abiding citizens" under the Second Amendment, it "said nothing about the status of citizens who were not [law-abiding]"—much less that *only* law-abiding citizens have Second Amendment rights. *Rahimi*, 144 S. Ct. at 1903.

Indeed, the Court's recent decision in *Rahimi* further emphasizes that lower courts shouldn't read too much into *Heller*'s and *Bruen*'s invocations of "law-abiding" and "responsible." *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[W]e think it generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the

United States Reports as though they were the United States Code."). When the government contended that it could disarm "irresponsible" persons, the Court quickly disposed of the argument. The Court acknowledged that *Heller* and *Bruen* used the term "responsible" to describe "the class of ordinary citizens who undoubtedly enjoy the Second Amendment right." *Rahimi*, 144 S. Ct. at 1903. But those cases had nothing to say about other citizens. *Id.*

B.

The law-abiding-citizens-only theory also fails as a matter of history and tradition. To be sure, at the Founding, there were some rights that a citizen could lose if he violated the law or otherwise lacked virtue. *See, e.g.*, *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). Thus, if gun possession is limited to the virtuous, and felons aren't virtuous, then they can't claim the right. The problem, however, is that the founding generation applied this virtuous-citizen approach to civic rights only.

Those rights, such as the right to sit on a jury or serve in the militia, were exercised collectively, for the benefit of the community. *See id.* And at the Founding, they were "limited to those members of the polity who were deemed capable of exercising [them] in a virtuous manner." Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002).

As applied to the Second Amendment, this argument immediately encounters a problem. For the civic-rights model of the Second Amendment to be correct, it must tie the right to some activity for the collective good, like militia service. But as the *Heller* Court made clear, the civic-rights model can't do that work; the right to bear arms doesn't stem from the collective need for a militia. 554 U.S. at 595. Rather, it's an *individual* right unconnected to any other civic activity. That much is clear from the right's historical justification: the individual's ability to defend himself. *See Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (citing *Heller*, 554 U.S. at 582–86). The right to self-defense—unlike the rights to vote or serve on a jury—doesn't bear the same connection to a common, community-oriented civic activity that only the virtuous enjoyed. And that historical disconnect from other civic rights undermines the virtuous-citizen theory.

Nor is the government's citation to Thomas Cooley's famous treatise availing. True, Cooley explains that certain groups, including "the infant . . . the idiot, the lunatic, and the felon" were categorically excluded from certain rights. Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 29 (1st ed. 1868). But Cooley is discussing the right to vote—the "elective franchise" and "a voice in [the government's] administration." *Id.* As we've discussed, voting is a civic right; the right to bear arms is not. So Cooley's view is of limited value in this context.[4]

This civic and political distinction is both critical and self-evident. Consider a few obvious examples. A felon might lose the right to vote. But that does not mean the government can strip them of their right to speak freely, practice the religion of their choice, or to a jury trial.

### C.

Finally, our pre-*Bruen* precedent isn't binding here because intervening Supreme Court precedent demands a different mode of analysis. *Heller*, to be sure, said felon-in-possession statutes were "presumptively lawful." But felon-in-possession laws weren't before the Court in *Heller* or *McDonald*. And while *Bruen* didn't overrule any aspect of *Heller*, it set forth a new analytical framework for courts to address Second Amendment challenges. Under *Bruen*, courts must consider whether a law's burden on an individual's Second Amendment rights is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Specifically, courts must study how and why the founding generation regulated firearm possession and determine whether the application of a modern regulation "fits neatly within" those principles. *Id.* at 1901.

Our circuit's pre-*Bruen* decisions on § 922(g)(1) omitted any historical analysis. They simply relied on *Heller*'s one-off reference to felon-in-possession statutes. Those precedents are therefore inconsistent with *Bruen*'s mandate to consult historical analogs. Indeed, applying *Heller*'s dicta uncritically would be at odds with *Heller* itself, which stated courts would need to

---

[4]Scholars have tried to shore up the virtuous-citizen theory. But they have not been successful. As Judge Bibas thoughtfully points out in his dissent in *Folajtar v. Att'y Gen.*, the articles in question resemble Russian nesting dolls because they "rest on one another." 980 F.3d 897, 913–17 (3d Cir. 2020) (Bibas, J., dissenting). They also fail to discuss felons, rely on the civic-rights theory *Heller* rejected, and cite no primary sources other than the ratifying conventions. *See id.* After *Bruen*, this lack of a historical foundation is fatal.

"expound upon the historical justifications" for firearm-possession restrictions when the need arose. 554 U.S. at 635. Thus, this case is not as simple as reaffirming our pre-*Bruen* precedent.

IV.

Under *Bruen*, we first ask whether "the Second Amendment's plain text" covers Williams's conduct. *Bruen*, 597 U.S. at 24. If so, then the Constitution presumptively protects it. *Id.* The government must then justify its regulation of that conduct by demonstrating that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

This historical analysis "involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. The question is not whether the modern regulation has a historical "twin" or "dead ringer." *Bruen*, 597 U.S. at 30. Rather, we ask whether the modern regulation is "relevantly similar" to laws that our tradition has historically embraced. *Id.* at 29. Specifically, we must consider "how and why [historical] regulations burden a law-abiding citizen's right to armed self-defense," and determine whether the challenged regulation is comparably justified. *Id.*

A.

Under *Bruen*'s first step, we assess whether the challenger's conduct falls within the Second Amendment's plain text. The Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II. Because *Heller* recognized that "individual self-defense . . . was the *central component* of the right itself," we give close attention to the last two clauses: "the right of the people to keep and bear Arms, shall not be infringed." *Heller*, 554 U.S. at 599; U.S. Const. amend. II.

This portion of the Amendment starts with "the right." These two words suggest the Amendment describes a right that existed before the ratification of the Bill of Rights. *See Heller*, 554 U.S. at 592. Indeed, many provisions in the Bill of Rights were "understood as declaratory, inserted simply out of an abundance of caution to clarify pre-existing constitutional understandings." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 28 (1998);

*United States v. Cruikshank*, 92 U.S. 542, 553 (1876) ("[The right to keep arms] is not a right granted by the Constitution.  Neither is it in any manner dependent upon that instrument for its existence.  The second amendment *declares* that it shall not be infringed.") (emphasis added).  But a reader doesn't need to take historians' or judges' word for it.  The congressional resolution announcing the Bill of Rights explicitly noted the document contained "declaratory" provisions.[5] 2 Documentary History of the Constitution of the United States of America 321 (Washington: Department of State, 1894).  And it was common knowledge at the founding that the Bill of Rights merely served to codify rights that existed long before the ink dried on constitutional parchment.  *Cf.* Letters from the Federal Farmer (XVI), *reprinted in* 2 *The Complete Anti-Federalist* 324 (Herbert J. Storing ed., 1981) ("we do not by declarations change the nature of things, or create new truths").  Thus, the Second Amendment's reference to "the right" to "keep and bear arms" refers to a liberty that predated the Bill of Rights.  To understand this right, then, we must look to history and tradition.

