No. 24-1091

# In the United States Court of Appeals for the Third Circuit

♦

**EDWARD A. WILLIAMS,**

*Plaintiff–Appellee*,

v.

**ATTORNEY GENERAL OF THE UNITED STATES, et al.,**

*Defendants–Appellants*.

♦

Appeal from the United States District Court
for the Eastern District of Pennsylvania
Case No. 2:17-cv-02641

♦

**SUPPLEMENTAL BRIEF OF THE APPELLEE**

♦

<div style="text-align:right">

JOSHUA PRINCE, ESQ.
PRINCE LAW OFFICES, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 313-0416
Joshua@PrinceLaw.com

*Counsel for Appellee*

</div>

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................1

    A.    The Implications of *Rahimi*, *Range*, and *Pitsilides* ..............................1

        *1.  Rahimi* ..........................................................................................2

        *2.  Range II* .......................................................................................5

        *3.  Pitsilides* ......................................................................................6

        *4.  Rahimi, Range II, and Pitsilide agree that the determining factor is whether the putatively prohibiting offense was violent; only if so, does the court look to whether the individual currently poses a threat of physical violence to another* ...............................................6

    B.    **The Temporary Disarmament of Section 922(g)(8) Compared to the Indefinite Disarmament of Section 922(g)(1)** ............................9

    C.    **The Possibility of Relief under Section 925(c)** ...................................11

CONCLUSION ...................................................................................................13

CERTIFICATE OF COMPLIANCE .................................................................14

# TABLE OF AUTHORITIES

**CASES**

*Holloway v. Att'y Gen. United States*, 948 F.3d 164 (3d Cir. 2020)........................12

*Leocal v. Ashcroft*, 543 U.S. 1 (2004).................................................................8

*New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022)............passim

*Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025)..................................................passim

*Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024)..............................passim

*United States v. Rahimi*, 602 U.S. 680 (2024) .................................................passim

**STATUTES**

18 U.S.C. § 922 ................................................................................................passim

18 U.S.C. § 925 ........................................................................................ ii, 1, 11, 13

# INTRODUCTION

Pursuant to this Court's Order of May 21, 2025, Appellee submits this supplemental brief addressing: (1) the implications of *United States v. Rahimi*, 602 U.S. 680 (2024), *Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) (*en banc*) (*Range II*), and *Pitsilides v. Barr*, 128 F.4th 203 (3d Cir. 2025); (2) the constitutional significance, if any, between temporary disarmament described in 18 U.S.C. § 922(g)(8) and the indefinite disarmament described in 18 U.S.C. § 922(g)(1); and, (3) the possibility of relief under 18 U.S.C. § 925(c).

# ARGUMENT

### A.   The Implications of *Rahimi*, *Range*, and *Pitsilides*

As discussed *infra*, *Rahimi*, *Range II*, and *Pitsilides* all support the district court's decision that Section 922(g)(1), *as-applied* to Mr. Williams, is unconstitutional, as the Government failed to show that Mr. Williams' offense was violent and even if, *arguendo*, a DUI could be considered to be violent, it failed to submit *any evidence* that Mr. Williams currently poses a physical danger to others in possession of a firearm[1] and, to the contrary, the evidence of record establishes,

---

[1] Unlike in *Pitsilides*, upon the Supreme Court's decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), this case (prior appeal No. 19-2694) was remanded to the district court, where the Parties agreed that as discovery had already occurred and further discovery was unnecessary, the only

*(Contd.)*

as addressed at length in Mr. Williams' brief,[2] that he "has a normal personality, without psychopathology and without addition or violent tendencies" and that "Mr. Williams may possess a firearm without risk to himself or any other person." Appx73-74.

### 1. Rahimi

In *Rahimi*, the Supreme Court considered whether a law *temporarily*[3] prohibiting an individual from possessing a firearm was *facially* constitutional, where the underlying offense was violent, the deprivation was limited in duration—only occurring after a hearing where the defendant was provided due process—and the court order includes a finding that the individual currently "represent[s] a credible threat to the physical safety of [an] intimate partner." 602 U.S. at 680. In holding that Section 922(g)(8), which prohibits a person subject to a domestic violence restraining order from possessing a firearm for the duration of that restraining order, was not facially unconstitutional, 602 U.S. at 700, the Court reaffirmed its holding in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S.

---

outstanding issue could be addressed via cross-motions for summary judgment. Consistent therewith, the Court on October 11, 2022 issued a scheduling order addressing the timing for filing cross-motions for summary judgment.
[2] Brief of Appellee, pgs. 34-36.
[3] Consistent with the Court's Order, the temporal aspect of Section 922(g)(8) compared to the indefinite prohibition of Section 922(g)(1) will be discussed *infra*, in sub-section B, instead of in this section.