Before we do so, it's important to consider another key part of the Second Amendment's text.  After the words "the right," there is another short phrase: "the people."  As the Court explained in *Heller*, "the people" "unambiguously refers to all members of the political community, not an unspecified subset."  554 U.S. at 580.  The right thus belongs to "all Americans."  *Id.*  Nothing in the Second Amendment's text draws a distinction among the political community between felons and non-felons—or, for that matter, any distinction at all.  Williams, an American citizen, is a member of this political community.

The phrase "the people," moreover, appears elsewhere in the Bill of Rights.  Both the First and Fourth Amendments extend their protection to "the people."  And neither of those protections evaporates when the claimant is a felon.  Thus, "[u]nless the meaning of the phrase 'the people' varies from provision to provision," excluding Williams from "the people" in the Second Amendment would exclude him from the First and Fourth Amendments too.  *Range*,

---

[5]The resolution also announced that the Bill contained "restrictive" provisions.  These included what became the Third Amendment.  Then, as now, that proposal explained "No solider shall, in time of peace, be quartered in any house, with the consent of the Owner, nor in time of war, but in a manner to be prescribed by law." 2 Documentary History of the Constitution of the United States of America 321 (Washington: Department of State, 1894).

69 F.4th at 101–02. Such a reading is implausible under ordinary principles of construction. Courts have long presumed that words are used in a consistent way across provisions. *See Hurtado v. California*, 110 U.S. 516, 533–34 (1884) ("The conclusion is equally irresistible, that when the same phrase was employed [elsewhere], . . . it was used in the same sense and with no greater extent"); A. Scalia & B. Garner, *Reading Law* 170–171 (2012); *Pulsifer v. United States*, 601 U.S. 124, 149 (2024) (noting application of the presumption of consistent usage for terms of "heft"). We see no reason to deviate from that principle.

On balance, the Second Amendment's plain text presumptively protects Williams's conduct. *Bruen*, 597 U.S. at 17. Williams is a member of the people claiming "the right" to possess a gun—to "keep and bear arms." *See Heller*, 554 U.S. at 582. Section 922(g)(1) burdens that right. The question becomes whether that burden is consistent with the principles underpinning our historical tradition of regulating firearms. *See Rahimi*, 144 S. Ct. at 1898.

B.

When it comes to interpreting the Constitution, "not all history is created equal." *Bruen*, 597 U.S. at 34. The most relevant history speaks to the rights citizens enshrined when they adopted a particular amendment. Because the Second Amendment codified a pre-existing right, we must begin our journey in pre-Founding England. *See Heller*, 554 U.S. at 592; *Bruen*, 597 U.S. at 20. Historical evidence demonstrates that early English kings and Parliament alike disarmed individuals they deemed dangerous. An examination of colonial history next reveals that residents of the New World carried on this tradition. Finally, a study of founding-era practice reveals that the new Americans shared the views of their colonial counterparts on this score. They believed that certain classes of people posed a great risk of violence. Thus, until those individuals could show they did not pose such a risk, they could be forbidden from owning firearms.

1.

English kings placed a premium on maintaining peace. As St. George Tucker, a prominent early American legal scholar, put it, the common law of England "hath ever had a special care and regard for the conservation of the peace." 1 Henry St. George Tucker,

*Commentaries on the Laws of Virginia* 49 (3d. ed. 1846). And how did the law promote peace? One way was by disarming dangerous individuals. Indeed, early cases demonstrated that those intending to "terrify the King's subjects" were forbidden from "walk[ing] about the streets armed with guns." *See Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686) (calling this a "great offense at the common law"). Those subjects who violated this principle forfeited their "armour" and could be imprisoned "at the King's pleasure." *Id.*

The common law also relied on surety regimes. The law allowed officials called magistrates to require individuals they suspected would misbehave in the future to post bond. *See* 4 W. Blackstone, *Commentaries on the Laws of England* 253 (10th ed. 1787) (Blackstone). These surety regimes often took the form of a "surety of the peace," in which the defendant pledged to "keep the peace." *Id.* at 252–53. The common law, in other words, had multiple mechanisms to preserve peace.

A study of statutory law tells the same tale. As early as 1328, Parliament had peace on its mind. In the same year Parliament ended the First War of Scottish Independence and brought peace to the soldiers of the king's forces, it passed the Statute of Northampton. That law sought to reduce violence among everyday subjects. It targeted those who carried arms "in such a manner as will naturally cause a terror to the people" or cause "suspicion of an intention to commit any act of violence." William Hawkins, *A Treatise of the Pleas of the Crown* ch. 63, §§ 4, 9, 266–67 (6th ed. 1788) (1716). Such people would have to "forfeit their armour to the king." *Id.*; *see also* 5 W. Blackstone, *Commentaries* 149 (St. George Tucker ed. 1803) (1767) (Tucker's Blackstone) (confirming such conduct was sanctioned by the "forfeiture of the arms"); *Heller*, 554 U.S. at 594 (calling Tucker's Blackstone "the most important early American edition of Blackstone's Commentaries").

This principle was not confined to the Middle Ages. Three hundred years later, the Militia Act of 1662 allowed the Crown and its officers to "seize all Armes" from subjects they judged to be "dangerous to the Peace of the Kingdom." 14 Car. 2, c. 3, § 13 (1662); *see also* Robert Gardiner, *The Compleat Constable* 68 (4th ed. 1710) (allowing officials to "search for and seize Arms in the Custody of" any person they "judge Dangerous"). To maintain the hard-won peace, officials took arms from subjects they thought were dangerous.

Parliament also got into the act of keeping peace by determining what people were dangerous. As various rulers—some Catholic and others Protestant—battled for control of the British Isles, violence abounded. *See* Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 7–21 (2024). After the Protestant King William finally took power, his Parliament resolved to neutralize the Catholics by allowing only Protestants to have arms. According to this calculus, disarming what it saw as a troublesome group would spare England from the religious wars that had rocked the kingdom for decades. Parliament thus adopted the English Bill of Rights, which stated that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law."[6] An Act Declaring the Rights and Liberties of the Subject and Setling the Succession of the Crowne, 1 W. & M. Sess. 2 c. 2, sch. 1. (Eng.). To the Protestants, "[p]revention of a Catholic counter-revolution was of paramount concern." Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 122 (1994); *see* 5 Tucker's Blackstone, *supra*, at 54–55 (explaining that Catholics would've been tolerable were it not for their "subversion of the civil government"). Disarming a group of individuals they thought dangerous would help Parliament prevent social upheaval and rebellion. *See Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (quoting Alexander Deconde, *Gun Violence in America* 22–23 (2001)). Parliament, like the kings, saw such laws as preserving peace.[7]

This focus on preserving peace by prohibiting dangerous people from owning weapons also appears in Parliament's exceptions to its Catholic disarmament policy. Laws only prohibited Catholics from owning guns if they would not declare loyalty to the crown. *See, e.g.*, An Act for the Better Secureing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 2, ch. 15, § 3 (1688) (Eng.). By swearing a loyalty oath, the oath-taker

---

[6]While scholars often label the English Bill of Rights an antecedent to the Second Amendment, earlier English history is also relevant here. *See* Steven J. Heyman, *Natural Rights and the Second Amendment*, 76 Chi.-Kent L. Rev. 237 (2000). It informs our understanding of the right the English Parliament enshrined in that document and provides greater insight into the legal tradition that gave birth to our Second Amendment.