1 (2022) that modern firearm laws are presumptively unconstitutional unless the government can demonstrate, by proffering historical analogues that are similar in "how" and "why" they restrict the right to keep and bear arms, that they are "consistent with the principles that underpin our regulatory tradition" as well as "the principles underlying the Second Amendment." *Id*. at 692.

In "considering whether [Section 922(g)(8)] is consistent with the principles that underpin our regulatory tradition," *Rahimi* conspicuously focused on the Founding era. *Id*. It stressed that in the analogical process, "[i]f laws *at the founding* regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* (emphasis added). It also cautioned that that "[e]ven when a law regulates arms-bearing for a permissible reason … it may not be compatible with the right if it does so to an extent *beyond what was done at the founding*." *Id.* (emphasis added). And in analyzing Section 922(g)(8), the Court's analysis remained true to these statements, as it focused on what firearm regulation looked like contemporaneous with the Founding, when the Second Amendment was ratified. For instance, the Court noted that, although going back to "the earliest days of the common law" there were examples of laws disarming certain groups (including "political opponents [of the sovereign] and disfavored religious groups"), it treated those laws as having only limited value because they were largely defunct

3

by the Founding. *Id.*, at 694. The only laws of that type that were *not* defunct at the Founding—those "regulations targeting individuals who physically threatened others"—comprised the "two distinct legal regimes" of surety laws and "going armed" laws that formed the basis of the Supreme Court's decision. *Id.* In discussing these laws, the Court stressed their Founding-era bona fides, heavily based its understanding of them on Founding-era sources, and cited little from outside the Founding era. *See id.*, at 693–98 (chiefly citing Blackstone's *Commentaries on the Laws of England* and a 1795 Massachusetts statute to understand the way surety laws functioned and "targeted the misuse of firearms," and noting that four States had codified "going armed" prohibitions between 1741 and 1807). In fact, other than a citation to a 2010 case (which merely confirmed that these Founding-era traditions *remained* a part of the legal landscape today), *Rahimi* cited *nothing* in its assessment of historical evidence that post-dated the ratification of the Fourteenth Amendment in 1868.

Based on this historical evidence, the Court concluded that the Second Amendment is consistent with "what common sense suggests: When an individual poses *a clear threat of physical violence to another*, the threatening individual may be disarmed." *Id.* at 698 (emphasis added). Given the facts of Rahimi's own case, the Court had "no trouble concluding" that, in disarming him, Section 922(g)(8) on its face was consistent with that historical principle. *Id.* at 700. That being said, the

4

Court went out of its way to "reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible,'" because such a holding would not be administrable and would be subject to manipulation by courts; thereby, threatening to create an exception that swallows the rule. *Id*. at 701.

### 2. Range II

In *Range II*, this Court, *en banc*, addressed whether Mr. Range, who had a prior conviction for making a false statement to obtain food stamps, could successfully bring an *as-applied* challenge to Section 922(g)(1), where the offense was non-violent and there was no evidence that Mr. Range was likely to act in a violent or dangerous manner. 124 F.4th at 222. In reviewing *Rahimi* and its command that the Government prove that Range "pose[ ] a clear threat of physical violence to another" in order to, at least temporarily, strip him of his ability to exercise his right to bear arms, *id*. at 230, this Court had no difficulty in concluding that because the "record contains no evidence that Range poses a physical danger to others" and because "the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights," *id*. at 232.

      3.     *Pitsilides*

In *Pitsilides*, a panel of this Court vacated the district court's judgment in favor the Government and remanded the case for further consideration on the basis that the district court had considered the case under the pre-*Bruen* framework and that under *Bruen*, further factual development was necessary to determine whether Pitsilides' offense was violent[4] and if so, if he "continues to 'present a special danger of misus[ing firearms].'" 128 F.4th at 205, 210 (quoting *Rahimi*, 602 U.S. at 698).

      4.     *Rahimi, Range II, and Pitsilides agree that the determining factor is whether the putatively prohibiting offense was violent; only if so, does the court look to whether the individual currently poses a threat of physical violence to another*

Distilled down to their most simplistic, collective holdings, *Rahimi*, *Range II*, and *Pitsilides* stand for the rule that after determining that the issue before the court involves the Second Amendment and the challenger is one of the People—neither of which are challenged in this matter—the government must prove that the challenger was convicted of a violent offense. If the offense was non-violent, there is *no* historical basis to have *ever* denied the challenger his Second Amendment

---

[4] As this Court explained, "while bookmaking and pool selling offenses may not involve inherently violent conduct, they may nonetheless, depending on the context and circumstances," such as whether Pitsilides' gambling business was "consistent with a large-scale, cash-based criminal activity, such as organized crime" and whether the security guards "were armed." 128 F.4th at 213.


rights. However, on the other hand, if the government has proven that the challenger was convicted of a violent offense, the court then looks to whether the government has established that the individual *currently* poses a danger in possession of firearms.