[7]All in all, laws disarming individuals and those disarming groups had the same objective: preserving peace. Because threats of interpersonal violence and rebellion both threatened that aim, leaders treated such seemingly different harms with the same medicine.

satisfied the authorities that he would not raise arms against king and country.  In other words, he was no longer dangerous.

All in all, a study of English history reveals a few key principles.  The English Crown and Parliament alike forbade individuals from possessing weapons if their possession of those weapons threatened the general public.  At times, Parliament made generalized determinations of dangerousness.  But even individuals in a broad group—like Catholics—could keep arms if they could demonstrate they didn't pose a danger.

2.

While many practices didn't survive the odyssey from the Old World to the New, the desire to promote peace by disarming dangerous groups arrived intact.  Between disease, famine, and harsh weather, colonial-era settlers faced long odds.  They needed a stable, peaceful environment—at least to the extent possible on a new continent.  To create such a dynamic, they embraced the regime that governed England for centuries.  They denied arms to dangerous groups, even as they allowed members of those same groups to retain arms if a third party determined they weren't dangerous.

The Massachusetts Bay Colony exemplified this theme when it ordered a group of seditious libelers to surrender their arms in 1637.  1 Records of the Governor and Company of the Massachusetts Bay in New England 211–12 (Nathaniel B. Shurtleff ed., 1853).  The young colony thought libelers were a threat to its survival, and thus dangerous if armed.  *Id.*  However, this rule was not without exception.  Just like Parliament allowed English Catholics to own arms if they were deemed not dangerous, a court could authorize libelers to buy or borrow weapons again.  *Id.*  An alternative path to redemption occurred if the individuals disavowed their libel.  *Id.*  In other words, once they were deemed not dangerous, their weapons were restored.

A similar logic applied to Native Americans.  As was the case between Catholics and Protestants across the Atlantic Ocean, tensions often flared between settlers and indigenous people.  War and violence were common.  *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55, 57 (2017).  It is thus not

surprising that, out of an "overarching concern for public safety," colonial legislatures attempted to restrict Native Americans' ability to raise arms against colonial subjects.[8]  *Id.* at 58.

The Colonies of Virginia and New Netherland are two such examples.  Those colonies punished with death citizens caught providing arms to Native Americans.[9]  *See Laws Enacted By The First General Assembly of Virginia*, *in* Colonial Origins of the American Constitution 287 (Donald S. Lutz ed., 1998) (quoting 1 Journals of the House of Burgesses of Virginia, 9–14 (H.R. McIlwaine & John P. Kennedy eds., 1905)); Act of March 31, 1639, 1639 N.J. Laws 18, *reprinted in* Laws and Ordinances of New Netherland, 1638-1674 (Edmund Bailey O'Callaghan ed., 1868) (forbidding citizens from providing "Guns, Powder and Lead" to Native Americans "on pain of being punished by Death"); *see also* Act of May 9, 1723, 1723 Conn. Pub. Acts 292. At least one colony let settlers trade arms with Native Americans so long as the indigenous population was "not in hostility with . . . any of the English."  *Trade with Indians*, *in* The Colonial Laws of Massachusetts 240, 240–41 (1889) (1672).  As colonists saw it, their survival depended on arms not making their way into the hands of populations that might strike against the young settlements.

Meanwhile, this principle also colored interactions between members of different faiths. At the outset of the French and Indian War, British colonists took a page from King William's playbook.  Protestant settlers feared the Catholics would side with France, a Catholic kingdom. In response to this alleged threat, the Protestants moved to disarm Catholics.  *See United States*

---

[8] It's true, of course, that regulations preventing colonists from trading with Native Americans weren't regulations on firearm possession by American citizens.  *See Duarte*, 101 F.4th at 686.  Indeed, there is evidence suggesting that early Americans didn't think of the Native Americans as part of "the people" at all.  *See Worcester v. State of Georgia*, 315 U.S. 515, 559 (1832) (describing Native Americans as a "people distinct from others").  But these laws still inform how early settlers of the colonies that became the United States thought about regulating firearms.  Their key idea was to keep weapons out of the hands of the Native Americans, whom colonists believed were hostile and dangerous.

[9] True, many colonies and early states didn't themselves explicitly protect a Second Amendment right in the Founding and immediately subsequent eras.  Only North Carolina, Pennsylvania, Vermont, and Massachusetts did. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208 (2006). But the Second Amendment "codified a right 'inherited from our English ancestors.'"  *Bruen*, 597 U.S. at 39 (quoting *Heller*, 554 U.S. at 599).  Regulations in the era leading up to the Second Amendment's framing thus help flesh out the historical right's content, even if colonies and some post-Founding states didn't protect the right.  All in all, the history from the states that did protect the right is more probative than from the states that didn't.  *See Bruen*, 597 U.S. at 34 ("[N]ot all history is created equal.").

*v. Jackson*, 85 F.4th 468, 471 (Mem.) (8th Cir. 2023) (Stras, J., dissenting from the denial of rehearing en banc) (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 115–26 (1st ed. 2012)); Greenlee, 16 Drexel L. Rev. at 35–46.[10]

In Pennsylvania, legislators required officials to take arms, military accoutrements, gunpowder and ammunition from any "papist or reputed papist." An Act for Forming and Regulating the Militia of the Province of Pennsylvania, *reprinted in* 5 James T. Mitchell & Henry Flanders, The Statutes at Large of Pennsylvania from 1682 to 1801, 609, 627 (Wm. Stanley Ray ed. 1898). Why? Because Pennsylvanians believed that such measures were "absolutely necessary" to protect against Catholic-led violence. *Id.* at 609.

Virginia also followed King William's strategy. Explaining that "it is dangerous at this time to permit Papists to be armed," Virginia banned Catholics from owning weapons, gunpowder, or ammunition. An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government, *reprinted in* 7 William Waller Hening, The Statutes at Large; Being a Collection of All the Laws of Virginia ch. 4, 35 (1820). Nevertheless, a justice of the peace was authorized to allow Catholics to keep weapons necessary for defending their home. *Id.* at 36.