And it is extremely telling that both the *Rahimi* Court and this Court in *Range II* and *Pitsilides* focused not on the past tense, but rather the *present* tense of whether the challenger poses a physical danger to others. *See, e.g.*, *Rahimi*, 602 U.S. at 693 (declaring that "the Second Amendment permits the disarmament of individuals who *pose* a credible threat to the physical safety of others") (emphasis added); *id.*, at 698 (declaring that "[w]hen an individual *poses* a clear threat of physical violence to another, the threatening individual may be disarmed") (emphasis added); *Range II*, 124 F.4th at 230 (declaring there exists "a tradition of disarming people who *pose* a clear threat of physical violence to another") (internal quotations omitted and emphasis added); *id.*, at 232 (declaring that "[t]he record contains no evidence that Range *poses* a physical danger to others") (emphasis added); Pitsilides, 128 F.4th at 210 (declaring that "disarmament is justified as long as a felon *continues* to present a special danger of misus[ing firearms]") (internal quotations omitted and emphasis added). And perhaps in no better example, in *Pitsilides*, this Court declared that its opinion in *Range II* evidenced that the determination regarding the constitutionality of Section 922(g)(1) *as-applied* to a

particular individual, after a determination that the convicted offense was violent, hinges on whether the challenger "*currently* present a special danger of misusing firearms." *Id.*, at 211 (emphasis added).

\*     \*     \*     \*

In turning to the instant matter, the Government contends that Mr. Williams is prohibited—in perpetuity—as a result of a single DUI conviction from 2004, even though that DUI did not involve violence, property damage or injury to another and the record is devoid of *any* evidence that Mr. Williams poses a physical danger to others. Appx55, ¶¶ 7-9; Appx56, ¶ 18; Appx57, ¶ 19. Rather, as reflected by the record in this matter (*see* Appx60-61), Mr. Williams' DUI offense was non-violent,[5] resulting in there being no historical basis for denying him his right to keep and bear arms. Even if, *arguendo*, there was a basis for a particular DUI being violent (*e.g.*, vehicular homicide while DUI), not only is that not reflective of Mr. Williams' DUI, but if it were, the government has failed to show that he has never acted physically violent towards anyone or that he has misused a firearm. In fact, the undisputed evidence of record proves that Mr. Williams "has a normal personality, without psychopathology and without addition or violent

---

[5] As argued before and agreed to by the district court, DUI does not constitute a crime of violence. *See*, Mem. Op. at 10; *see also*, *Leocal v. Ashcroft*, 543 U.S. 1, 4, 7–8 (2004).

8

tendencies" and that "Mr. Williams may possess a firearm without risk to himself or any other person." Appx73-74.

Resultantly, under the *Bruen* framework, the district court found in favor of Mr. Williams. And *Rahimi*, *Range*, and *Pitsilides* all support the district court's determination that Section 922(g)(1) is unconstitutional as applied to Mr. Williams, because "the Government has not carried its burden in proving that the United States' tradition of firearm regulation supports stripping an individual of their right to possess a firearm because they had previously driven while intoxicated." Mem. Op. at 10. Moreover, not only has the Government failed to prove that Mr. Williams' convicted offense was violent or that he currently poses a clear threat of physical violence to another as required by *Rahimi*, but the record in this matter establishes that Mr. Williams lacks violent tendencies and can possess a firearm without threat to himself or anyone else.

### B. The Temporary Disarmament of Section 922(g)(8) Compared to the Indefinite Disarmament of Section 922(g)(1)

In *Rahimi*, the Supreme Court, in reviewing the "how" and "why" of the historical analogues—*i.e.* the surety and "going armed" laws—placed significant

weight on the fact that Section 922(g)(8) was temporary, in conjunction with it "targeting individuals who physically threatened others." 602 U.S. at 694.[6]

Specifically, the Court noted that "like surety bonds of limited duration, Section 922(g)(8)'s restriction was *temporary*" as, under the facts before the Court, it would only apply to Rahimi for "one to two years after his release from prison." *Id.*, at 699 (emphasis added). And perhaps even more telling is the Court's ultimate holding only that "[a]n individual found by a court to pose a credible threat to the physical safety of another may be *temporarily* disarmed consistent with the Second Amendment." *Id.*, at 702 (emphasis added). If the temporal aspect of Section 922(g)(8)'s prohibition was not instrumental to the Court's conclusion, there was simply no reason or need for the Court to inject the word "temporarily" into the holding. Rather, because the constitutionality of Section 922(g)(8) hinged on its temporary nature of disarmament, its inclusion was necessitated.