As the colonists progressed towards Revolution, their fears shifted from religious differences to political ones. Settlers feared that the loyalists would become a homegrown fighting force that could send information to the British and attack the revolutionary lines from within. 1 *Laws of the State of New York Passed at the Sessions of the Legislature* 50 (1777–1784); *Duarte*, 101 F.4th at 680.

Even as fears shifted, the remedy remained constant. To avoid the possibility of additional bloodshed, the Continental Congress recommended that the colonies disarm loyalists. 1 *Journals of the American Congress*, at 285 (Washington, Way & Gideon 1823) (order recommending disarmament of those who were "notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United

---

[10]Of course, restrictions based on classifications like race and religion would now be unconstitutional under the First and Fourteenth Amendments. *See* U.S. Const. amends. I, XIV.

Colonies."). Several states heeded this call. In Pennsylvania, legislators directed militia commanders to "collect, receive and take all the arms . . . which are in the hands of non-associators" and repurpose those arms for use in the Revolution. *See* An Ordinance Respecting the Arms of Non-Associators, *reprinted in* 9 Mitchell & Flanders, *supra*, at 11–12.[11] A subsequent statute noted that it was "very improper and dangerous" for "disaffected" persons to keep weapons. Act of Apr. 2, 1779, *reprinted in* Acts of the General Assembly of Pennsylvania 192, 193. Likewise, in New York, the state congress deemed it "absolutely necessary" to disarm "the most dangerous" among the loyalists. Greenlee, 16 Drexel L. Rev. at 63. New Jersey directed officials to disarm "such Persons as they shall judge disaffected and dangerous to the present Government." An Act for Constituting a Council of Safety, 1777 N.J. Laws 84, 90. To colonists, disarming dangerous loyalists was a necessary strategy to preserve order.

Just as with the English statutes of days past, these colonial laws often gave alleged loyalists the chance to demonstrate they were not dangerous. In Connecticut, the legislature established that loyalists would be disarmed until they'd demonstrated they were not dangerous to the fledgling revolutionary project. *See* Act of Dec. 1775, *in* 15 The Public Records of the Colony of Connecticut 193 (Charles J. Hoadly ed., 1890) (allowing individuals to retain firearms if they were "friendly to this and the other United Colonies"). Rhode Island and Massachusetts allowed loyalists to keep their arms once they showed "satisfactory reasons" for needing weapons or "by the order of" colonial committees. *See Duarte*, 101 F.4th at 683 (citing Rhode Island's and Massachusetts's provisions, respectively).

Colonial era laws thus demonstrate that England's history and tradition of disarming dangerous individuals continued across the Atlantic Ocean. Colonial governments frequently deemed entire groups too dangerous to possess weapons. And, as in the Old World, individual members of those groups could demonstrate that they were not dangerous, thereby restoring their ability to keep arms.

---

[11]As of 1776, the Pennsylvania Constitution protected the right to keep and bear arms, so pre-Founding examples from that state are highly probative of the federal right's scope.

3.

The story did not change when the future Americans decided whether to ratify their new Constitution.  Citizens of the eventual Republic considered and rejected proposals during the ratifying conventions that dealt with whether dangerous individuals could possess weapons.  These debates reveal that early Americans' views on how to preserve peace were not so different from those of their predecessors.

Take the example of Massachusetts.  There, Anti-Federalist delegates proposed language asserting that the government could not prevent "peaceable citizens" from "keeping their own arms."  2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 681 (1971).  Such wording clearly did not encompass all criminals.  Nor did it encompass all felons.  *See Kanter*, 919 F.3d at 455 (Barrett, J., dissenting).  Instead, the term of "peaceable" merely meant "non-dangerous." *Jackson*, 85 F.4th at 476  (Stras, J., dissenting from the denial of rehearing en banc) (citing *Kanter*, 919 F.3d at 455–56 (Barrett, J., dissenting), which in turn cites several Founding-era dictionaries).  In other words, the proposal demonstrates that Massachusetts delegates recognized a need to disarm dangerous individuals.

Just north of Massachusetts, in Exeter, New Hampshire, delegates considered the same issue.  One proposal asserted that Congress "shall never" disarm citizens unless they "are or have been in actual rebellion."  1 Jonathan Elliott, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (2d ed. 1891).  By introducing such language, delegates placed themselves in the tradition of legislatures, Parliament, and English kings who sought to disarm individuals they deemed to be dangerous.  *See Kanter*, 919 F.3d at 455 (Barrett, J., dissenting).

Finally, during Pennsylvania's ratifying convention, the Anti-Federalists proposed a draft constitutional amendment explaining that "no law shall be passed for disarming the people . . . unless for crimes committed, or real danger of public injury from individuals."  2 Schwartz, *supra*, at 665.  At first glance, this amendment is confusing.  The government argues that this piece of history supports disarming all criminals.  But thoughtful jurists have rejected this reading and pointed out that the "crimes committed" language refers only to a subset of crimes,

those that present a "real danger of public injury." *See Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) ("[N]o one, even today, reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants."); *Folajtar*, 980 F.3d at 915 (Bibas, J., dissenting). And then-contemporary commentators agreed. Nicholas Collin, a noted political writer, explained the proposal would've empowered Congress to disarm "dangerous persons." Nicholas Collin, *Remarks on the Amendments to the Federal Constitution . . . by a Foreign Spectator*, No. 11 (Nov. 28, 1788), *in* Three Neglected Pieces of the Documentary History of the Constitution and Bill of Rights 40 (Stanton D. Krauss ed., 2019). Thus, in Pennsylvania, as in the colonies and England before that, governing officials were aware that some individuals were too dangerous to possess firearms.

While the proposing delegates failed to get these amendments into state or federal constitutions, these provisions still reveal a great deal about the Second Amendment. *See* Volokh, *supra*, 11 Tex. Rev. L. & Pol'y at 208 (collecting state constitutions). For one, because the Amendment codified a pre-existing and widely understood right, it's unlikely that "different people of the founding period had vastly different conceptions" of that right's scope. *Heller*, 554 U.S. at 603–05.

What's more, two of the proposals—from Pennsylvania and Massachusetts—came from the Anti-Federalists. Understanding this minority view is critical to any determination of original meaning. Amul R. Thapar & Joe Masterman, *Fidelity and Construction*, 129 Yale L.J. 774, 797–98 (2020) (book review). Why do the views of the losing side matter? They shaped how leaders and laymen alike thought about the proposed government. *See generally* Nils Gilbertson, *Return of the Skeptics: The Growing Role of the Anti-Federalists in Modern Constitutional Jurisprudence*, 16 Geo. J.L. & Pub. Pol'y 255, 275 (2018). Just like counterarguments identify the outer bounds of our views, Anti-Federalist arguments help identify the scope of our constitutional rights. And their thoughts on rights were particularly influential. Among many contributions, Anti-Federalists thought the Constitution needed a bill of rights—a view that won over Federalists and had obvious lasting effect. Akhil Reed Amar, *Anti-Federalists, the Federalist Papers, and the Big Argument for Union*, 16 Harv. J. L. & Pub. Pol'y 111, 115 (1993). The Anti-Federalists' views colored the constitutional moment, both pre- and

post-ratification.  And here, Anti-Federalist proposals about rights reveal ratifiers thought they could disarm dangerous individuals.