In turning to this matter, unlike the temporary prohibition of Section 922(g)(8), there is no dispute that Section 922(g)(1) prohibits—in perpetuity—an individual, under its control, from being able to purchase, possess, and utilize firearms and ammunition. Moreover, unlike surety and "going armed" laws, Section 922(g)(1) does not provide a mechanism by which Mr. Williams could

---

[6] As discussed *supra*, the Court also "reject[ed] the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'" *Id.*, at 701.

10

post a bond or claim an exception for purposes of "self-defense or some other legitimate reason." *Id*., at 697.

Thus, as the district court found, Section 922(g)(1) is unconstitutional *as-applied* to Mr. Williams.

### C.    The Possibility of Relief under Section 925(c)

There is no possibility of relief under Section 925(c), as there is no current process or criteria for seeking relief.

As the Government previously acknowledged in the Joint Status Report of May 19, 2025 (Doc. 48, pg. 2), as a result of Executive Order No. 14206, § 2(b)(v), 90 Fed. Reg. 9503 (Feb. 12, 2025), "the Attorney General issued an interim final rule withdrawing the delegation of authority to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to administer 18 U.S.C. § 925(c)." However, as acknowledged by Attorney General Bondi, this was only a "first step" in the process, which requires "rulemaking consistent with applicable law, to give full effect to 18 U.S.C. 925(c)." Doc. 48, pg. 3. And the Government does not dispute that there is currently no statutory or regulatory basis for the Office of the Pardon Attorney to adjudicate any relief applications[7] nor is there a formal process or

---

[7] As the Government acknowledges, the Attorney General withdrew the delegation of authority from the ATF and resultantly, the power, currently, rests with her, as she has not re-delegated the authority to another governmental body.

defined criteria for applying. *Id.*, at 4-5. The Government also cannot explain, in the absence of any such formal process or defined criteria (*i.e.* framework), how it would ensure equal application of the law to all applicants. Are applicants, who have successfully litigated their claims before the federal court, establishing that any putative prohibition is unconstitutional, going to be provided preferential treatment—especially in an attempt to deny them the ability to file for attorney fees and costs relating to the successful litigation—over those who have yet to institute litigation or receive a favorable decision? How would it treat Mr. Holloway in comparison to Mr. Williams, since both have the same legal issue, but Mr. Holloway's claim was heard before *Bruen* and was denied based on a now defunct analysis. *See generally*, *Holloway v. Att'y Gen. United States*, 948 F.3d 164 (3d Cir. 2020). To apply for relief, does one have to agree to waive any challenge to the constitutionality of whatever subsection of Section 922 applies? If one applies for relief and is denied, although Section 925(c) provides for *de novo* review by the district court, what level of deference will be applied by the courts to the original determination? Can the individual, appealing pursuant to Section 925(c), at that point raise the constitutionality of Section 922 *as-applied* to them? Or, would the court lack jurisdiction to hear the appeal, if the individual is contending that there was no basis to grant relief, since, *as-applied* to him, the law was unconstitutional and thus, *void ab initio* and never having resulted in a prohibition in the first place?

These and numerous other issues will have to be addressed by the yet-to-be-announced rulemaking and is why the Attorney General referred to the withdrawal of the delegation as only the first step in giving the full effect to Section 925(c).

## CONCLUSION

For the foregoing reasons, this Court should affirm the holding of the district court and find that Mr. Williams is entitled to summary judgment on the grounds that 18 U.S.C. § 922 (g)(1) is unconstitutional *as-applied* to him.

Dated: June 17, 2025

Respectfully Submitted,

_____

Joshua Prince, Esq.
Attorney ID No. 306521
Joshua@PrinceLaw.com
Prince Law Offices, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
(888) 202-9297, ext 81114

*Counsel for Plaintiff-Appellee*

## CERTIFICATE OF COMPLIANCE

1. Attorney Joshua Prince is a member of the bar of this court.

2. This brief complies with the type-volume limit of the Court's Order of May 21, 2025 because it contains 2,917 words, excluding the parts of the brief exempted under Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

3. The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4. This document was scanned for viruses using Bitdefender Virus Scanner v. 3.18.277, and no virus was detected.

_Joshua Prince_
Joshua Prince