Other evidence supports the Anti-Federalists' view that governments could only disarm individuals they deemed dangerous.  William Rawle, writing in Pennsylvania, explained that the Second Amendment's right was limited by the principle that it "ought not . . . be abused to the disturbance of the public peace."  William Rawle, *A View of the Constitution of the United States of America* 126 (Philadelphia 1829).  To Rawle, as to early colonial citizens, peace remained paramount.  St. George Tucker, the editor of America's version of Blackstone's Commentaries, explicitly linked the then-novel Amendment with the British legal tradition.  In his view, American citizens enjoyed the right to bear arms "without any qualification as to their condition or degree, as is the case with the British government."  2 Tucker's Blackstone, *supra*, at 143 & n.40; *cf.* Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 270 (Boston, Little, Brown & Co. 1880) (explaining that the Second Amendment was adopted "with some modification and enlargement from the English Bill of Rights").  Tucker would have known that the British tradition from which this right came had long prohibited dangerous individuals from accessing arms.

This tradition did not stop with ratification of the Second Amendment.  Post-enactment history also provides color to the right our Framers secured.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (relying on post-enactment history to evaluate the "widespread and longstanding traditions of our people").  As the Civil War approached, some citizens worried that freedmen might rebel.  In response to these concerns, states turned to what had become a familiar tactic: they passed repressive laws.  This time, though, they didn't target a religious group.  Instead, they prohibited freedmen from owning arms.  *See, e.g.*, Act of November, 1806, *in* 3 The Laws of Maryland 298 (Virgil Maxcy ed., 1811); An Act to Prevent the Use of Fire Arms by Free Negroes and Free Mulattoes and for Other Purposes, *in* Laws of the State of Delaware ch. 176, at 180.  And, like the statutes of days past, these laws also had exceptions.  In Maryland, a freedman could carry a gun if he had "a certificate from a justice of the peace, that he is an orderly and peaceable person."  Act of November, 1806, 3 The Laws of Maryland 298.  In Delaware, if "five or more respectable and

judicious citizens" certified that a freedmen was a "person of fair character," the local justice of the peace could "issue a license" authorizing the freeman to carry a hunting rifle—a "fowling piece." In the former Chesapeake colonies, the past regulations had served as prologue. *Cf.* Greenlee, 16 Drexel L. Rev. at 28.

Ultimately, the Fourteenth Amendment sought to end this sordid history of race-based discrimination. *See McDonald v. City of Chicago*, 561 U.S. 742, 770–78 (2010); *id.* at 847–50 (Thomas, J., concurring in part and concurring in the judgment). Classifying people as dangerous simply because of their race or religion was wrong from the beginning and unconstitutional from 1868. Nevertheless, these pre-Fourteenth Amendment laws provide insight into how early Americans conceived of the right to bear arms embodied in the Second Amendment. The key point is that entire groups could be presumptively disarmed. That principle holds true today—except today, of course, a group must not be singled out for disarmament on the basis of race or religion in violation of the Fourteenth Amendment.

*

This historical study reveals that governments in England and colonial America long disarmed groups that they deemed to be dangerous. Such populations, the logic went, posed a fundamental threat to peace and thus had to be kept away from arms. For that reason, governments labeled whole classes as presumptively dangerous. This evaluation was not always elegant. And even though some of those classifications would offend both modern mores and our current Constitution, there is no doubt that governments have made such determinations for centuries. Each time, however, individuals could demonstrate that their particular possession of a weapon posed no danger to peace.

## C.

Against this historical backdrop, how does § 922(g)(1) stack up? Start with the facial challenge. For Williams to succeed, he must show that there exists "no set of circumstances under which the Act would be valid." *Salerno*, 481 U.S. at 475. He can't do so. As discussed above, our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous. Section 922(g)(1) is an attempt to do just that. Because, as we discuss

below, most applications of § 922(g)(1) are constitutional, the provision is not susceptible to a facial challenge.

Of course, Williams is also bringing an as-applied challenge.  As first glance, an as-applied challenge is an odd match for § 922(g)(1), which doesn't provide a mechanism allowing individuals to prove the class-wide presumption shouldn't apply to them.  But history shows that § 922(g)(1) might be susceptible to an as-applied challenge in certain cases.

Recall that several historical examples authorized the official doing the disarming, usually the local justice of the peace, to make the dangerousness determination.  Often, he was guided by some benchmarks, either a loyalty oath, the attestations of others, or some other statutory criteria.

District judges serve the same function when they entertain as-applied challenges to § 922(g)(1)'s applicability.  *See Jackson*, 85 F.4th at 478–79 (Stras, J., dissenting from the denial of rehearing en banc).  Indeed, they already determine whether a given defendant is dangerous in multiple situations.  Judges deciding whether to release a defendant before trial must consider whether that defendant will "endanger the safety of any other person or the community." 18 U.S.C. § 3142.  Moreover, at sentencing, "dangerousness comes up at least twice":  when the judge balances the § 3553 sentencing factors, including the need "to protect the public," and when he determines whether a defendant "must refrain from possessing a firearm" while on probation or supervised release.  *See Jackson*, 85 F.4th at 478 (Stras, J., dissenting from the denial of rehearing en banc) (citing 18 U.S.C. §§ 3553(a)(2)(c), 3583).

In determining whether an individual has met his burden to demonstrate that he is not dangerous, and thus falls outside of § 922(g)(1)'s constitutionally permissible scope, courts—much like the officials of old—must focus on each individual's specific characteristics.  That necessarily requires considering the individual's entire criminal record—not just the predicate offense for purposes of § 922(g)(1).[12]  As discussed below, certain categories of past convictions are highly probative of dangerousness, while others are less so.

---

[12]We recognize that courts may wish to consider information beyond criminal convictions when assessing a defendant's dangerousness.  In *Rahimi*, for example, a state court had issued the defendant a civil restraining order.

In broad terms, governments have long divided criminal offenses into a few classes. The first such group is crimes against the person. *See, e.g.*, *Borden v. United States*, 593 U.S. 420, 454 (2021) (Kavanaugh, J., dissenting). This historical category was filled with dangerous and violent crimes like murder, rape, assault, and robbery. *Offense Against the Person*, Black's Law Dictionary (12th ed. 2024). Many of them were common-law felonies. *See, e.g.*, Wayne R. LaFave, Substantive Criminal Law § 20.3 (3d ed. 2023) (robbery); *cf. Duarte*, 101 F.4th at 690–91. Offenses in this category speak directly to whether an individual is dangerous.

But one open question is whether the crimes in this bucket are dispositive. It is hard to see how someone who commits such a dangerous and violent act may overcome the presumption that they are dangerous. Why? One reason is that the Framers punished the very same offenses with death. *See, e.g.*, Chapter 9, 1 Congress, Public Law 1-9. 1 Stat. 112 (1790). They used this penalty specifically to rid the country of dangerous people. Indeed, at the founding, the death penalty was a way of "preventing crimes in the future; [and] it was also a backward-looking effort at purging the community of guilt for crimes committed in the past." *See* Stuart Banner, The Death Penalty: An American History 15 (2009). The key idea was that capital punishment would "prevent existing criminals from repeating their crimes." *Id.* at 13. In this sense, the death penalty served to eliminate those too dangerous to have a place in society before the development of prisons. In other words, the availability of the death penalty for these crimes might indicate an irrebuttable presumption of dangerousness.

But this question is unsettled. Felons, after all, don't lose other rights guaranteed in the Bill of Rights even though an offender who committed the same act in 1790 would have faced capital punishment. No one suggests that such an individual has no right to a jury trial or be free from unreasonable searches and seizures. So the question remains an open one, but even if the individual was given the opportunity to show they are not dangerous, the burden would be extremely heavy.

---

144 S. Ct. at 1895. However, we leave the question of what information is relevant for another day. Williams's criminal convictions are sufficient to resolve this case.

While we ultimately reserve this question for another day, there is little debate that violent crimes are at least strong evidence that an individual is dangerous, if not totally dispositive on the question.

Whatever the case, the founders' instinct that some crimes are more dangerous than others maps well onto the Nation's early 20th-century regulatory framework. *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698–707 (2009). In 1926, and again in 1930, the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Firearms Act. *See id.* at 700–01; *see* Standing Committee on Uniform State Laws, *A Uniform Act to Regulate the Sale and Possession of Firearms*, *in* Report of the Annual Meeting of the American Bar Association 530, 555–62 (1926) (UFA). That Act—the result of increased crime in the Prohibition era—provided that anyone convicted of a "crime of violence" was barred from possessing a handgun. *See* UFA, § 4, at 556. The listed "crimes of violence" included, among others, murder, rape, robbery, and burglary. *Id.* § 1, at 556. The Act drew those crimes from the historical "crimes of violence against the person and property" and distinguished those crimes from crimes of dishonesty. *See* Marshall, 32 Harv. J.L. & Pub. Pol'y at 702; *For a Better Enforcement of the Law*, 8 A.B.A. J. 588, 590 (1922). Eleven jurisdictions enacted the Uniform Firearms Act. Marshall, 32 Harv. J.L. & Pub. Pol'y at 705.

The state-level Uniform Firearms Act eventually gave way to the 1938 Federal Firearms Act—§ 922(g)(1)'s predecessor. That Act likewise disarmed only felons convicted of a "crime of violence." *See* An Act to Regulate Commerce in Firearms, ch. 850, § 2(f), 52 Stat. 1250, 1250 (1938); Marshall, 32 Harv. J.L. & Pub. Pol'y at 706. "Crime of violence," in turn, included many of the common-law offenses against the person—murder, rape, assault (including assault with intent to rob), and burglary, among others. *Id.* § 1(6).

In 1961, the FFA's crime-of-violence disability was replaced by the now-familiar category of all felonies. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). That version of the Act is in effect today.

In sum, felon disarmament has broadened over the years. Of course, there is peril in drawing meaning from statutory provisions subsequently deleted. *Cf. Heller*, 554 U.S. at 590.

But the history of § 922(g)(1) shows that it grew out of concern for guns in the hands of dangerous criminals. In identifying that class, the Act's creators relied on historical notions of crimes against the person.

A second category of crimes, while not strictly crimes against the person, may nonetheless pose a significant threat of danger. These crimes do not always involve an immediate and direct threat of violence against a particular person. A prime example is drug trafficking. *See* 18 U.S.C. § 924(c); *Folajtar*, 980 F.3d at 922 (Bibas, J., dissenting). "[D]rug trafficking is a serious offense that, in itself, poses a danger to the community." *United States v. Stone*, 608 F.3d 939, 947 n.6 (6th Cir. 2010). In addition, it often leads to violence. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring in part and concurring in the judgment). Other crimes, like burglary, pose a similar threat. Courts have recognized that burglary is dangerous because it "creates the possibility of a violent confrontation between the offender and occupant." *Taylor v. United States*, 495 U.S. 575, 588 (1990). Ultimately, most of these crimes put someone's safety at risk, and thus, justify a finding of danger.

The final category of crimes is the most challenging to address. These are crimes like mail fraud, *see Kanter*, 919 F.3d at 440, or making false statements, *see Range*, 69 F.4th at 98. Often, such crimes cause no physical harm to another person or the community. For example, "[i]n New Jersey, opening a bottle of ketchup at the supermarket and putting it back on the shelf is a third-degree felony, punishable by up to five years' imprisonment." *See Folajtar*, 980 F.3d at 921 (Bibas, J., dissenting). But we trust district courts will have no trouble concluding that many of these crimes don't make a person dangerous.

When evaluating a defendant's dangerousness, a court may consider a defendant's entire criminal record—not just the specific felony underlying his § 922(g)(1) conviction. After all, nothing in the Second Amendment's text or history limits "dangerousness" to the particular felony (if any) listed in an indictment or plea agreement. This makes sense, given that the government doesn't need to prove the specific predicate felony in securing a conviction under § 922(g)(1) in the first place. *See generally Old Chief v. United States*, 519 U.S. 172 (1997). Courts may consider any evidence of past convictions in the record, as well as other judicially

noticeable information—such as prior convictions—when assessing a defendant's dangerousness.

Additionally, in determining whether a defendant's past convictions are dangerous, we don't mean to suggest that courts facing as-applied challenges must find "categorical" matches to show a defendant is dangerous. *Cf. Mathis v. United States*, 579 U.S. 500, 504 (2016). We only make the commonsense point that certain categories of offenses—like historical crimes against the person—will more strongly suggest that an individual is dangerous. But rather than draw bright categorical lines, district courts may make "an informed judgment about how criminals commonly operate[]." Marshall, 32 Harv. J.L. & Pub. Pol'y at 729. The dangerousness determination will be fact-specific, depending on the unique circumstances of the individual defendant. And in many instances—prior murders, rapes, or assaults—the dangerousness will be self-evident. District courts are well-versed in addressing challenges like these. We are therefore confident that the dangerousness inquiry is workable for resolving as-applied challenges to § 922(g)(1). *See Jackson*, 85 F.4th at 479 (Stras, J., dissenting from the denial of rehearing en banc) (explaining that in the Third Circuit, where as-applied challenges to § 922(g)(1) were possible pre-*Bruen*, district courts "had no trouble" making individualized dangerousness determinations).

One might object, however, that courts should simply defer to Congress. *See* Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1588 (2022). Indeed, one could read the history of categorical-disarmament laws and conclude that the relevant principle is to let the elected branches make the dangerousness call. *See, e.g.*, *Jackson*, 69 F.4th at 504–05. Such an approach would be mistaken for multiple reasons.

First, the history cuts in the opposite direction. English laws largely vested discretion in the officials on the ground. They were the ones determining whether a given individual was "judged dangerous." And even when the disarmament legislation itself created the exception regime, the fact remained that individuals had the opportunity to demonstrate that they weren't dangerous.

Second, it would be inconsistent with *Heller*. If courts uncritically deferred to Congress's class-wide dangerousness determinations, disarmament laws would most often be subject to rational-basis review. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955). But that runs headlong into *Heller*: "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." 554 U.S. at 628 n.27.

Third, complete deference to legislative line-drawing would allow legislatures to define away a fundamental right. Normally, of course, we judges have little authority to question a legislature's decision to criminalize or punish certain conduct; a felony sentence is "purely a matter of legislative prerogative." *Rummel v. Estelle*, 445 U.S. 263, 274 (1980). But when that decision implicates a fundamental, individual right, judicial deference is simply not an option. *See Bruen*, 597 U.S. at 26; *Heller*, 554 U.S. at 636. The very premise of constitutional rights is that they don't spring into being at the legislature's grace. When a disarmament statute doesn't provide an administrative scheme for individualized exceptions, as-applied challenges provide a mechanism for courts to make individualized dangerousness determinations.

Of course, district courts addressing as-applied challenges need not be the sole mechanism by which the case-by-case determination may be made. Indeed, one legislative solution is already on the books. Under 18 U.S.C. § 925(c), the Bureau of Alcohol, Tobacco, and Firearms may authorize a felon to possess a gun if the felon can show that he "will not be likely to act in a manner dangerous to the public safety" and that the public interest supports rearmament. This regime bears a striking resemblance to the individualized dangerousness determinations made by the justices of the peace of old.[13] What's more, the rearmament criteria in § 925(c) map neatly onto the dangerousness principle underlying traditional firearm regulation. If this program is on the books, then, why must felons resort to the courts?

---

[13] Another possible solution might be 18 U.S.C. § 921(a)(20). *See Range*, 69 F.4th at 128 & n.105, 136 (Krause, J., dissenting). That statutory provision sets out various exceptions to § 922(g)(1)'s "crime punishable by imprisonment for a term exceeding one year," including antitrust violations and unfair trade practices. So Congress, the theory goes, already has a mechanism for excluding non-dangerous felons from § 922(g)(1)'s ambit. But allowing Congress to define the exceptions is no different from allowing Congress to define the class and forbid exceptions. And as we've explained, that approach suffers from its own set of problems.

The answer is that Congress hasn't funded the program in decades. Since 1992, Congress has attached an appropriations rider forbidding any appropriated funding from being used to "investigate or act upon applications for relief" under § 925(c). *See* Treasury, Postal Service, and General Government Appropriations Act, 1993, Pub. L. No. 102-393, 106 Stat. 1732; *United States v. Bean*, 537 U.S. 71, 74–75 & n.3 (2002). Were the ATF program operational and funded, it might provide disarmed felons the chance required by the Second Amendment to make an individualized showing of qualification to keep and bear arms. And section § 925(c) provides a role for courts, stating that individuals whose rearmament requests are denied "may file a petition . . . for judicial review" in federal district court. But without funding, the program remains practically unavailable. Thus, without resort to the courts through as-applied challenges, the lack of an administrative scheme would abridge non-dangerous felons' Second Amendment rights.

The relevant principle from our tradition of firearms regulation is that, when the legislature disarms on a class-wide basis, individuals must have a reasonable opportunity to prove that they don't fit the class-wide generalization. That principle is satisfied whether the official is an executive agent or a court addressing an as-applied challenge.

V.

In light of our analysis above, Williams's as-applied challenge fails. History shows that governments may use class-based legislation to disarm people it believes are dangerous, so long as members of that class have an opportunity to show they aren't. Through § 922(g)(1), Congress has decided to enact a class-wide disarmament of felons. As discussed above, that statute is constitutional as it applies to dangerous individuals. Because Williams's criminal record shows that he's dangerous, his as-applied challenge fails.

Consider Williams's criminal record. He has two felony counts of aggravated robbery. Robbery is a common-law crime against the person. What's more, "aggravated robbery is robbery . . . [a]ccomplished with a deadly weapon." *See* Tenn. Code. Ann. § 39-13-402. Indeed, Williams robbed two people at gunpoint, stealing cash, a watch, and clothing. That offense alone is sufficient to conclude that Williams, if armed, presents a danger to others or the public.

But that's not all.  Williams has also been convicted of attempted murder.  And he's already been convicted of possessing a firearm as a felon.  In that case, he agreed to stash a pistol that was used to murder a police officer.  The government could've pointed to any one of those convictions to demonstrate his dangerousness.  Thus, Williams may be constitutionally disarmed through a class-based statute like § 922(g)(1).

In response, Williams argues the government has the burden of producing evidence of his prior convictions and proving that disarming him is consistent with history and tradition.  Not true.  Our nation's history shows that the government may require individuals in a disarmed class to prove they aren't dangerous in order to regain their right to possess arms.  Thus, in an as-applied challenge to § 922(g)(1), the burden rests on Williams to show he's not dangerous.  And he can't make that showing.

Nor is it a problem—statutory or evidentiary—that the government failed to list a specific predicate felony in his indictment.  From a statutory standpoint, the "specific name or nature" of a defendant's prior felony conviction isn't an element of § 922(g)(1).  *Old Chief*, 519 U.S. at 186.  Section 922(g)(1) applies if a defendant has committed, and knows he has committed, a crime punishable by a year or more in prison.  *Id.* at 175, 186 (holding that a stipulation that a defendant had been convicted of crime punishable by more than one year of imprisonment is "seemingly conclusive evidence of the element").  The indictment alleged he had committed a crime punishable by a year or more in prison, and Williams admitted as much during his plea colloquy.  Thus, the government has established the relevant element for § 922(g)(1).

Williams also faults the government for failing to offer proof of his prior crimes in response to his Second Amendment challenge.  But the government didn't need to.  For one, a court can accept prior convictions without an evidentiary hearing or jury fact finding. *Almendarez-Torres v. United States*, 523 U.S. 224, 228–39 (1998).  And here, Williams's Presentence Report provided details about his long record of past crimes.  What's more, Williams never objected to the Presentence Report's contents.

In short, we have little trouble concluding that Williams is a dangerous felon.  The government may, consistent with the Second Amendment, punish him for possessing a firearm.

And the government may enact this prohibition through a broad, class-wide ban like § 922(g)(1). His as-applied challenge therefore fails.

*        *        *

To summarize, we hold today that § 922(g)(1) is constitutional on its face and as applied to dangerous people. Our nation's historical tradition confirms *Heller*'s assumption that felon-in-possession laws are "presumptively lawful." The history reveals that legislatures may disarm groups of people, like felons, whom the legislature believes to be dangerous—so long as each member of that disarmed group has an opportunity to make an individualized showing that he himself is not actually dangerous.

A person convicted of a crime is "dangerous," and can thus be disarmed, if he has committed (1) a crime "against the body of another human being," including (but not limited to) murder, rape, assault, and robbery, or (2) a crime that inherently poses a significant threat of danger, including (but not limited to) drug trafficking and burglary. An individual in either of those categories will have a very difficult time, to say the least, of showing he is not dangerous.

A more difficult category involves crimes that pose no threat of physical danger, like mail fraud, tax fraud, or making false statements. But such a case is not before us today.

In any event, district courts need not find a "categorical" match to a specific common-law crime to show that a person is dangerous. Rather, district courts should make fact-specific dangerousness determinations after taking account of the unique circumstances of the individual, including details of his specific conviction. Finally, when considering an individual's dangerousness, courts may evaluate a defendant's entire criminal record—not just the specific felony underlying his section 922(g)(1) prosecution.

Here, Williams availed himself of his constitutionally required opportunity to show that he is not dangerous—albeit after he violated the law, not before. Because his record demonstrates that he is dangerous, we reject his challenge. We thus affirm.

---

### CONCURRING IN THE JUDGMENT

---

DAVIS, Circuit Judge, concurring in judgment.  The Supreme Court has repeatedly stated that there is a presumption of lawfulness for statutes and regulations that prohibit individuals who have been convicted of a felony from possessing a firearm.  And we have frequently applied this presumption in prior decisions of this court.  Because I believe that this case can be decided on that basis alone, I concur in judgment only.

The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *Heller v. District of Columbia*, the Supreme Court held that the Second and Fourteenth Amendments protect the right of law-abiding, responsible citizens to possess a handgun in the home for lawful purposes, including self-defense.  554 U.S. 570 (2008).  The Court explained, however, that "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  *Id.* at 626.  In particular, the Court noted that "nothing in [its] opinion" should "be taken to cast doubt on *longstanding prohibitions on the possession of firearms by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* (emphasis added).  Such prohibitions were found to be "presumptively lawful."  *Id.* at 627 n.26.

After *Heller*, when faced with a constitutional challenge to 18 U.S.C. § 922(g)(1), we concluded that the statute does not violate the Second Amendment.  *See, e.g.*, *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010).  In *Carey*, we determined that, because the Second Amendment right "is not unlimited," and "in fact . . . is *specifically* limited in the case of felon prohibitions," "Congress's prohibition on felon possession of firearms is constitutional."  *Id.* (emphasis added); *see also United States v. Khami*, 362 F. App'x 501, 507–08 (6th Cir. 2010) (relying on *Heller* to reject a Second Amendment challenge to § 922(g)(1)); *United States v. Griffin*, 476 F. App'x 592, 598 (6th Cir. 2011) (same); *United States v. Goolsby*, No. 21-3087,

2022 WL 670137, at *2–3 (6th Cir. Mar. 7, 2022) (same).  And other circuits have also relied, in varying degrees, on *Heller's* acknowledgment of presumptive lawfulness in analyzing the statute.  *See, e.g.*, *United States v. Gay*, 98 F.4th 843, 846–47 (7th Cir. 2024); *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (quoting *Heller*, 554 U.S. at 635); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1114–18 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009).

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the plaintiffs challenged a provision of New York's licensing law that required an applicant to prove "proper cause exists" to obtain a license to carry a gun outside his home.  597 U.S. 11, 12 (2022).  In its analysis, the Court explained that it sought to make "the constitutional standard endorsed in *Heller* more explicit." *Id.* at 31.  In doing so, it announced fresh guidance for determining whether a statute or regulation infringes on the Second Amendment right to possess and carry a firearm is lawful: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.  Separate and apart from articulating this new framework, the Court once again addressed the scope of the Second Amendment's application to felons.  In particular, Justice Kavanaugh, concurring with the majority, repeated *Heller's* language about the presumption of lawfulness as it pertains to laws that limit felons' rights:  "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons."  *Id.* at 81 (Kavanaugh, J., joined by Roberts, C.J., concurring).

Recently, in *United States v. Rahimi*, the Supreme Court addressed whether, on its face, 18 U.S.C. § 922(g)(8)—which prohibits a person subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that the person "represents a credible threat to the physical safety of [an] intimate partner," or a child of the partner or individual—can withstand constitutional review.  144 S. Ct. 1889, 1894 (2024).  In its analysis, the Court reiterated *Bruen's* requirement that "the Government must show that the restriction 'is consistent with the Nation's historical tradition of firearm regulation'" when assessing the constitutionality of statutes that infringe on citizens' Second Amendment rights.  *Id.* at 1896 (quoting *Bruen*, 597

U.S. at 24).  After conducting a meticulous review of the historical regulations against firearms, the Court concluded that "Section 922(g)(8) survives *Rahimi's* facial challenge [because America's] tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."  *Id.* at 1902.

In addition to applying the requirement—consistent with *Heller* and *Bruen*—to conduct a historical analysis to determine the constitutionality of Section 922(g)(8), the Court again repeated its pronouncement from *Heller* that prohibiting "possession of firearms by '*felons* and the mentally ill,' is 'presumptively lawful.'"  *Id.* (emphasis added).  I take this to mean that *Rahimi* did not intend for courts of appeals to abandon prior decisions that relied on the presumption in favor of conducting independent historical surveys to determine what it already settled:  categorical bans that prohibit felons from possessing firearms are "presumptively lawful" and thus survive constitutional challenge.  *See Heller*, 554 U.S. at 626, 627, n.2; *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring; Roberts, C.J., joining); *Rahimi*, 144 S. Ct. at 1902. True, the Court has not articulated a standard addressing how one might overcome this presumption.  But the fact that the Court has continued to reinforce its continuing vitality even post-*Bruen* would seem to suggest that reliance on the presumption for this limited category of prohibitions remains constitutionally sound.

Relying on the Supreme Court's decision in *Bruen*, Williams argues that the plain text of the Second Amendment protects his right to bear arms despite being a felon because he is a part of "the people" contemplated in the amendment.  Because *Rahimi* acknowledged the continuing soundness of the presumption, it does not call into question our prior cases that relied on it to conclude that felons may be disarmed consistent with the Second Amendment.  And Williams's as-applied challenge to § 922(g)(1) fails as a matter of law.  Hence, notwithstanding the majority's thoughtful historical analysis, I would join our colleagues in our sister Circuits who have concluded that upholding § 922(g)(1) based upon the presumption of lawfulness set forth in *Heller*, *Bruen*, and now *Rahimi*, is sufficient.  As such, I concur in judgment only.